1  **JAMES FIFE**
   California State Bar No. 237620
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California  92101-5030
   Telephone No. (619) 234-8467
4  Email: james_fife@fd.org

5  Attorneys for Petitioner

6

7

8                 UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10             **(HONORABLE  JEFFREY T. MILLER)**

11  **IDRISA SESAY,**                          Case No.  07CV2354-JM (LSP)

12                        Petitioner,

13            v.                               **PETITIONER'S TRAVERSE**

14  **MICHAEL CHERTOFF, et al.,**

15                        Respondents.

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I    RESPONDENTS' PELICH ARGUMENT IS MERITLESS, BECAUSE IT IS
FORFEITED AND BASED ON CONDUCT OCCURRING PRIOR TO THE
START OF THE REMOVAL PERIOD, AND MR. SESAY HAS DONE
NOTHING DURING REMOVAL TO IMPEDE HIS DEPORTATION. . . . . . . . . . . . 2

   A.   Parameters for Suspension of the Removal Period Under 8 U.S.C.
        § 1231(a)(1)©. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   B.   The Suspension Claim Is Barred Due to ICE's Failure to Follow the
        Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

   C.   Suspension Does Not Apply to Pre-Removal Conduct. . . . . . . . . . . . . . . . . 5

   D.   Mr. Sesay Cannot Be Indefinitely Detained for Telling the Truth. . . . . . . . . . . 7

   E.   Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II   THE DOCTRINE OF UNCLEAN HANDS IS INAPPLICABLE HERE,
AS THE MISCONDUCT IS UNRELATED TO THE REMOVAL PROCESS. . . . . . 12

III  THERE IS GOOD REASON TO BELIEVE THAT REMOVAL IS NOT
SIGNIFICANTLY LIKELY IN THE REASONABLY FORESEEABLE
FUTURE UNDER ZADVYDAS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

EXHIBIT A-D

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## FEDERAL CASES

Abdel-Muhti v. Ashcroft,
    314 F. Supp.2d 418 (M.D. Pa. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,8,9,15

Andreasyan v. Gonzales,
    446 F.3d 1186 (W.D. Wash. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,10

Arevalo v. Ashcroft,
    344 F.3d 1 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13

Castillo-Gradis v. Turnage,
    752 F.2d 937 (C.D. Cal. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Davis v. Gonzales,
    482 F. Supp.2d 796, 802 (W.D. Tex. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Ford v. Quarantillo,
    142 F. Supp.2d 585 (D.N.J. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,10,11

Khan v. Gonzales,
    481 F. Supp.2d 638 (W.D. Tex. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,7

Jarrow Formulas, Inc. v. Nutrition Now, Inc.,
    304 F.3d 829 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Lema v. INS,
    341 F.3d 853 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Moro v. INS,
    58 F. Supp.2d 854, 858 (N.D. Ill. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10,15

Parra v. Perryman,
    172 F.3d 954 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Pelich v. INS,
    329 F.3d 1057 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,7,12,13

Rajigah v. Conway,
    268 F. Supp.2d 159, 165 (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10

Rogowski v. Reno,
    94 F. Supp.2d 177, 182 (D.Conn. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Seretse-Khama v. Ashcroft,
    215 F. Supp.2d 37, 51-53 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Singh v. Gonzales,
    448 F. Supp.2d 1214 (W.D. Wash. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,5,11

Ulysse v. DHS,
    291 F. Supp.2d 1318, 1324 n.11 (M.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 11

Zadvydas v. Davis,
    533 U.S. 678 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,5,10,11,12,13,14,15

## FEDERAL STATUTES

8 U.S.C. § 1231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,5,6,9,10,15

8 U.S.C. § 1231(a)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,3,4,5,8,10,11,16

18 U.S.C. § 1519 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## FEDERAL REGULATIONS

8 C.F.R. § 241.4(g)(1)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4,5,10

8 C.F.R. § 1241.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1

**MISCELLANEOUS**

2  General Accounting Office, Immigration Enforcement: <u>Better Data Controls Are Needed</u>
       <u>to Assure Consistency with the Supreme Court Decision on Long-Term Alien</u>
3      <u>Detention</u> (May 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

4  Office of Inspector General, Dep't of Homeland Security, <u>ICE's Compliance with</u>
       <u>Detention Limits for Aliens with a Final Order of Removal from the</u>
5      <u>United States</u> (Feb. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 │ **JAMES FIFE**
California State Bar No. 237620
2 │ **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 │ San Diego, California 92101-5030
Telephone No. (619) 234-8467
4 │ Email: james_fife@fd.org

5 │ Attorneys for Petitioner

6

7

8 │                          UNITED STATES DISTRICT COURT

9 │                        SOUTHERN DISTRICT OF CALIFORNIA

10 │                          **(HONORABLE JEFFREY T. MILLER)**

11 │ **IDRISA SESAY,**                    Case No. 07CV2354-JM (LSP)

12 │                    **Petitioner,**

13 │          **v.**

14 │ **MICHAEL CHERTOFF, et al.,**        **PETITIONER'S TRAVERSE**

15 │                    **Respondents.**

16

17

18 │                          __STATEMENT OF THE CASE__

19

20 │     Petitioner, Idrisa Sesay, also known as Mikey Jabbar, filed the instant Petition for Writ of Habeas Corpus

21 │ under 28 U.S.C. § 2241 on December 17, 2007. Mr. Sesay sought release under the authority of <u>Zadvydas</u>

22
23 │ <u>v. Davis</u>, 533 U.S. 678 (2001), because there was no significant likelihood of his removal to Sierra Leone or

24 │ any alternative destination in the reasonably foreseeable future.

25 │     Respondents filed their Return on March 7, 2008. Respondents argue the Petition should be denied,

26
27 │ because Mr. Sesay's statutory removal period has been extended under 8 U.S.C. § 1231(a)(1)(C), permitting

28 │ continued detention under <u>Pelich v. INS</u>, 329 F.3d 1057 (9th Cir. 2003). Return at 4-6. Respondents also

1  argue that relief should be denied because of unclean hands.  Return at 7.

2

3      For the reasons below, these contentions should be rejected, and this Court should grant the Petition.  The

4  Court set oral argument on the matter for March 28, 2008.

5

6                                              **ARGUMENT**

7                                                   **I**

8  **RESPONDENTS' <u>PELICH</u> ARGUMENT IS MERITLESS, BECAUSE IT IS FORFEITED AND**
   **BASED ON CONDUCT OCCURRING PRIOR TO THE START OF THE REMOVAL PERIOD,**
9  **AND MR. SESAY HAS DONE NOTHING DURING REMOVAL TO IMPEDE HIS**
10                                          **DEPORTATION.**

11

12     Respondents argue that Mr. Sesay's past conduct constitutes a failure to cooperate, allowing an extension

13  of the removal period under 8 U.S.C. § 1231(a)(1)(3) and indefinite detention under <u>Pelich</u>.  Return at 4-6.

14  They point to acts of supposed obstruction occurring in 1994, 2000, and 2006, long before Mr. Sesay's

15  removal hearing was held in February 2007.  Return at 2-3.  Their argument fails, for two basic reasons: (1)

16

17  Respondents' claim has been forfeited by their own inaction, and (2) Mr. Sesay has taken no bad faith actions

18  during the removal period to obstruct ICE's deportation efforts.

19

20  **A.   Parameters for Suspension of the Removal Period Under 8 U.S.C. § 1231(a)(1)(C).**

21

22     The provisions of 8 U.S.C. § 1231(a)(1)(C) allow the 90-day removal period to be extended for non-

23  cooperation in the removal efforts.  The seeming purpose of the statute is to avoid penalizing ICE for lack of

24  progress in a removal on account of a deportee's intransigence.  As such, it is an incentive to cooperate, not

25  a punishment for prior misconduct.  Consequently, the failure to cooperate should apply only to acts occurring

26

27  during the statutory removal period.  This is reflected in the language of the statute and related regulations.

28

See 8 U.S.C. § 1231(a)(1)(C) ("the removal period shall be extended . . . if the alien fails or refuses to make a *timely application in good faith* for travel or other documents . . . or conspires or acts to prevent the alien's removal *subject to an order of removal*"); 8 C.F.R. § 241.4(g)(1)(ii) (extension for non-cooperation applies "*before the expiration* of the removal period"); 8 C.F.R. § 241.4(g)(5)(iii) (effect of non-cooperation is "extending the removal period as provided by law, *if the removal period has not yet expired*") (emphasis added). The statute and regulations are not concerned with acts occurring *prior* to the entry of a final removal order, since such acts, though they may create hurdles for ICE, are not acts of bad faith or lack of cooperation with a known order. One cannot fail to cooperate with an order that does not even exist at the time of the acts. See Rogowski v. Reno, 94 F. Supp.2d 177, 182 (D.Conn. 1999) (because the statutory removal period had not yet started, detainee's acts could not trigger suspension under § 1231(a)(3)(C)).

In Mr. Sesay's case, he was transferred to ICE custody in October 2006 and had his first appearance before an immigration court in December of that year. After continuances to obtain counsel, the removal hearing was held in February 2007. He was ordered removed in May 2007 and waived appeal, so his removal order was administratively final, starting the removal period. See 8 U.S.C. § 1231(a)(1)(B)(i); 8 C.F.R. § 1241.1(b). The three acts of obstruction alleged by Respondents occurred prior to the removal proceedings, as far back as 13 years earlier. The purported obstruction manifestly falls outside the scope of the removal period, and so cannot be considered obstruction "to prevent the alien's removal" as Mr. Sesay was not "subject to an order of removal" as required by the statute.

/ / /

**B.   The Suspension Claim Is Barred Due to ICE's Failure to Follow the Regulations.**

Respondents have forfeited their right to seek an extension of the removal period under § 1231(a)(1)(C), because they failed to serve Mr. Sesay with a notice of non-compliance before the end of the removal period, as required by regulations.  In <u>Singh v. Gonzales</u>, 448 F. Supp.2d 1214 (W.D. Wash. 2006), the court held that the Government was precluded from raising the suspension provisions of § 1231 to excuse a prolonged detention, because it had failed to fulfill the requirement of 8 C.F.R. § 241.4(g)(5)(ii) to serve the deportee within the removal period with notice of a failure to comply.  <u>See id.</u> at 1219:

> Here, ICE failed to comply with its own regulations when it purported to extend petitioner's detention pursuant to INA § 241(a)(1)(C) without issuing a Notice of Failure to Comply within the 90-day removal period, indicating that petitioner is not in compliance and what steps he must take to be in compliance. Rather, respondents did not issue a Notice of Failure to Comply until January 21, 2005-seventeen months after the 90-day removal period expired. Although respondents issued a Warning for Failure to Depart in August 2003, the warning is merely a form given to every detainee and provides no indication that petitioner has failed to cooperate or that the removal period has been extended. (Dkt. # 15 at R136). According to the Code of Federal Regulations, Notice of Failure to Comply and extension of the removal period must be provided before the removal period expires. 8 C.F.R. § 241.4(g)(1)(ii)(requiring that ICE provide notice of failure to comply "before the expiration of the removal period"); <u>see also</u> 8 C.F.R. § 241.4(g)(1)(iii)(providing that ICE shall advise the alien that the notice of failure to comply shall extend the removal period, "if the removal period has not yet expired."). Consequently, ICE cannot rely on Section 241(a)(1)(C) to extend the removal period that expired seventeen months earlier.

Here, Mr. Sesay has openly and consistently asserted since February 2007 that he is Sudanese.  <u>See</u> Return Exhibits at 32.  Despite this, ICE proceeded solely with an attempt to remove him to Sierra Leone, even though it was aware of his contrary claims of identity and origin.  <u>See</u> Return at 3; Return Exhibits at 36, 44.  Mr. Sesay's 90-day removal period started on May 10, 2007, when his order was final; it expired on August 8, 2007.  His custody review on August 12, 2007, provides no indication that Mr. Sesay had failed

to cooperate.  See Return at 47.  The mandatory "Notice of Failure to Comply Pursuant to 8 CFR 241.4(g)" was not issued and served on Mr. Sesay until **December 11, 2007**, over four months after his removal period had expired.  See Return Exhibits at 49-50.[1]  Accordingly, as in Singh, ICE was too late in serving the required notice of non-compliance to insist now that § 1231(a)(1)(C) suspended the removal period.  Because "ICE failed to comply with its own regulations," it cannot use the suspension provisions as an excuse for not obeying Zadvydas.  See Singh, 448 F. Supp.2d at 1219; 8 C.F.R. § 241.4(g)(5)(iii).

**C.  Suspension Does Not Apply to Pre-Removal Conduct.**

Even if the suspension provisions were not barred by regulations per Singh, Respondents' argument fails on the merits.  The district courts which have directly addressed this issue have held that acts occurring prior to the removal period do not come within the purview of the § 1231 suspension.  In Khan v. Gonzales, 481 F. Supp.2d 638 (W.D. Tex. 2006), the deportee had been convicted previously of knowingly destroying his identity documents under 18 U.S.C. § 1519.  See id. at 640.  Nonetheless, the court rejected the Government's claim that this prior act constituted an obstruction triggering the suspension provisions of § 1231(a)(1)(C).  See id. at 641-42.  That is because suspension is allowed only for acts *during* the removal period.  See id.  As regards his conduct after the removal, Khan had cooperated by filling in forms, providing his expired passport, and participating in three interviews with the consulate.  See id. at 642.  While the prior destruction of his documents made ICE's job more difficult, it did not count as obstruction *of the removal* under the statute, and the court granted release on habeas corpus.

---

[1] Coincidentally, ICE did not serve Mr. Sesay with its standard I-229 warning until after he filed his habeas corpus petition.  See Return Exhibits at 59-62.

1    Similarly, in Abdel-Muhti v. Ashcroft, 314 F. Supp.2d 418 (M.D. Pa. 2004), a case cited by Khan, the

2

3    writ was granted despite the Government's claim that the removal period had been suspended under § 1231.

4    Although the record showed that the deportee had, in the past, provided multiple, conflicting accounts of his

5

6    origins and nationality, these acts occurred *before* the start of the removal period, and so did not qualify to

7    trigger § 1231. See id. at 429. Instead, during the removal process, Abdel-Muhti provided a consistent

8

9    argument that he was Palestinian, which was supported by corroborating evidence. See id. at 428.

10    Mr. Sesay's case is comparable to Khan and Abdel-Muhti. Although–in order to remain in the United

11

12    States and obtain status to work–Mr. Sesay had in the past maintained his false Sierra Leonean identity, at no

13    point during the removal proceedings did he claim to be from Sierra Leone, and he consistently stated he was

14

15    Sudanese.[2] See Return Exhibits at 32 (Notice to Appear indicating denial of Sierra Leonean citizenship and

16    claiming Sudanese origin). Likewise, Mr. Sesay asserted his true name from the start of the removal

17

18    proceedings. See Return Exhibits at 35 (IJ decision noting "aka Mikey Jabbar"); Exhibit B attached hereto

19    (IJ's minute from initial hearing noting name "Mikey Jabbar" and denial of Sierra Leonean citizenship). While

20    removal proceedings were pending, Mr. Sesay confirmed and supported these assertions by filing an asylum

21

22    claim indicating his Sudanese nationality. See Exhibit C attached hereto.[3] Like the petitioners in Khan and

23

24        [2] Mr. Sesay denies the allegation he told an ICE officer he was from the Virgin Islands, as Respondents claim. Return at 3. As his Declaration attached hereto as Exhibit A indicates, Mr. Sesay stated to the ICE officer that he had used identity papers belonging to someone from the Virgin Islands, not that he himself claimed that origin. Exhibit A at 3.

25

26        [3] Respondents failed to include the contrary evidence contained in the asylum claim in their Exhibits, claiming the need to protect Mr. Sesay's privacy rights. Return at 3 n.2. However, Respondents had no qualms about including in their Exhibits the equally confidential probation officer's report, even though the details of Mr. Sesay's criminal history have nothing to do with the legal issues in this case. See Return Exhibits at 15-26.

27

28

<u>Abdel-Muhti</u>, Mr. Sesay has cooperated fully from the start of his removal process, and the prior acts do not suffice under the statute to trigger suspension.

These cases contrast factually with cases like <u>Pelich</u> and <u>Lema v. INS</u>, 341 F.3d 853 (9th Cir. 2003), where the deportees' conduct included acts occurring *during the removal period*, such as refusing to fill in applications proffered by ICE. No such acts have been alleged by Respondents here, because Mr. Sesay has never refused to provide what documents he has, sign applications, or conduct interviews with consulates as directed by ICE. <u>Cf.</u> <u>Khan</u>, 481 F. Supp.2d at 642 (listing these very acts as showing cooperation during removal). Neither of the custody reviews in Mr. Sesay's case indicates that he has refused to fill in forms or conduct interviews. <u>See</u> Return Exhibits at 47, 57. The only obstruction cited is his truthful insistence that he is Sudanese. Return Exhibits 47, 49, 57. Mr. Sesay has complied, to the extent possible, with all the requirements placed on him by ICE. <u>See</u> Return Exhibits at 60, 62.

**D.    <u>Mr. Sesay Cannot Be Indefinitely Detained for Telling the Truth.</u>**

Respondents seek to get around this requirement of a within-period obstruction by basing their argument on the existence of a discrepancy between the prior information and his present assertions of Sudanese origin. Return at 5-6. But their argument contradicts itself. Although for <u>Pelich</u> purposes, Respondents insist that the Sierra Leone story of Mr. Sesay's origins is the truth and the Sudan claim a lie, Return at 5-6, to support their unclean hands defense, they have to reverse course and claim that the *prior* story was the falsehood, which must entail that the current claim of Sudanese origin is *true*. <u>See</u> Return at 7. The evidence is manifestly ambivalent, as Respondents acknowledge. Return at 5 (stating Mr. Sesay "lied *either* in his [earlier

statements] or in his asylum application [and] in his instant, verified Petition") (emphasis added). Although Respondents claim that the Sierra Leone story is more likely true, because Mr. Sesay was able to renew the false passport in 1994, Return at 5, this is contradicted by the evidence that the Sierra Leone consulate–after investigation–found that (1) the passport receipt was suspicious; (2) that they had no record of Idrisa Sesay or Sesay Idrisa; and (3) there was no record of the false passport number. See Exhibit A at 3-4. It was this basis, not Mr. Sesay's assertion of Sudanese origin, which prompted the refusal from the Sierra Leone consulate.

A deportee who has given different accounts of his origins, but then maintains a consistent, good faith nationality claim during the removal period, and cooperates on that basis, cannot be considered obstructionist so as to trigger the § 1231(a)(1)(C) extension. This is obvious from the holding in Abdel-Muhti, where the conflicting prior claims did not vitiate a consistent, substantiated, within-period claim of a different nationality. The Abdel-Muhti court rejected the Government argument that the obstruction was on-going, because Abdel-Muhti continued to maintain his Palestinian nationality despite ICE's belief he was Honduran. The fact that ICE insists on a nationality denied in good faith by the deportee does not trigger the suspension provisions. As the court stated, "the law does not authorize ICE to continue Petitioner's detention until he supplies answers it likes." 314 F. Supp.2d at 430 n.9. See also Ford v. Quarantillo, 142 F. Supp.2d 585, 588 (D.N.J. 2001) (although alien had misrepresented his origin at first, correcting it before the removal period expired precluded application of § 1231(a)(1)(C) suspension); see also Andreasyan v. Gonzales, 446 F.3d 1186, 1190 (W.D. Wash. 2006) (subsequent compliance moots the claim of non-cooperation).

Likewise, in <u>Seretse-Khama v. Ashcroft</u>, 215 F. Supp.2d 37, 51-53 (D.D.C. 2002), the fact that the

deportee honestly told the consul on the phone that he did not want to return to Liberia, prompting a refusal,

was not an act of obstruction triggering § 1231 suspension.  <u>Accord</u> <u>Rajigah v. Conway</u>, 268 F. Supp.2d 159,

165 (E.D.N.Y. 2003).  Indeed, on closer look, the facts showed that the consulate did not reject Seretse-

Khama solely because of his statement, but also because Liberia was reluctant to accept back a deportee with

no ties to the country and who would become a public charge.  <u>Id.</u> at 52; <u>cf.</u> General Accounting Office,

<u>Immigration Enforcement: Better Data Controls Are Needed to Assure Consistency with the Supreme Court</u>

<u>Decision on Long-Term Alien Detention</u> 21 (May 2004) (noting countries' reluctance to accept deportees who

left the country many years before and have no support network).  Here, even if it is true that the Sierra Leone

consul disbelieved Mr. Sesay was Sudanese, as Respondents' exhibits claim, <u>see</u> Return Exhibits at 44, 54,

that does not mean he would have been otherwise accepted for "repatriation," in light of the fact that he has

lived in Chad, South Africa, and the United States for the last three decades.  <u>See</u> Exhibit A at 2.[4]

In essence, Respondents now want to penalize Mr. Sesay for coming clean at his removal hearing and

telling the truth about his origins.  They fault him for failing to provide information to support a false claim

of Sierra Leonean nationality, a situation akin to one the judge in <u>Abdel-Muhti</u> described as "Kafkaesque."

314 F. Supp.2d at 430 n.9.  Mr. Sesay cannot be detained until he provides ICE with "answers it likes" or for

---

[4] The Inspector General of DHS found that some ICE offices applied incorrect legal standards, "the most serious being the misapplication of the failure to comply standard and resulting suspension of the" custody review process.  The ICE officers at times treated denial from the destination countries as constituting a failure to comply *by the detainee*.  <u>See</u> Office of Inspector General, Dep't of Homeland Security, <u>ICE's Compliance with Detention Limits for Aliens with a Final Order of Removal from the United States</u> 9, 17-18 (Feb. 2007).

telling the consul the truth. See Rajigah, 268 F. Supp.2d at 165-66 (it was not obstruction for deportee truthfully to tell consul that he was considering further court action, even though consulate had policy to refuse documents in such cases). Nor can it detain him for failing to provide documents which it is impossible for him to obtain. See Moro v. INS, 58 F. Supp.2d 854, 858 (N.D. Ill. 1999) (§ 1231 suspension does not apply where deportee cannot provide a non-existent birth certificate). Moreover, once the lack of cooperation ends, ICE is allowed only "a reasonable period of time in order to effect the alien's removal." 8 C.F.R. § 241.4(g)(1)(ii). Thus, the suspension under the statute is confined by strict limits to non-cooperation *during* the removal period and only for as long as the non-cooperation lasts. See Ford, 142 F. Supp.2d at 588 (return to cooperation precludes application of suspension provisions); Andreasyan, 446 F. Supp.2d at 1190 (cooperation moots claim of non-compliance).

**E.    Conclusion.**

Ultimately, the determination of whether Mr. Sesay is entitled to Zadvydas relief despite accusations of non-cooperation must be decided on a broader perspective than Respondents urge. They argue the Court should focus solely on the existence of discrepant versions of Mr. Sesay's origins. However, the Court must, under the case law and statute, consider the timing of the statements and whether they were part of the removal procedure or made in a separate context unrelated to ICE's efforts to secure travel documents for removal.

The Court must also consider ICE's failure to comply with the regulations, even when it knew for months before the removal period expired that Mr. Sesay denied he was Sierra Leonean and claimed he was from the

Sudan.    Only in February 2008 did ICE make any efforts–at Mr. Sesay's instigation–to secure travel

permission from the Sudan.  See Exhibit A at 4.  When non-removal is the result of ICE's own inaction during

the removal period, it cannot claim suspension per § 1231(a)(1)(C).  See Ulysse v. DHS, 291 F. Supp.2d 1318,

1324 n.11 (M.D. Fla. 2003) (suspension does not apply when ICE made no efforts to deport during removal

period).  And, as argued above, inaction by ICE in providing notice of non-compliance during the removal

period forecloses reliance on suspension to excuse delay in removal.  See Singh, 448 F. Supp.2d at 1219.

Finally, the detention-cooperation argument must be viewed on a sliding scale: the longer the detention,

the higher the burden on the Government to show lack of compliance.  See Davis v. Gonzales, 482 F. Supp.2d

796, 802 (W.D. Tex. 2006) ("as the length of Petitioner's confinement grows, so must the amount of evidence

the Government presents to support a finding of non-cooperation") (citing Abdel-Muhti).  As Mr. Sesay has

been held in civil detention four months beyond the presumptively reasonable period of detention under

Zadvydas, Respondents' burden to show obstruction during the removal process should be quite high.  Given

their own expressed ambivalence about the evidence, Return 5, 7, their claim that suspension excuses the

prolonged delay in removal under § 1231(a)(1)(C) applies should be rejected.[5]

/ / /

---

[5] Respondents' cited case law is inapposite and adds nothing to their argument.  Return at 6.  Parra v. Perryman, 172 F.3d 954 (7th Cir. 1999) (which Respondents mistakenly cite as a Ninth Circuit case) related to a non-final removal order and, contrary to this Circuit's law, treated petitioning for review as an act of obstruction.  Castillo-Gradis v. Turnage, 752 F.2d 937, 940 (C.D. Cal. 1990) (which Respondents miscite to page 941), was a case applying a pre-Zadvydas standard of prolonged detention based on "unusual circumstances."  Nonetheless, Castillo-Gradis held the alien did nothing to delay his removal and granted release.  Likewise, Ford and Moro, in proper context, are cases which support Mr. Sesay's position, not Respondents'.  See supra Argument I.D.

11

## II

## THE DOCTRINE OF UNCLEAN HANDS IS INAPPLICABLE HERE, AS THE MISCONDUCT IS UNRELATED TO THE REMOVAL PROCESS.

In what is just a variant of the <u>Pelich</u> argument, Respondents argue that because of "previous, perjurious statements," Mr. Sesay is barred from receiving relief on habeas corpus. Return at 7. Respondents' argument lacks merit.

Contrary to Respondents' view, the unclean hands doctrine does not apply simply because the party opponent can point to some unanchored misconduct by the petitioner. "However, unclean hands does not constitute 'misconduct in the abstract, unrelated to the claim to which it is an asserted defense.' " <u>Jarrow Formulas, Inc. v. Nutrition Now, Inc.</u>, 304 F.3d 829, 841 (9th Cir. 2002) (citation omitted). Rather, the supposed misdeed must be material to the issues in the case. Here, the Petition claims excessive delay by ICE in bringing about Mr. Sesay's removal from the country. For the reasons stated above in Argument I, the only actions which are material to this issue are those which attend the actual removal proceedings. Acts by Mr. Sesay in an unrelated, separate context which happen to impede ICE's monocular attempts to secure removal to Sierra Leone cannot be raised now as instances of deceptive conduct *in the present issue of timely removal*. Mr. Sesay's prior acts were not an attempt to delay or obfuscate a final removal order. Respondents cannot claim that an act intended to secure a passport *from another government* should be considered aimed at impeding removal efforts 13 years in the future.

Even if the unclean hands doctrine operated as sweepingly as Respondents claim, case law shows it does not bar <u>Zadvydas</u> relief. In <u>Arevalo v. Ashcroft</u>, 344 F.3d 1 (1st Cir. 2003), the petitioner had used a false

name, and the Government raised unclean hands as a defense to her claim that she was denied the right to seek

discretionary relief. <u>See</u> <u>id.</u> at 15. The Court of Appeals stated "[t]his argument is wide of the mark," since

unclean hands applies only " 'when the claimant's misconduct is directly related to the merits of the

controversy between the parties [and] "in some measure affect[s] the equitable relations between the parties

in respect of something brought before the court for adjudication." ' " <u>Id.</u> (citations omitted; alterations by

<u>Arevalo</u>). Because her lying on the application for relief was unrelated to the merits of the legal claim she

raised, unclean hands did not apply. <u>See</u> <u>id.</u> But more importantly for purposes of this case, <u>Arevalo</u>

immediately went on to recognize the viability of the petitioner's <u>Zadvydas</u> claim and remanded for further

proceedings. <u>See</u> <u>id.</u> at 15-16. It follows that, if the unclean hands doctrine does not bar <u>Zadvydas</u> habeas

relief because of a petitioner's use of a false name to secure discretionary relief from removal, no act by

Mr. Sesay *occurring prior to and unconnected with* the removal order can either. The Court should reject the

unclean hands reasoning.

**III**

**THERE IS GOOD REASON TO BELIEVE THAT REMOVAL IS NOT SIGNIFICANTLY
LIKELY IN THE REASONABLY FORESEEABLE FUTURE UNDER <u>ZADVYDAS</u>.**

Respondents never directly dispute the applicability of <u>Zadvydas</u>, but claim that relief is barred under

<u>Pelich</u>. The record here is clear that Mr. Sesay is not removable anytime in the reasonably foreseeable future,

as both Sierra Leone and the Sudan have refused to accept him.

To obtain release under <u>Zadvydas</u>, a detainee must show "good reason to believe that there is no

significant likelihood of removal in the reasonably foreseeable future." 553 U.S. at 701. Once such a

13

showing is made, the burden shifts to the Government to show removal is imminent. See id.

Here, Respondents admit that Sierra Leone "has been unwilling to issue a travel document for his repatriation" to that country. Return at 3. The ICE official writing Mr. Sesay's latest custody review was even more definite: "the Sierra Leone consulate notified ICE that a travel document could not be issued to him . . . ." Return Exhibits at 57. Both the Return and the ICE officer attribute this to Mr. Sesay's claim of Sudanese citizenship. Mr. Sesay maintains, however, that the refusal has a different basis. The Sierra Leone consul acknowledged that the passport forwarded to him by ICE was suspicious and that, on investigation, there was no record of Mr. Sesay or of that passport number. See Exhibit A at 3-4.

This explanation is more plausible than Respondents', since there is no reason that a Sudanese national may not become a Sierra Leonean citizen; the two claims are not necessarily exclusive. In addition, ICE reports that, after the first telephone interview in June 2007, the Sierra Leone consul "doesn't believe" Mr. Sesay's claim to be Sudanese. See Return Exhibits at 44. However, after the consul had investigated the matter of the false passport and the existence of "Idrisa Sesay" or "Sesay Idrisa" in their records, during the *second* telephonic interview in August 2007, the consul rejected the claim of Sierra Leonean status. The difference between the first and second response is not due to a changed belief in the claim of Sudanese origin, but more likely the result of concrete investigation into the validity of the false passport. Under this account, Sierra Leone's refusal is not based on any act of Mr. Sesay, but on the objective basis that his documents are counterfeit.

Because he is willing to return to his country of origin, Mr. Sesay initiated efforts to obtain travel

documents to the Sudan.[6]  At his insistence, ICE arranged a telephone interview with consular officials in the Sudanese embassy in February 2008.  See Exhibit A at 4.  Although the consular officer found Sudanese origin credible based on Mr. Sesay's knowledge of conditions in the country, cf. Abdel-Muhti, 314 F. Supp.2d at 429, he was not able to issue permission for repatriation absent documentary proof, like a birth certificate.  Id.  This was confirmed in a letter to ICE following the interview.  See Exhibit D attached hereto.  As Mr. Sesay was not born in a hospital and has no birth certificate from the Sudan, he cannot provide the necessary documentation to satisfy the embassy.  See Exhibit A at 1.  However, this refusal based on the inability to produce non-existent documents does not vitiate a Zadvydas claim, as ICE cannot ask the impossible.  See Moro, 58 F. Supp.2d at 858 (Romani without birth certificate cannot be considered non-compliant for not providing required documents).

A claim for relief under Zadvydas has two requirements: prolonged detention and good reason to believe there is no significant likelihood of removal in the reasonably foreseeable future.  Here, Mr. Sesay has been in civil custody since October 2006 and four months longer than the reasonable limit set by the Supreme Court.  With definitive refusals from both the designated destination country and the most likely alternative, there is no significant likelihood of removal in the reasonably foreseeable future under Zadvydas.  Accordingly, Mr. Sesay must be released from Respondents' custody.

/ / /

---

[6] The minute order from the initial removal hearing on February 7, 2007, indicates Sudan as an alternative destination.  See Exhibit B.  Inexplicably, the removal order issued on May 10, 2007, states only Sierra Leone as a destination.  See Return Exhibits at 35.

# CONCLUSION

For the above reasons, and those stated in the Petition, the Court should grant the writ of habeas corpus ordering Mr. Sesay's release forthwith on appropriate conditions of supervision. See 8 U.S.C. § 1231(a)(3).

Respectfully submitted,

Dated:                                    _s/ James Fife_____

**JAMES FIFE**
**Federal Defenders of San Diego, Inc.**
Attorneys for Petitioner SESAY
james_fife@fd.org

Exhibit A

1 | **JAMES FIFE**
California State Bar No. 237620
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, California 92101-5030
Telephone No. (619) 234-8467
4 | Email: james_fife@fd.org

5 | Attorneys for Petitioner

6

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE JEFFREY T. MILLER)**

11 | IDRISA SESAY,                           Case No. 07CV2354-JM (LSP)

12 | Petitioner,

13 | v.

14 | MICHAEL CHERTOFF, et al.,        **PETITIONER'S DECLARATION IN**
                                      **SUPPORT OF TRAVERSE**
15 | Respondents.

16

17

18 | I, Idrisa Sesay, declare:

19

20 | 1.    I am the Petitioner in the above-captioned habeas corpus action. If called to testify, I would be

21 |       a competent witness to the facts attested to below in this Declaration.

22

23 | 2.    I am a native-born national of Sudan. My true name is Mikey Jabbar. I was born in the village

24 |       of Toray in South Darfur in Sudan. My parents were Episcopal Christians and members of the

25 |       minority Dinka tribe. Because I was born at home, I have no official birth certificate. I do not

26

27 |       know my actual birthdate, but I was born in 1971 or 1972.

28

3.  My father was a farmer and a church deacon before he was killed by members of the Muslim Janjaweed militia in an effort to take over his farm. After my father's death, my mother fled Darfur along with my siblings and me.

4.  When I was about eight years old, my mother gave me to a businessman named Hassan Dossa, who took me to Chad. I lived there for about 18 months and sold fruit on the street at the orders of Hassan Dossa.

5.  After a year and a half, Hassan Dossa took me to South Africa and eventually sold me to a farmer named Johannes Sepat. Sepat and his family lived on a farm at the Khomani San Community.

6.  I was forced to work for the Sepats and suffered physical and emotional harm from hard labor, beatings, and lack of adequate food. I was required to work from 5:00 in the morning, doing domestic chores and filling the water tanks and watching the Sepat children. I was not allowed to speak to anyone outside the family, and I was afraid I would be killed if I tried to escape. On one occasion, the Sepat children set the family dog on me. I was bitten and had to be taken to a clinic.

7.  Around 1986, Sepat obtained a false Sierra Leone passport in the name of Idrisa Sesay, which he used to bring me to New York. I was again not allowed to leave the house, and I was tied up to prohibit escape if the family left the house. The family later moved to Maryland, where I was able to escape after three years.

8.  After escaping, I was homeless for six months. I was befriended by a man named James

Robinson, who was sick with cancer. Mr. Robinson sent me to adult school to learn to read and write. After two years, Mr. Robinson died, and I traveled to California and Tennessee.

9.    In Tennessee I met Teena Case, who became my girlfriend. I was too haunted and ashamed of my past to tell her about it at first. She was a Christian, and she introduced me to her church community. Eventually, I was able to testify to the community about my past, the abuse I had suffered, and about my true name and origins.

10.    Because I had no legal basis to be in the country, I took advantage of the supposed passport from Sierra Leone to remain in the United States. I also used documents that belonged to someone who was from the Virgin Islands, but I never told ICE that I was from the Virgin Islands. I explained all this to the immigration case judge in open court how I was using the papers in order to obtain work, since I was desperate and had no other way of earning a living. I tried to change my name to my true birth-name, but I could not legally do so, because I lacked a birth certificate.

11.    I have never failed to cooperate with ICE's efforts to remove me. However, I truthfully told the Sierra Leone consul on a speaker-phone interview at which ICE officials were present and listening in, that I am not from Sierra Leone, but the Sudan, and that the passport used to come to the United States was not genuine. The consular official stated the receipt on the passport sent by ICE did not look correct and that he would have to investigate the passport, since it is illegal to accept return of deportees who are not citizens of Sierra Leone.

12.    Later, after my 90-day custody review, ICE asked me to participate in another telephone interview

3

with the Sierra Leone consulate. The consul said that they cannot find me listed in their system and as far as the embassy can tell, the passport was not issued by them, as the number does not match up in their records.

13.   I have filled in every form ICE has requested of me, and I have volunteered to assist ICE in obtaining travel permission to return to Sudan. To that end, I participated in a telephone interview with the Paul. A. Ujwok at the Embassy of the Sudan in February 2008. Although Mr. Ujwok acknowledged that I seemed familiar with the Sudan, without an official document showing Sudanese citizenship, he cannot issue a travel document for me. He later sent me a letter confirming this fact.

14.   I have cooperated with ICE efforts to remove me to the fullest extent I can. Sierra Leone's refusal to accept me is based on my true statements that I am not a native or citizen of that country and have never been there in my life. Despite my providing all the proof I have of my being a native of Sudan, the embassy cannot accept my return there without documentation, which I do not have.

I am very willing to return to my native country of Sudan, if they will accept me.

I declare under penalty of perjury that the foregoing is true and correct, except for matters stated to be on information and belief, and as to those matters, I believe them to be true.

Executed this _18_ day of March, 2008, at San Diego, California.

_____
**IDRISA SESAY**
Declarant

Exhibit B

**U.S. Department of Justice**
Executive Office of Immigration Review

# Record of Master Calendar Pre-Trial Appearance and Order

Name: _Mikey Jabbar aka Idrissa Sesay_          Date: _2/7/2007_

File No.: _A77 062 688_          Language: _English_

Presiding Judge: HON. _ZsaZsn DePaolo_

Government's Attorney: _J.S.        F Lindblad_

Respondent/Applicant Attorney: _Kudjoi_
_237(a)(C)(A)_

Removability/Deportability/Excludability:    ☑ CONCEDED    ☐ CONTESTED

Factual Allegations No.: _1,3,4_ ADMITTED _2,5,6_ DENIED

Relief Sought: _Withholding, CAT_

Country of choice for Removal/Deportation purposes: _____

The parties acknowledge receipt of a copy of this record and order and have no objections to the contents herein.

X _____    X _____    X _____
Government Attorney         Respondent/Applicant         Respondent/Applicant Attorney

## ORDER

The Court directs _Sierra Leon / Sudan_ _____ as the country for deport/removal purposes.

All relief applications and documents in support thereof must be filed no later than _March 23, 2007_ or by such date as may be extended by the Immigration Judge. Failure to timely file the relief applications will result in the conclusion that such applications are abandoned.

A pre-hearing statement of position must be filed by the respondent: ☐ GOV'T ☐ both parties ☑ no later than _March 23, 2007_

Opposing party's statement due by: _____

All filings and submissions must comply with local operating procedures of the San Diego Immigration Court. A copy of the local procedures may be obtained from Court staff.

Individual Calendar Trial Date: _____ at _____ am/pm.

Master Calendar re-set Date: _March 23, 2007_ at _8:30_ am/pm.

Notes: _____

So ordered _____
United States Immigration Judge

U.S. GOVERNMENT PRINTING OFFICE: 2005-313-690

EOIR Form-55
August 2003

Exhibit C

U.S. Department of Homeland Security
Bureau of Citizenship and Immigration Service
U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1615-0067; Expires 9/30/03

# Application for Asylum and for Withholding of Removal

*Start Here- Please Type or Print.* **USE BLACK INK. SEE THE SEPARATE INSTRUCTION PAMPHLET FOR INFORMATION ABOUT ELIGIBILITY AND HOW TO COMPLETE AND FILE THIS APPLICATION.** (Note: There is NO filing fee for this application.)

*Please* check the box if you also want to apply for withholding of removal under the Convention Against Torture.  ☒

## PART A.I.  INFORMATION ABOUT YOU

| | |
|---|---|
| 1. Alien Registration Number(s)(A #'s) *(if any)*  **A77 062 688** | 2. Social Security No. *(if any)*  **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** |

| | | |
|---|---|---|
| 3. Complete Last Name  **Jabbar** | 4. First Name  **Mikey** | 5. Middle Name |

6. What other names have you used *(Include maiden name and aliases.)*
**Sesay Idrisa; Cisse Idrisa**

| 7. Residence in the U.S.  C/O  **DHS Custody** | Telephone Number |
|---|---|
| Street Number and Name  **446 Alta Road** | Apt. No. |
| City  **San Diego** | State **CA** | ZIP Code |

| 8. Mailing Address in the U.S., if other than above | Telephone Number |
|---|---|
| Street Number and Name | Apt. No. |
| City | State | ZIP Code |

| 9. Sex  ☒ Male  ☐ Female | 10. Marital Status:  ☒ Single  ☐ Married  ☐ Divorced  ☐ Widowed |
|---|---|

| 11. Date of Birth *(Mo/Day/Yr)*  **00/00/1971** | 12. City and Country of Birth  **Toray**  **Sudan** |
|---|---|

| 13. Present Nationality *(Citizenship)*  **Sudanese** | 14. Nationality at Birth  **Sudanese** | 15. Race, Ethnic or Tribal Group  **Dinka** | 16. Religion  **Christian** |
|---|---|---|---|

17.  Check the box, a through c that applies:
a. ☐ I have never been in immigration court proceedings.
b. ☒ I am now in immigration court proceedings.
c. ☐ I am **not** now in immigration court proceedings, but I have been in the past.

18. *Complete 18 a through c.*
a. When did you last leave your country?  *(Mo/Day/Yr)*  **1983**    b. What is your current I-94 Number, if any?

c. Please list each entry to the U.S. beginning with your most recent entry.
List date *(Mo/Day/Yr)*, and your status for each entry.  *(Attach additional sheets as needed)*

| Date | **1986** | Place | **New York** | Status | **Visitor** | Date Status Expires | **1987** |
|---|---|---|---|---|---|---|---|
| Date | | Place | | Status | | | |
| Date | | Place | | Status | | | |
| Date | | Place | | Status | | | |

| 19. What country issued your last passport or travel document  **Sierra Leone** | 20. Passport #  **? False Passport**  Travel Document # | 21. Expiration Date *(Mo/Day/Yr)* |
|---|---|---|

| 22. What is your native language?  **Dinka** | 23. Are you fluent in English?  ☒ Yes  ☐ No | 24. What other languages do you speak fluently? |
|---|---|---|

| **FOR EOIR USE ONLY** | **FOR BCIS USE ONLY** |
|---|---|
| | Action:  <br> Interview Date: _____  <br> Decision: _____  <br> ___ Approval Date _____  <br> ___ Denial Date: _____  <br> ___ Referral Date: _____  <br> Asylum Officer ID# _____ |

Form I-589 (Rev. 07/03/03)Y

**PART A.II.  INFORMATION ABOUT YOUR SPOUSE AND CHILDREN**

Your Spouse        ☒ I am not married. (Skip to *Your Children,* below)

| 1. Alien Registration Number (A#)  *(If Any)* | 2. Passport/ID Card No.  *(If any)* | | 3. Date of Birth  *(Mo/Day/Yr)* | 4. Social Security No.  *(If any)* |
|---|---|---|---|---|
| 5. Complete Last Name | 6. First Name | | 7. Middle Name | 8. Maiden Name |
| 9. Date of Marriage  *(Mo/Day/Yr)* | 10. Place of Marriage | | 11. City and Country of Birth | |
| 12. Nationality  *(Citizenship)* | 13. Race, Ethnic or Tribal Group | | | 14. Sex  ☐ Male  ☐ Female |

15. Is this person in the U.S.?        ☐ Yes *(Complete blocks 16 to 24)*        ☐ No  *(Specify location)*

| 16. Place of last entry in U.S.? | 17. Date of last entry in the U.S.  *(Mo/Day/Yr)* | 18. I-94 No.  *(If any)* | 19. Status when last admitted  *(Visa type, if any)* |
|---|---|---|---|
| 20. What is your spouse's current status? | 21. What is the expiration date of his/her authorized stay, if any?  *(Mo/Day/Yr)* | 22. Is your spouse in immigration court proceedings?  ☐ Yes  ☐ No | 23. If previously in the U.S., date of previous arrival  *(Mo/Day/Yr)* |

24. If in the U.S., is your spouse to be included in this application?     *(Check the appropriate box.)*

☐ Yes *(Attach one (1) photograph of your spouse in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐ No

**Your Children.**     Please list **ALL** of your children, regardless of age, location, or marital status.

☒ I do not have any children. *(Skip to Part A.III., Information about Your Background.)*
☐ I do have children. Total number of children _____

*(Use Supplement A Form I-589 or attach additional pages and documentation if you have more than four (4) children.)*

| 1. Alien Registration Number (A#)  *(if any)* | 2. Passport/ID Card No. *(If any)* | 3. Marital Status  *(Married Single, Divorced, Widowed)* | 4. Social Security No.  *(if any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth  *(Mo/Day/Yr)* |
| 9. City and Country of Birth | 10. Nationality  *(Citizenship)* | 11. Race, Ethnic or Tribal Group | 12. Sex  ☐ Male  ☐ Female |

13. Is this child in the U.S.?        ☐ Yes *(Complete Blocks 14 to 21)*        ☐ No  *(Specify Location)*

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.  *(Mo/Day/Yr)* | 16. I-94 No. *(If any)* | 17. Status when last admitted  *(Visa type, if any)* |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any?  *(Mo/Day/Yr)* | 20. Is your child in immigration court proceedings?  ☐ Yes  ☐ No | |

21. If in the U.S., is this child to be included in this application?     *(Check the appropriate box.)*

☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person)*
☐ No

Form I-589 (Rev. 07/03/03)Y Page 2

**PART A.II. INFORMATION ABOUT YOUR SPOUSE AND CHILDREN Continued**

| 1. Alien Registration Number (A#) *(if any)* | 2. Pass/ID Card No. *(if any)* | 3. Marital Status *(Married Single, Divorced, Widowed)* | 4. Social Security No. *(if any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(Mo/Day/Year)* |
| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male  ☐ Female |

13. Is this child in the U.S.? ☐ Yes *(Complete blocks 14 to 21)*   ☐ No *(Specify Location)*

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.? *(Mo/Day/Yr)* | 16. I-94 No. *(If any)* | 17. Status when last admitted |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any) *(Mo/Day/Yr)* | | 20. Is your child in immigration court proceedings? ☐ Yes  ☐ No |

21. If in the U.S., is this child to be included in this application?   *(Check the appropriate box)*
   ☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
   ☐ No

| 1. Alien Registration Number (A#)(If any) | 2. Passport/ID Card No. *(If any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. Social Security No. |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(Mo/Day/Yr)* |
| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male  ☐ Female |

13. Is this Child in the U.S.? ☐ Yes *(Complete blocks 14 to 21)*   ☐ No *(Specify Location)*

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.? *(Mo/Day/Yr)* | 16. I-94 No. *(If any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? | | 20. Is your child in immigration court proceedings? ☐ Yes  ☐ No |

21. If in the U.S., is this child to be included in this application?   *(Check the appropriate box)*
   ☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
   ☐ No

| 1. Alien Registration Number (A#) *(If any)* | 2. Passport/ID Card No. *(If any)* | 3. Marital Status *(Married Single, Divorced, Widowed)* | 4. Social Security No. *(If any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(Mo/Day/Yr)* |
| 9. City and Country of Birth | 10. Nationality | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male  ☐ Female |

13. Is the child in the U.S.? ☐ Yes *(Complete blocks 14 to 21)*   ☐ No *(Specify Location)*

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.? *(Mo/Day/Yr)* | 16. I-94 No. *(If any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* | | 20. Is your child in immigration court proceedings ☐ Yes  ☐ No |

21. If in the U.S., is this child to be included in this application?   *(Check the appropriate box)*
   ☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
   ☐ No

Form I-589 (Rev. 07/03/03)Y Page 3

**PART A.III.   INFORMATION ABOUT YOUR BACKGROUND**

1. Please list your last address where you lived before coming to the U.S.  If this is not the country where your fear persecution, also list the last address in the country where you fear persecution.   *(List Address, City/Town, Department, Province, or State, and Country.) (Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| Number and Street *(Provide if available)* | City/Town | Department, Province or State | Country | Dates | |
|---|---|---|---|---|---|
| | | | | From *(Mo/Yr)* | To *(Mo/Yr)* |
| Unknown | Toray | | Sudan | 1971 | 1979/80 |
| Don't Remember | Capetown | Capetown | South Africa | 1981 | 1986 |

2. Provide the following information about your residences during the last five years.  List your present address first.  *(Use Supplement Form B or additional sheets of paper if necessary.)*

| Number and Street | City/Town | Department, Province or State | Country | Dates | |
|---|---|---|---|---|---|
| | | | | From *(Mo/Yr)* | To *(Mo/Yr)* |
| 446 Alta Road | San Diego | CA | U.S. | 10/2006 | Present |
| South Facility | Soledad | CA | U.S. | 12/2004 | 10/2006 |
| 181 Cedar Point Lane | South Pittbury | Tennessee | U.S. | 01/2002 | 10/2004 |
| 1721 S. Normandie | Los Angeles | CA | U.S. | 04/1998 | 01/2002 |

3. Provide the following information about your education, beginning with the most recent.  *(Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| Name of School | Type of School | Location *(Address)* | Attended | |
|---|---|---|---|---|
| | | | From *(Mo/Yr)* | To *(Mo/Yr)* |
| Chatanooga Tech. School | Trade School | L22 Hwy. Chattanooga, TN | 01/2002 | 12/2003 |
| Los Angeles City College | Trade School | Vermont Blvd., LA, CA | 09/1994 | 11/1995 |
| Cal State Los Angeles | Trade School | University Rd., LA, CA | 08/1992 | 09/1994 |
| High Point High School | Adult School | Powdermill Rd., Beltsville, MD | 07/1989 | 01/1990 |

4. Provide the following information about your employment during the last five years. List your present employment first.  *(Use Supplement Form B or additional sheets of paper if necessary.)*

| Name and Address of Employer | | Your Occupation | Dates | | | |
|---|---|---|---|---|---|---|
| | | | From *(Mo/Yr)* | | To *(Mo/Yr)* | |
| CA Dept. of Correction | Soledad, California | Boiler Technician | 06 | 2005 | 10 | 2006 |
| BFI Waste Management | Nashville, TN | Diesel Mechanic | 08 | 2003 | 10 | 2004 |
| D&D Repair Shop | Sormona, TN | Diesel Mechanic | 04 | 2003 | 08 | 2003 |
| Chattanooga Trailer Ex. | Chattanooga, TN | Diesel Mechanic | 06 | 2002 | 12 | 2002 |
| Work Training Program | Woodland Hills, CA | Job Coach | 02 | 1998 | 04 | 2001 |

5. Provide the following information about your parents and siblings (brother and sisters). Check box if the person is deceased. *(Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| Name | City/Town and Country of Birth | Current Location |
|---|---|---|
| *Mother* Jabbar  Kadijata | Hamada, Sudan | ☐ Deceased  Unknown |
| *Father* Jabbar  Bamba | Hamada, Sudan | ☒ Deceased |
| *Siblings* Jabbar  Amina | Toray, Sudan | ☐ Deceased  Unknown |
| Jabbar  Kada | Toray, Sudan | ☐ Deceased  Unknown |

## PART B.    INFORMATION ABOUT YOUR APPLICATION

*(Use Supplement B Form I-589 or attach additional sheets of paper as needed to complete your responses to the questions contained in PART B.)*

When answering the following questions about your asylum or other protection claim (withholding of removal under 241(b)(3) of the Act or withholding of removal  under the Convention Against Torture) you should provide a detailed and specific account of the basis of your claim to asylum or other protection.  To the best of your ability, provide specific dates, places, and descriptions about each event or action described.  You should attach documents evidencing the general conditions in the country from which you are seeking asylum or other protection and the specific facts on which you are relying to support your claim.  If this documentation is unavailable or you are not providing this documentation with your application, please explain why in your responses to the following questions. Refer to Instructions, Part 1: Filing Instructions, Section II, "Basis of Eligibility," Parts A-D, Section V, "Completing the Form," Part B, and Section VII, "Additional Documents the You Should Submit" or more information on completing this section of the form.

1.  Why are you applying for asylum or withholding of removal under section 241(b)(3) of the Act, or for withholding of removal under the Convention Against Torture? Check the appropriate box(es) below and then provide detailed answers to questions A and B below.

      I am seeking asylum or withholding of removal based on

        ☐ Race
        ☒ Religion
        ☐ Nationality
        ☒ Political opinion
        ☒ Membership in a particular social group
        ☒ Torture Convention

A.  Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?

      ☐ No    ☒ Yes   If your answer is "Yes," explain in detail:

      1)  What happened;
      2)  When the harm or mistreatment or threats occurred;
      3)  Who caused the harm or mistreatment or threats; and
      4)  Why you believe the harm or mistreatment or threats occurred.

**A government back militia group called the janjaweed killed my father and burned our village church over 20 years ago when I was a child in Toray, Sudan.  This is because we were Christians and from another tribal group (the Dinka) which was against government policy.**

B.  Do you fear harm or mistreatment if you return to your home country?

      ☐ No    ☒ Yes   If your answer is "Yes," explain in detail:

      1)  What harm or mistreatment you fear;
      2)  Who you believe would harm or mistreat you; and
      3)  Why you believe you would be harmed or mistreated.

**I fear that I would be tortured or killed because of the current situation in the Sudan.  The village that I am originally from is in the Darfur region and there are serious human rights violations occuring at this time.  The harm or mistreatment that I would suffer would be because of my membership in the Dinka tribe, as well as my Christian religion.**

**PART B.   INFORMATION ABOUT YOUR APPLICATION Continued**

2. Have you or your family members ever been charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States?

☒ No   ☐ Yes  If "Yes," explain the circumstances and reasons for action.

3.A.   Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

☐ No   ☒ Yes  If "Yes," describe for each person the level of participation, any leadership or other positions held, and the length of time you or your family members were involved in each organization or activity.

**My parents were members of the Episcopal church and were mebers of the Dinka tribe.  My father was second to the village tribal chief and was a deacon in the church.  My mother was a member of a female church group.**

B.   Do you or your family members continue to participate in any way in these organizations or groups?

☐ No   ☐ Yes   If "Yes," describe for each person, you or your family members' current level of participation, any leadership or other positions currently held, and the length of time you or your members have been involved in each organization or group.

**My father is deceased.  As for my mother and siblings, I cannot answer this question yes or no because I have not heard from them in many years and do not know where the are.**

4.  Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?

☐ No   ☒ Yes  If "Yes," explain why you are afraid and describe the nature of the torture you fear, by whom, and why it would be inflicted.

**Torture is a serious problem in the Sudan, as documented in the U.S. Department of State Country Reports on Human Rights practices.  The report states that, "government security forces continue to torture, beat and harass suspected political oponents and others."  My fear would be because of my membership in the Dinka tribe and my Christian religion.**

**PART C.  ADDITIONAL INFORMATION ABOUT YOUR APPLICATION**

*(Use Supplement B Form I-589 or attach additional sheets of paper as needed to complete your responses to the questions contained in Part C.)*

1.  Have you, your spouse, your child(ren), your parents, or your siblings ever applied to the United States Government for refugee status, asylum, or withholding of removal?    ☒ No  ☐ Yes

   If "Yes" explain the decision and what happened to any status you, your spouse, your child(ren), your parents, or your siblings received as a result of that decision. Please indicate whether or not you were included in a parent or spouse's application. If so, please include your parent or spouse's A-number in your response. If you have been denied asylum by an Immigration Judge or the Board of Immigration Appeals, please describe any change(s) in conditions in your country or your own personal circumstances since the date of the denial that may affect your eligibility for asylum.

   **\* as far as I know, my mother or siblings have never applied.  I have never applied elsewhere.**

2.  A.  After leaving the country from which you are claiming asylum, did you or your spouse or child(ren), who are now in the United States, travel through or reside in any other country before entering the United States?    ☐ No  ☒ Yes

   B.  Have you, your spouse, your child(ren), or other family members such as your parents or siblings ever applied for or received any lawful status in any country other than the one from which you are now claiming asylum?    ☒ No  ☐ Yes

   If "Yes" to either or both questions (2A and/or 2B), provide for each person the following: the name of each country and the length of stay; the person's status while there; the reasons for leaving; whether the person is entitled to return for lawful residence purposes; and whether the person applied for refugee status or for asylum while there, and, if not, why he or she did not do so.

   **\* I cannot answer this question as it relates to my mother or siblings.  When I was forcibly taken from the Sudan (see declaration) I was in Chad for about a year and a half, and in South Africa for about five and a half years.  I am not allowed to return to either country for lawful residency purposes.**

3.  Have you, your spouse, or child(ren) ever ordered, incited, assisted, or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion?

   ☒ No    ☐ Yes  If "Yes," describe in detail each such incident and your own or your spouse's or child(ren)'s involvement.

**PART C.   ADDITIONAL INFORMATION ABOUT YOUR APPLICATION Continued**

4.   After you left the country where you were harmed or feared harm, did you return to that country?

☒ No   ☐ Yes   If "Yes," describe in detail the circumstances of your visit (for example, the date(s) of the trip(s), the purpose(s) of the trip(s), and the length of time you remained in that country for the visit(s)).

5.   Are you filing the application more than one year after your last arrival in the United States?

☐ No   ☒ Yes   If "Yes," explain why you did not file within the first year after you arrived. You should be prepared to explain at your interview or hearing why you did not file your asylum application within the first year after you arrived. For guidance in answering this question, see Instructions, Part I: Filing Instructions, Section V. "Completing the Form," Part C.

I was a minor when I was forcible brought to the United States and was unaware of political asylum.

6.   Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted and sentenced for any crimes in the United States?

☐ No   ☒ Yes   If "Yes," for each instance, specify in your response what occurred and the circumstances; dates; length of sentence received; location; the duration of the detention or imprisonment; the reason(s) for the detention or conviction; any formal charges that were lodged against you or your relatives included in your application; the reason(s) for release. Attach documents referring to these incidents, if they are available, or an explanation of why documents are not available.

On October 26, 2004, I was convicted after a judge trial of sexual battery by restraint in violation of section 243.4(a) of the California Penal Code I found out that there was a warrant for my arrest when I went to the Tenessee Department of Motor Vehicles and on my own returned to California to face the charges to which I have always maintained my innocence.

Prior to that, I did plead guilty to filing a false police report.

Form I-589(Rev. 07/03/03)Y Page 8

## PART D.    YOUR SIGNATURE

*After reading the information regarding penalties in the instructions, complete and sign below. If someone helped you prepare this application, he or she must complete Part E.*

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it are all true and correct. Title 18, United States Code, Section 1546, provides in part; "Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or knowingly presents any such application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in the law or fact - shall be fined in accordance with this title or imprisoned not more than five years, or both." I authorize the release of any information from my record which the Bureau of Citizenship and Immigration Service needs to determine eligibility for the benefit I am seeking.

Staple your photograph here or the photograph of the family member to be included on the extra copy of the application submitted for that person.

**WARNING: Applicants who are in the United States illegally are subject to removal if their asylum or withholding claims are not granted by an Asylum Officer or an Immigration Judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act. See 208(d)(6) of the Act and 8 CFR 208.20.**

| Print Complete Name | | Write your name in your native alphabet |
|---|---|---|
| **Mikey** | **Jabbar** | |

Did your spouse, parent, or child(ren) assist you in completing this application?    ☒ No  ☐ Yes  *(If "Yes," list the name and relationship.)*

_____    _____    _____    _____
*(Name)*                          *(Relationship)*                   *(Name)*                          *(Relationship)*

Did someone other than your spouse, parent, or child(ren) prepare this application?    ☐ No  ☒ Yes *(If "Yes," complete Part E)*

Asylum applicants may be represented by counsel. Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim?    ☐ No  ☒ Yes

Signature of Applicant *(The person in Part A.I.)*

[                                                    ]                          _____
   Sign your name so it all appears within the brackets                                    Date *(Mo/Day/Yr)*

## PART E.    DECLARATION OF PERSON PREPARING FORM IF OTHER THAN APPLICANT, SPOUSE, PARENT OR CHILD

I declare that I have prepared this application at the request of the person named in Part D, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324(c).

| Signature of Preparer | Print Complete Name  Bill Waddell |
|---|---|
| | **Law Office of Bill Waddell** |
| Daytime Telephone Number **(619) 645-5280** | Address of Preparer: Street Number and Name **110 West "C" St., Suite 1300** |

| Apt. No. | City | | State | | ZIP Code | |
|---|---|---|---|---|---|---|
| | **San Diego** | | **CA** | | | **92101-3978** |

## PART F.    TO BE COMPLETED AT INTERVIEW OR HEARING

*You will be asked to complete this Part when you appear before an Asylum Officer of the U.S. Department of Homeland Security, Bureau of Citizenship and Immigration Services (BCIS), or an Immigration Judge of the Executive Office for Immigration Review (EOIR) for examination.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are all true to the best of my knowledge taking into account correction(s) numbered _____ to _____ that were made by me or at my request.

Signed and sworn to before me by the above named applicant on:

_____                          _____
   Signature of Applicant                                      Date *(Mo/Day/Yr)*

_____                          _____
   Write Your Name in Your Native Alphabet                          Signature of Asylum Officer or Immigration Judge

Form I-589 (Rev. 07/03/03)Y Page 9

Addendum to I-589 Page 1 Part 18c.

Additional Information for Question #5, siblings:

Buntu Jabbar, born Toray, Sudan  location unknown.

Fula Jabbar, born Toray, Sudan, location unknown.

Saide Jabbar, born Toray, Sudan, location unknown.

Daude Jabbar, born Toray, Sudan, location unknown.

## ATTACHMENTS

Declaration of Mikey Jabbar..................................................A1-A3

Letter from Teena Case.....................................................A4-A6

Department of State 2005 Country Report, Sudan....................B1-B20

Department of State 2006 Country Report, Sudan....................C1-C18

# DECLARATION OF MIKEY JABBAR

My name is Mikey Jabbar. I am a native and citizen of the Sudan. I was born in the Sudan sometime in 1971-1972. I am not sure of the exact date because I was born at home in my village and was not issued a birth certificate. I am of the Dinka tribe.

My parents were Episcopal Christians, and belonged to the Episcopal Chuch in my hometown of Toray in South Darfur, Sudan. My parents owned a small piece of land that my father was farming. He also helped out in our small church as a deacon. I remember when I was a little boy that my father left to do farm work. He was attacked and killed by members of the janjaweed clan who wanted to take over our farm. The group members were Muslims and did not like the Christians in our town.

My mother fled with my siblings after the death of my father. My mother gave me away to a businessman by the name of Hassan Dossa when I was about eight years old. This man took me to Chad. While I was living in Chad with Hassan Dossa, I was ordered to sell fruits on the street. We were in Chad for about one and a half years before he took me to South Africa.

While I was living in South Africa, I was sold to one of Mr. Dossa's clients who was a South African farmer. His name was Johannes Sepat. Mr.

1

A1

Sepat took me to his farmhouse located at Khomani San Community, a village in the south of Western Cape Province. When I was living with Mr. Sepat, I suffered emotional, psychological and physical harm. This was the result of hard labor, regular whipping and starvation. I received this humiliating treatment from his wife and kids also.

I was ordered to awake up at 5:00 AM to statrt doing my domestic chores such as cleaning the farm compound, washing clothes, and making sure that there was water in the big water tanks if there was no running water. I was sometimes punished with beatings for waking up late or not finishing my chores on time. I sometimes had to watch over the two-year old son of Mr. Sepat. If I did anything which would upset the child then I would be whipped.

Mr. Sepat ordered me not to speak to anyone outside of his family. I feared for my life on several occasions and was afraid that I would be killed if I tried to escape. There was a time when his kids let loose of the family dog to attack me from the back. I was bitten and had to be taken to a clinic. I often did not have enough to eat since I was fed only what was leftover from their dinner.

Around 1986, Mr. Sepat obtained for me a false passport and brought me to the United States as his domestic slave-worker. We lived in New

A2

York and I was not permitted to leave the house. If the family went out my hands would be tied so that I would not escape.

We later moved to Maryland where the abuse continued. After about three years I was able to escape and was homeless for about six months. A gentleman by the name of James Robinson who was single and sick with cancer decided to help me. I stayed with Mr. Robinson who sent me to an adult school so I would be able to learn how to read and write.

I lived with Mr. Robinson for about two years before his death. After Mr. Robinson's death, I traveled to California and later to Tennessee where I met Teena Case. We became friends and she later became my girlfriend. I was haunted by my past and ashamed of it. I broke down one night and told my girlfriend about my past. She is a Christian herself, and introduced me to her church's members, where I gave my first testimony.

I told them that my real name was Mikey Jabbar and not Idrisa Sesay. I also told them that I was from the Sudan. I told them how I was sold into child slavery and suffered both physical and psychological abuse.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true to the best of my knowledge and belief.

Date 3/27/07

Mikey Jabbar

3



Dear Judge,

My name is Teena Case and I am the girlfriend of Mikey Jabbar. I am writting you to express my support for Mikey, who is currently in deportation proceeding in your Honors Courtroom.

You Honor I have known Mikey for approximately 7 years. Mikey is a good person, with a dark history to which he was truly ashamed of. It took me a while before I could get him to open up and talk about his past that he was a victim of Child abuse and trafficking.

Your Honor, in learning of Mikey's past, I became aware that he was from Sudan, and was trafficked into the USA by a businessman from South Africa when Mikey was at the age of 15. I was also became aware that Mikey had been through events within his past, in which brought tears from my eyes in listening to his experience in his past.

Your honor, I understand that Mikey had broken the law in the USA, and he did express his feelings to me regarding the whole situation that he truly regrets it. Because of that, I am more than willing to stand by his side throughout the legal process that he is facing now.

A4

In addition, I would like to add that Mikey is a good Christian, who is eager to find his lost family that he had not seen in over a period of 20 years. As your honor can also understand, Mikey has been in the USA for a period of time 20 years and now had no family ties in his home country (Sudan). Mikey doesn't even know whether his family still alive or not because of the civil war that has been going on for almost 20 years. There's much more that I would like to ramble on about Mikey, but I don't want to waste any more time of your honor's. In conclusion, I wish I can travel so I could personally attend Mikey's hearing in court and testify on his behalf when needed, so everyone involved with his case, which includes your Honor and the Immigration Attorney would see and understand how much or how far I am willing to support Mikey. Your Honor, please grant Mikey a relief because he has no place or home that he can go to if he had to leave this Country. If Your Honor be kind enough to grant Mikey a relief to stay in this Country. If Your Honor be kind enough to grant Mikey a relief to stay in this Country, I will

be more than glad to welcome him back to my home in Tennessee, where he used to live in the past before he went to prison.

Your time and consideration in regards to the contents of this letter is truly appreciated.

Sincerely,
Teena G. Case

(423) 883-7232

A6

Exhibit D



بسم الله الرحمن الرحيم

Embassy of The Republic of
the Sudan – Washington DC
2210 Massachusetts Ave.
Washington, DC, 20008

سفارة جمهورية السودان
واشنطون – دي سي
هاتف : 202-338-8565
فاكس : 202-667-2406

February 26, 2008

William Pitt
Department of Homeland Security
Bureau of Immigration and Customs Enforcement
880 Front Street, Suite 1234
San Diego, CA 92101-8834

REF: Sesay, Idrisa
A#77 062 688

Dear Sir,

     Our records indicate that no proof of Sudan citizenship pertaining to Mr. Sesay Idrisa. Furthermore, Mr. Sesay possesses a passport from Sierra Leone. Mr. Sesay should furnish the Embassy of Sudan with the convincing Sudanese documents such as nationality certificate, birth certificate, national identity card or Sudan passport to prove his citizenship.

Sincerely Yours,

Paul A. Ujwok

Consular Section



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IDRISA SESAY,               ) Case No. 07cv2354-JM (LSP)
[A77-062-688]           )
                       )
       Plaintiff,     )
                       )
sv.                     ) PROOF OF SERVICE
                       )
MICHAEL CHERTOFF, et al.,  )
                       )
       Defendant.   )
_____)

I, the undersigned, say:

1) That I am over eighteen years of age, a resident of the County of San Diego, State of California, and not a party in the within action;

2) That my business address is 225 Broadway, Suite 900, San Diego, California, 92101;

3) That I served the within PETITIONER'S TRAVERSE, placing a true copy of the above-mentioned document in the United States mail on March 20, 2008, to:

**Samuel Bettwy**
U S Attorneys Office Southern District of California
Civil Division
880 Front Street
Suite 6253
San Diego, CA 92101

I certify under the laws of the State of California that the foregoing is true and

correct. Executed on 20 March 2008 at San Diego, California.

_/s/ Sylvia Freeman_____
SYLVIA FREEMAN