1  **JAMES FIFE**
California State Bar No. 237620
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3  San Diego, California  92101-5030
Telephone No. (619) 234-8467
4  Email: james_fife@fd.org

5  Attorneys for Petitioner

6

7

8                    UNITED STATES DISTRICT COURT

9                SOUTHERN DISTRICT OF CALIFORNIA

10               **(HONORABLE  JEFFREY T. MILLER)**

11  **IDRISA SESAY,**                          Case No.  07CV2354-JM (LSP)

12                    Petitioner,

13        v.

14  **MICHAEL CHERTOFF, et al.,**              **PETITIONER'S COURT-ORDERED**
                                              **SUPPLEMENTAL BRIEFING AND**
15                    **Respondents.**              **EVIDENCE**

16

17  —————————————————————

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    EVEN IF FURTHER FACT-FINDING IS NECESSARY, THE IMMIGRATION COURT IS NEITHER AN AUTHORIZED NOR ADEQUATE FORUM FOR DECIDING ISSUES ATTENDING A HABEAS CORPUS PETITION PENDING BEFORE A DISTRICT JUDGE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A.    This Court Has a Duty to Decide the Issues in This Case. . . . . . . . . . . . . . . . . . . 3

B.    Referral Is Permitted Under Specific Circumstances to the Magistrate Judge. . . . . . . . . 5

C.    Referral to an IJ Is Not Authorized Nor Appropriate. . . . . . . . . . . . . . . . . . . . . . . . 5

    *1. There Is No Authority for an IJ to Hear Post-Removal Issues in This Case.* . . . . . . . . 6

    *2. Immigration Court Is an Inappropriate Forum for Determining Facts Central to a Habeas Claim.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    *3. Referral Is Not Necessary to Avoid Conflicting Decisions Between This Court and the IJ.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.   A REFERRAL IS UNNECESSARY, BECAUSE THERE IS ALREADY SUFFICIENT EVIDENCE IN THE RECORD FOR THE COURT TO DECIDE THE LEGAL ISSUES PRESENTED BY THE PLEADINGS. . . . . . . . . . . . . . . . . . . 10

A.    The Basic *Zadvydas* Facts Are in the Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B.    Respondents' Suspension Argument Can Be Decided Without Further Evidence. . . . . . 11

    *1. Procedural Default Is Apparent on the Record.* . . . . . . . . . . . . . . . . . . . . . . . . . 12

    *2. The Facts in the Record Show Official Refusals Are Unconnected to Any Act of Mr. Sesay.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    *3. The Facts Show That the Sudanese Claim Was Not Asserted to Frustrate Removal.* .15

    *4. Conclusion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

TABLE OF EXHIBITS

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## FEDERAL CASES

Chicot County v. Sherwood,
        148 U.S. 529, 13 S. Ct. 695, 37 L. Ed. 546 (1893) . . . . . . . . . . . . . . . . . . . . . . . . 3
Cohens v. Virginia,
        6 Wheat. 264, 5 L. Ed. 257 (1821) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Harris v. Nelson,
        395 U.S. 286 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4
Khan v. Gonzales,
        481 F. Supp.2d 638 (W.D. Tex. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Ma v. Ashcroft,
        257 F.3d 1095 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Maier v. Orr,
        758 F.2d 1578 (9th Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Martinez v. Gonzales,
        504 F. Supp.2d 887 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Miller v. Johnson,
        515 U.S. 900 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Moro v. INS,
        58 F. Supp.2d 854, 858 (N.D. Ill. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
New Orleans Public Service, Inc. v. Council of City of New Orleans,
        491 U.S. 350 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Orand v. United States,
        602 F.2d 207 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Pelich v. INS,
        329 F.3d 1057 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,11,12,15
Pierson v. Ray,
        386 U.S. 547 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Singh v. Gonzales,
        448 F. Supp.2d 1214, 1219 (W.D. Wash. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 12
United States v. Holland,
        ____ F.3d ____, 2008 WL 696903 (9th Cir. Mar. 17, 2008) . . . . . . . . . . . . . . . . 3
United States v. Nixon,
        418 U.S. 683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
United States v. Snyder,
        235 F.3d 42 (1st Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Wingo v. Wedding,
        418 U.S. 461 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Zadvydas v. Davis,
        533 U.S. 678 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,10,11

## DOCKETED CASES

Del-Toro v. Chertoff,
        No. C05-1861-RSL, 2008 WL 687445 (W.D. Wash. Mar. 10, 2008) . . . . . . . . . . 5
Garcia-Garcia v. Chertoff,
        No. 107CV1057-OWW, 2007 WL 4258836 (E.D. Cal. Dec. 3, 2007) . . . . . . . . . 5
Judulang v. Chertoff,
        No. 07CV1414-IEG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

//

Kantrdzhyan v. Chertoff,
     No. 08CV001-LAB (RBB) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Makaj v. Crowther,
No. CV-07-0342-PHX, 2007 WL 3224539 (D. Ariz. Oct. 29, 2007) . . . . . . . . . . . . . . . . . . . . . . . 5
Mau v. Chertoff,
     No. 07CV2037-IEG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## FEDERAL STATUTES

8 U.S.C. § 1231(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10,11,12,13,16
8 U.S.C. § 1252(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
28 U.S.C. § 453 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
28 U.S.C. § 455 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
28 U.S.C. § 636(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,5,6
28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
28 U.S.C. § 2243 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3,4,10
28 U.S.C. § 2246 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## FEDERAL RULES

Fed. R. Civ. P. 53 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,6,7
Fed. R. Evid. 201(b)(2) & (d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Habeas Rule 8(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## FEDERAL REGULATIONS

8 C.F.R. § 1003.2(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
8 C.F.R. § 1003.23(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
8 C.F.R. § 1236(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## MISCELLANEOUS

William Reno, Clandestine Economies, Violence and States in Africa,
     53 J. Int'l Affairs 433 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**JAMES FIFE**
California State Bar No. 237620
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone No. (619) 234-8467
Email: james_fife@fd.org

Attorneys for Petitioner

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE JEFFREY T. MILLER)**

**IDRISA SESAY,**

                **Petitioner,**

      **v.**

**MICHAEL CHERTOFF, et al.,**

                **Respondents.**

Case No. 07CV2354-JM (LSP)

**PETITIONER'S COURT-ORDERED SUPPLEMENTAL BRIEFING AND EVIDENCE**

Pursuant to this Court's order of March 28, 2008, Petitioner hereby files his Supplemental Briefing on the need for, and the appropriateness of, a referral to the Immigration Judge for further fact finding.

This Court requested further briefing on the issue of whether "this Court has equitable remedies available to it as a habeas court to remand the matter for further factual determinations" to the Immigration Judge ("IJ"). MRT 18-19.[1] In addition, counsel offered to provide additional evidence in support of Petitioner's good faith claim of Sudanese origin. MRT 4-7, 17-18. This Court invited counsel to submit additional evidence along with the additional briefing. MRT 18.

---

[1] "MRT" refers to the Reporter's Transcript of the hearing held on March 28, 2008, a copy of which is attached hereto as Appendix A.

Petitioner opposes an IJ referral on two grounds. First, even if disputed, material facts need to be determined, the immigration court is neither an authorized nor an appropriate forum for that purpose. Under statute, this Court has a duty to hold any necessary evidentiary hearing, although a referral to a U.S. Magistrate may be allowed. But because of the legal pitfalls and specific limitations attending a referral to an IJ, if a remand is necessary, it should be to the assigned Magistrate Judge, not the immigration court.

More fundamentally, however, there is no need on this record to resolve any factual disputes in order for this Court to rule on the dispositive legal issues raised in this case. This Court is, therefore, in a position to "summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243.

# I

**EVEN IF FURTHER FACT-FINDING IS NECESSARY, THE IMMIGRATION COURT IS NEITHER AN AUTHORIZED NOR ADEQUATE FORUM FOR DECIDING ISSUES ATTENDING A HABEAS CORPUS PETITION PENDING BEFORE A DISTRICT JUDGE.**

Even if the Court decides that some disputed, material fact still requires determination, but see infra Argument II, the matter should not be referred to an IJ for decision, as it would present grave separation of powers problems. The Court has a duty to resolve the issues of this case itself, although there may be circumstances warranting a referral to the Magistrate Judge. Moreover: this Court lacks authority to delegate judicial functions to an officer of the executive branch; the IJ has no jurisdiction to hear the matter; and the immigration court is an inappropriate forum in light of a number of legal and practical problems, which are completely avoided by a referral to the magistrate.

///

**A.  This Court Has a Duty to Decide the Issues in This Case.**

"It is a judge's duty to decide all cases within his jurisdiction that are brought before him . . . ." <u>Pierson v. Ray</u>, 386 U.S. 547, 554 (1967).

Our cases have long supported the proposition that federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred. For example: "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution." <u>Cohens v. Virginia</u>, 6 Wheat. 264, 404, 5 L.Ed. 257 (1821). " '[T]he courts of the United States are bound to proceed to judgment and to afford redress to suitors before them in every case to which their jurisdiction extends. They cannot abdicate their authority or duty in any case in favor of another jurisdiction.' " <u>Chicot County v. Sherwood</u>, 148 U.S. 529, 534, 13 S.Ct. 695, 697, 37 L.Ed. 546 (1893) (citations omitted).

<u>New Orleans Public Service, Inc. v. Council of City of New Orleans</u>, 491 U.S. 350, 358 (1989).  Absent a basis for recusal, a federal judge must decide a case properly brought before him for decision.

We begin with the general proposition that, in the absence of a legitimate reason to recuse himself, "a judge should participate in cases assigned." <u>Maier v. Orr</u>, 758 F.2d 1578, 1583 (9th Cir.1985); <u>United States v. Snyder</u>, 235 F.3d 42, 46 (1st Cir.2000).  This proposition is derived from the "judicial Power" with which we are vested. <u>See</u> U.S. CONST. art. III, § 1. It is reflected in our oath, by which we have obligated ourselves to "faithfully and impartially discharge and perform [our] duties" and to "administer justice without respect to persons, and do equal right to the poor and to the rich." 28 U.S.C. § 453. Without this proposition, we could recuse ourselves for any reason or no reason at all; we could pick and choose our cases, abandoning those that we find difficult, distasteful, inconvenient or just plain boring.

<u>United States v. Holland</u>, ___ F.3d ___, 2008 WL 696903 at * 2 (9th Cir. Mar. 17, 2008).

This duty extends to a specific mandate to conduct any evidentiary hearing required in the course of deciding a habeas corpus petition. Under 28 U.S.C. § 2243, when a factual dispute appears, the district court is not only empowered to hold an evidentiary hearing, it is obliged to do so. <u>See</u> <u>Harris v. Nelson</u>, 395 U.S. 286, 291 (1969).  Indeed, "[t]here is no higher duty of a court, under our constitutional system, than the

careful processing and adjudication of petitions for writs of habeas corpus, for it is in such proceedings that a person in custody charges that error, neglect, or evil purpose has resulted in his unlawful confinement and that he is deprived of his freedom contrary to law." Id. at 292. Because of this, the original requirement was that any evidentiary hearing be held by the district judge personally, and referral, even to a magistrate, was prohibited. See Wingo v. Wedding, 418 U.S. 461, 472-73 (1974).

Congress amended the Federal Magistrates Act in 1976 to avoid the infirmity noted in Wedding and to allow referral of the evidentiary hearing in a habeas proceeding to a U.S. Magistrate Judge. See Orand v. United States, 602 F.2d 207, 207-08 (9th Cir. 1979). However, the relaxation of the duty of the district judge in a habeas proceeding is specifically confined to the delegation of authority permitted under 28 U.S.C. § 636(b)(1)(B).

While Petitioner agrees that a habeas court possesses broad equity powers *to shape appropriate relief*, its equity jurisdiction does not empower it to ignore statutory, procedural mandates. This Court's equitable jurisdiction does not authorize it to delegate the Article III judicial power of the United States to an officer of the executive branch. See Miller v. Johnson, 515 U.S. 900, 922 (1995) (courts cannot delegate to executive their role in enforcing equal protection); United States v. Nixon, 418 U.S. 683, 704 (1974) (judicial power cannot be shared with the executive branch). Thus, absent a specific basis to delegate the duty under § 2243 to hold an evidentiary hearing, general equity authority does not permit a remand to an officer of the executive to conduct judicial functions attending a habeas petition.

/ / /

**B.    Referral Is Permitted Under Specific Circumstances to the Magistrate Judge.**

The current form of the Magistrates Act permits delegation of the evidentiary hearing to a magistrate. See 28 U.S.C. § 636(b)(1)(B).  Magistrates assigned to § 2241 habeas cases are–by analogy–available to conduct evidentiary hearings under the procedure in Rule 8(b) foll. 28 U.S.C. § 2254. See Civ.L.R. 72.1(d). In addition, a magistrate may be designated as a special master to conduct fact finding.  See 28 U.S.C. § 636(b)(2); Fed. R. Civ. P. 53; Civ.L.R. 72.1(f).

Thus, an established, approved process for referral to magistrates is in place, which gives both parties fair opportunity to present evidence and respond to any recommendations before a final order is entered. Accordingly, several districts in this Circuit regularly refer immigration detention claims to magistrates under the standard habeas corpus procedures.  See, e.g., Del-Toro v. Chertoff, No. C05-1861-RSL, 2008 WL 687445 (W.D. Wash. Mar. 10, 2008); Garcia-Garcia v. Chertoff, No. 107CV1057-OWW, 2007 WL 4258836 (E.D. Cal. Dec. 3, 2007); Makaj v. Crowther, No. CV-07-0342-PHX, 2007 WL 3224539 (D. Ariz. Oct. 29, 2007); Martinez v. Gonzales, 504 F. Supp.2d 887 (C.D. Cal. 2007).

**C.    Referral to an IJ Is Not Authorized Nor Appropriate.**

In contrast to authority calling for factual disputes in habeas corpus cases to be decided by the judiciary, there is no statutory basis for a referral to an IJ for purposes of conducting additional fact finding in a petition pending before a district court.  Moreover, remand to an IJ would result in legal and practical tangles undermining the Petitioner's right to due process, and without any corresponding pay-off in fact-finding expertise or comity.

***1. There Is No Authority for an IJ to Hear Post-Removal Issues in This Case.***

Because Mr. Sesay's order of removal is administratively final, there is no procedural mechanism within the regulations, apart from a motion to reopen, to bring this matter back before the IJ; the parties are agreed on that point. See MRT 11-12. No such motion has been made, and under the regulations, the time for bringing one expired months ago. See 8 C.F.R. §§ 1003.2(c)(2), 1003.23(b)(1) (deadline before both BIA and IJ is 90 days from final order).

Nor is there any authority for the IJ to review custody matters once a final order is entered. Immigration judges are granted authority to review the custody decisions of ICE officials "at any time *before* an order under 8 CFR part 1240 becomes final." 8 C.F.R. § 1236(d)(1) (emphasis added). To the extent that this Court frames the referral as ancillary to Mr. Sesay's Zadvydas claim, IJs generally lack authority to revisit the DHS's custody determinations at this stage of the proceedings.

The remaining possible basis for authority is that suggested by Respondents' "broad equitable powers" argument. MRT 15. More concretely, the power to refer a civil matter to another adjudicator is contained in the rule on special masters, Fed. R. Civ. P. 53. However, to the extent the Court seeks to rely on Rule 53, the requirements have not been met. Rule 53(a) allows referral only with consent of the parties, where exceptional circumstances or difficult calculations are required, or when the matter cannot be effectively and timely heard by the district court. Certain procedural requirements must be met under subsection (b), including notice and hearing, followed by a specific, written referral order. Consent of the parties is required to appoint a master without complying with these demands. See 28 U.S.C. § 636(b)(2); Civ.L.R. 72.1(f).

Since these requirements are not satisfied here, Rule 53 does not authorize the Court's contemplated remand to the IJ.[2]

### 2. Immigration Court Is an Inappropriate Forum for Determining Facts Central to a Habeas Claim.

The IJ is not in any way a superior adjudicator of any remaining, disputed facts in this case, and in some regards, the immigration court is a procedurally inferior forum for that purpose.

In the first instance, to the extent that a remand is grounded in the special master reasoning, the IJ is disqualified from hearing this matter. Rule 53(a)(2) disqualifies anyone from serving as a master if he has a relationship to a party which would be a ground for disqualification under 28 U.S.C. § 455. Under § 455(b)(5)(i), disqualification is required if the adjudicator is an "officer" of a party. The individual IJs are officers of the Executive Office of Immigration Review in the Department of Justice, whose head, the Attorney General, is a named party in this Petition. The organizational status of the IJ is a disqualification under Rule 53 to serve as an adjudicating official in this case.

Moreover, the procedures utilized in an immigration court are inadequate to protect the due process rights in a case which is pending before an Article III court.[3] For instance, there is no requirement that the proceedings before the IJ be recorded, and so an adequate record for this Court to review *de novo* the determinations made on remand may be lacking. In contrast, a normal magistrate referral produces a written

_____

[2] Significantly, none of these procedural restrictions applies if the Court appoints a Magistrate Judge to serve as master. See Rule 53(h); Civ.L.R. 72.1-(f).

[3] The issue of the procedural adequacy of referrals to IJs within the confines of habeas relief is being litigated in two cases pending before Judge Gonzalez, Mau v. Chertoff, No. 07CV2037-IEG and Judulang v. Chertoff, No. 07CV1414-IEG.

report and a transcript which the parties can use to frame objections and this Court to weigh the actual evidence and arguments. Similarly, the normal rules of evidence do not apply to an IJ hearing, whereas the Federal Rules of Evidence apply largely intact in a hearing by the magistrate. Finally, there is a potential concern with continuity of counsel on both sides, since the Government is represented in IJ hearings by a different, DHS attorney, and DOJ has exhibited a policy of resisting appointed counsel's appearances in immigration court for matters ancillary to the habeas corpus proceedings. With fragmentation of representation, the issues are less likely to have full and fair airing.

Sending this case into such a procedural quagmire makes no sense. There is no basis to believe that IJs are necessarily more expert at taking additional evidence on whether the Petitioner has made a good faith and colorable claim of a different nationality. Since only an unsupportable, bad faith claim could activate the Pelich rationale, the central issue here is a typical one of weight of the evidence and credibility. IJs are no more expert in making such determinations than magistrates. Although IJs deal constantly with immigration matters, the central question here is whether evidence supports a good faith claim of nationality and what effect that a bad faith claim has had on the removal process. Magistrate Judges are equally competent to make such findings without resort to specialized knowledge of the immigration statutes. Consequently, no corresponding procedural gains offset the legal and practical pitfalls attending the use of IJs for such remands.

### 3. Referral Is Not Necessary to Avoid Conflicting Decisions Between This Court and the IJ.

Respondents may argue that remand is necessary to avoid a clash of findings between this Court and the removal order entered by the IJ. While it is true that the district courts lack jurisdiction under the REAL ID

1   Act to review the merits of the removal order, the point at issue here is collateral to the merits of the removal
2
3   and so not barred under 8 U.S.C. § 1252(a)(5).  Mr. Sesay does not challenge the validity of his removal
4   order, as the selection of a particular destination country under 8 U.S.C. § 1231(b) is not part of the merits
5
6   underlying a deportation.  The essential finding for deportation is lack of *U.S. nationality*; the alien's actual
7   citizenship is otherwise immaterial.  Indeed, one can even be a stateless person and be ordered removed.  As
8
9   a destination is a subsidiary issue, any holding by this Court as to a colorable claim of Sudanese nationality
10  does not impinge on the substance of the IJ's removal order.

11      Moreover, the determinations made in the district court and in the immigration court are not equivalent
12
13  as to have any preclusive effect.  The immigration court employs a different standard of proof and rules of
14  evidence, and the stakes involved (removal vs. personal liberty) differ greatly between a removal hearing and
15
16  a habeas corpus petition.  The findings of the IJ are therefore not binding on this Court.

17      Likewise, because of these differences in proof and issues involved, a deportee does not have the same
18
19  opportunity or motivation to litigate the issue of actual origin.  Once the deportee admits he is not a U.S.
20  citizen–as Mr. Sesay did–the only relevance of actual nationality is to the post-removal process of selecting
21
22  a destination country under § 1231(b).  The statute *requires* the IJ to designate the country selected by the
23  deportee, unless specific limitations apply.  See § 1231(b)(2)(A)-(C).  Under the statute, the deportee's actual
24
25  origin is irrelevant for the choice of destination, unless the alien selects a country contiguous to American
26  territory.  See § 1231(b)(2)(B).  Nationality becomes a factor only once the primary destination somehow
27
28

defaults and an alternative needs to be selected.[4] See § 1231(b)(2)(D) & (E). There was no reason, then, for a fully developed presentation on actual origin solely for the purposes of designating a destination country. In fact, counsel understands that in asylum cases, such as Mr. Sesay's, the usual practice in immigration court is for the respondent to *not* designate a destination and for the IJ to ask the *Government* to choose. For these reasons, the destination listed in the IJ's order is not definitive. A finding by this Court that Petitioner has a good faith claim of a different nationality would be no breach of comity.

## II

**A REFERRAL IS UNNECESSARY, BECAUSE THERE IS ALREADY SUFFICIENT EVIDENCE IN THE RECORD FOR THE COURT TO DECIDE THE LEGAL ISSUES PRESENTED BY THE PLEADINGS.**

Mr. Sesay brought his Petition seeking release under the principles of Zadvydas v. Davis, 533 U.S. 678 (2001), which mandate release from custody if the detainee has endured unreasonable detention and there is no significant likelihood of removal in the reasonably foreseeable future. The facts necessary to decide this claim are either undisputed or the record on them is sufficiently clear to enable this Court to "summarily . . . determine" them. 28 U.S.C. § 2243.

**A. The Basic *Zadvydas* Facts Are in the Record**

No one can dispute that Mr. Sesay has been detained in excess of the reasonable period to effect removal established in Zadvydas. The Supreme Court held the presumptively reasonable period to remove a detained alien is six months. See 533 U.S. at 701. It is undisputed that Mr. Sesay has been held in Respondents'

---

[4] Respondents are incorrect that "the IJ can't just put down any country; it has to be a country that reasonably is supported by some evidence." MRT 14. Under the statute, prior legal status in the destination country is a factor *only* under the specific facts of contiguous territory or a subsequent default, neither of which applies to the removal process in this case.

1   custody since his removal order became final on May 10, 2007, **nearly eleven months ago**, five months

2   beyond the Supreme Court's reasonable period.  See Return Exhibits at 35 (IJ's order of removal dated May

3

4   10, 2007, noting appeal had been waived).  No additional evidence is needed to determine this prong of

5   Zadvydas.

6

7        The record is also sufficient to show "good reason to believe that there is no significant likelihood of

8   removal in the reasonably foreseeable future."  Zadvydas, 533 U.S. at 701.  Not one, but *two*, potential

9

10  destination countries have refused to accept Mr. Sesay's deportation.  An official refusal from the destination,

11  or the functional equivalent, is the classic basis for granting Zadvydas relief.  See Zadvydas, 533 U.S. at 684

12

13  (rejections from Germany, Lithuania, and Dominican Republic due to inadequate showing of nationality or

14  deficient paperwork); Ma v. Ashcroft, 257 F.3d 1095, 1115 (9th Cir. 2001) (lack of repatriation treaty with

15

16  Cambodia and country's policy of not accepting repatriation sufficed to show removal not likely under

17  Zadvydas).  Again, no party disputes that both Sierra Leone and the Sudan have refused to accept Petitioner.

18  **B.   Respondents' Suspension Argument Can Be Decided Without Further Evidence.**

19

20        Mr. Sesay is entitled to release under Zadvydas, and Respondents' claim that the removal period has been

21  suspended under 8 U.S.C. § 1231(a)(1)(C) is wrong.  See Return at 4 (stating that "[t]he authority of DHS

22

23  to detain [Mr.] Sesay pending his failure to cooperate is set forth at 8 U.S.C. § 1231(a)(1)(C)").  Respondents'

24  argument for continued detention under Pelich v. INS, 329 F.3d 1057 (9th Cir. 2003), can be determined

25

26  without a referral for further fact finding.

27  / / /

28

*1. Procedural Default Is Apparent on the Record.*

Mr. Sesay argued in his Traverse that Respondents are barred from asserting suspension under § 1231(a)(1)(C), because they failed to serve notification of non-compliance within the 90-day statutory removal period. See Traverse at 4-5; Singh v. Gonzales, 448 F. Supp.2d 1214, 1219 (W.D. Wash. 2006). The facts establishing this forfeiture are apparent from Respondents' own proffered evidence: Return Exhibits at 35 (final removal order entered on May 10, 2007) & 49-50 (Notice of Failure to Comply served on December 11, 2007). The basis for a procedural default of the suspension claim under Singh appears on the face of the record and is undisputed.

*2. The Facts in the Record Show Official Refusals Are Unconnected to Any Act of Mr. Sesay.*

Respondents argue that because Mr. Sesay "continued to assert his Sierra Leone citizenship . . . until he was about to be placed in removal proceedings," Return at 2, and from the start of the removal proceedings maintained a consistent claim of Sudanese origin, he is obstructing his removal within the meaning of the statute. See Return at 1 ("[Mr.] Sesay's detention pending such failure to cooperate is authorized under 8 U.S.C. § 1231(a)(1)(C)."). But Respondents' claim is contradicted by the evidence in the record.[5]

First, it is manifest that the Sudan has not refused to accept Mr. Sesay because of a conflicting claim of

_____

[5] Respondents' argument that this case is similar to Pelich lacks merit. Mr. Sesay has not precluded Sierra Leone from determining his nationality, as Mr. Pelich did by refusing to fill out application forms. See 329 F.3d at 1061. Mr. Sesay has filled in all forms requested of him. It is noteworthy that although confusion surrounding the claims of nationality, origins, and even parentage was far greater in Pelich than here, no referral for additional fact finding was made in that case, and the issue of good or bad faith cooperation was determined without a definitive ruling on Mr. Pelich's real nationality. Mr. Sesay's case, far less convoluted, is even more amenable to decision without a referral.

nationality, but because he cannot provide the necessary documentary proof of citizenship. See Exhibit D

to the Traverse. Thus, Mr. Sesay has done nothing to impede his removal to the Sudan, and indeed, he has

done all he can to facilitate it. See Exhibit A to Traverse; see Moro v. INS, 58 F. Supp.2d 854, 858 (N.D.

Ill. 1999) (§ 1231 suspension does not apply where deportee cannot provide a non-existent birth certificate).

Second, Respondents contend that the reason for Sierra Leone's refusal is Mr. Sesay's truthful claim that

he is from the Sudan. Return at 3, 6. This assertion is based on an unsworn statements of a single ICE officer

in the summary section of Mr. Sesay's second custody review in December 2007. Return Exhibits at 57.

Tellingly, no record of the specific contact where this supposed reason for refusal was communicated to ICE

is given in the Travel Document Status section of that same custody review, see Return Exhibits at 54, nor

anywhere in the previous custody review. See Return Exhibits at 41-47. It was on the same day he approved

this custody review that the supervising ICE official signed the belated Notice of Failure to Comply. Return

Exhibits at 49.

Apart from this unsworn statement produced months after the supposed conversation with the consulate,

there is no basis for Respondent's claims. Rather, the weight of logic and the evidence indicates that the

refusal is based on the embassy's determination that Mr. Sesay's passport is counterfeit. See Exhibit A to

Traverse. While affidavits and the like are competent evidence in a habeas corpus proceeding, unsworn

assertions are not. See 28 U.S.C. § 2246. Sierra Leone's refusal of travel permission is more plausibly the

result of independent investigation into the validity of the passport, not a change of heart months later about

a claim of contrary nationality, since the consul told ICE he did not even believe the claim of Sudanese origin.

Only after an opportunity to investigate the passport to discover no such name or passport number on record did Sierra Leone refuse travel permission. See Traverse at 14.

Respondents incorrectly assert that Mr. Sesay is likely Sierra Leonean, because he was able to "renew" his passport in 1994. Return at 5; MRT 12-13. The 1994 passport was not a *renewal* of the original, but a forged passport which Mr. Sesay had obtained. It is precisely this 1994 passport–sent by ICE to the Sierra Leone officials, Return Exhibits at 1-3–which was found by the consulate to have a suspicious format and a non-existent name and number. The consul therefore refused to give travel permission for Petitioner, because *the passport presented to him* was fake. The original passport used to bring Mr. Sesay into the country illegally in 1986 apparently no longer exists. The traffic in false Sierra Leone passports is well documented. See William Reno, Clandestine Economies, Violence and States in Africa, 53 J. Int'l Affairs 433 (2000) (noting that during the civil war in Sierra Leone, rebel forces, under color of their claim to be the legitimate government, issued passports to foreigners in order to raise funds).

The weight of the evidence shows that *no act of Petitioner* was the basis of the refusal from either destination country: both countries refused acceptance based on documentary deficiencies, not on claims of contrary nationality. It is not unusual that countries refuse repatriation on the basis of invalid documents alone, even when there is little doubt as to the fact the deportee is a native of the refusing country.[6]

Respondents' suspension argument must be rejected, because there is no causal nexus between the rejections

---

[6] Mr. Sesay requests this Court take judicial notice of the records in Kantrdzhyan v. Chertoff, No. 08CV001-LAB (RBB) (S.D. Cal.), where the Petitioner alleged that Armenia's repeated refusal to grant travel documents was due solely to the invalidity of the Petitioner's passport. Fed. R. Evid. 201(b)(2) & (d).

1  and any willful act of Petitioner.  Thus, Pelich does not apply.

2

3  **3. The Facts Show That the Sudanese Claim Was Not Asserted to Frustrate Removal.**

4      Respondents argue that Mr. Sesay "continued to assert his Sierra Leone citizenship . . . until he was about

5

6  to be placed in removal proceedings."  Return at 2.  This is contrary to the evidence.  See Declaration of

7  Teena Case, Exhibit B attached hereto.  As counsel represented at the hearing, MRT 4-5, Ms. Case, Mr.

8  Sesay's fiancée, attests to the fact that this Sudanese origin is not a recent assertion, as Respondents claim.

9

10  Ms. Case's declaration indicates that she has known Petitioner as "Mikey Jabbar" since 2000, seven years

11  before the removal proceedings, and that he confided in her his true origins and history long before the

12

13  specter of removal would prompt him to manufacture a different nationality.  She also attests to the fact that

14  Petitioner publicly asserted these facts years before the supposed motive to fabricate arose.  Respondents'

15

16  theory of a suspiciously timed change of story to thwart removal efforts is belied by the Case Declaration,

17  and the Sudan claim is supported by the consistent assertions of Petitioner's own Declaration in Exhibit A

18

19  to the Traverse and his asylum application in Exhibit C.  The attachments to the asylum claim–which

20  Respondents did not include in their Exhibits–also attest to the fact that Petitioner had previously told

21

22  Ms. Case about his true origins, so Respondents were aware that the claim of Sudanese nationality antedated

23  the removal process.

24  **4. Conclusion.**

25

26      Although in the time available counsel was unable to secure declarations regarding the content of the

27  telephone interviews with Sierra Leonean and Sudanese consular officials, these are unnecessary for a full

28

determination of this case.  Regardless of whether Mr. Sesay is from Sierra Leone, the Sudan, or Greenland, the refusal of the two destination countries to accept him has nothing to do with subjective claims of nationality, but is based on the objective and concrete facts of deficient documentation.  As no post-removal act of Mr. Sesay is the cause of this deficiency, he is not the reason for ICE's failure to secure travel permission, and so the suspension provisions of § 1231(a)(1)(C) are inapplicable. Cf. Khan v. Gonzales, 481 F. Supp.2d 638 (W.D. Tex. 2006) (deportee's pre-removal destruction of his travel documents was not an act of obstruction precluding grant of habeas corpus).

## CONCLUSION

For the above reasons, the Court should not refer this mater to an IJ for fact finding. In addition, as this Court acknowledged that the burden to show eligibility for relief lies with Petitioner, MRT 3, he respectfully requests permission to file a short reply to the Respondents brief within three court days.

Respectfully submitted,

Dated:  April 4, 2008              _s/ James Fife_____
                                  **JAMES FIFE**
                                  **Federal Defenders of San Diego, Inc.**
                                  Attorneys for Petitioner SESAY
                                  james_fife@fd.org

**INDEX OF EXHIBITS**

<u>Idrisa Sesay v. Michael Chertoff, et, al.</u>

07CV2354-JM

<u>Page</u>

Exhibit A - *Reporter's Transcript of Motion Hearing, March 28, 2008* . . . . . . . . . . . . . . . . 1-21

Exhibit B - *Declaration in Support of Petitioner's Traverse* . . . . . . . . . . . . . . . . . . . . . . . . 22-23

# EXHIBIT A

( 31:19

1                         United States District Court

2                        Southern District of California

3

4    IDRISA SESAY,                    )
                                      )
5                       Petitioner,   )
                                      )
6        vs.                          ) Case No. 07-CV-2354 JM
                                      ) Motion Hearing
7    MICHAEL CHERTOFF, et al.,        )
                                      )
8                       Respondents.  ) Friday, March 28, 2008
     _____)
9

10                  Before the Honorable Jeffrey T. Miller
                        United States District Judge
11

12   Appearances:

13   For the Petitioner:      James Fife, Esq.
                              FEDERAL DEFENDERS OF SAN DIEGO
14                            225 W. Broadway, Suite 900
                              San Diego, CA   92101
15
     For the Respondents:     Karen Hewitt
16                            UNITED STATES ATTORNEY
                              By:  Samuel Bettwy
17                                 Raven Norris
                                   ASSISTANT U.S. ATTORNEYS
18                            880 Front Street, Suite 6293
                              San Diego, CA   92101
19

20

21   Official Court Reporter: Debra M. Henson, CSR, RPR
                              U.S. Courthouse
22                            940 Front Street, Suite 3142
                              San Diego, CA   92101
23                            (619) 238-4538

24

25           Record produced by certified stenographic reporter

1    San Diego, California – Friday, March 28, 2008

2         THE CLERK:  Calling item No. 1 on calendar, case

3    No. 07-CV-2354, Sesay versus Chertoff, et al., on for motion

4    hearing.

5         MR. FIFE:  Good morning, your Honor.  James Fife of

6    Federal Defenders on behalf of the petitioner.

7         MR. BETTWY:  Good morning, your Honor.  Sam Bettwy

8    representing the government.  Also here is Raven Norris,

9    Assistant United States Attorney.

10        THE COURT:  Very good.  Thank you.  Good morning to

11   everyone.  Well, this is an interesting case.  I have

12   questions that I'd like to have addressed.  I think it's no

13   surprise to anyone that I would observe that on the basis of

14   the evidence currently before the Court, it certainly seems

15   that the petitioner, by the weight of the evidence, is a

16   citizen of Sierra Leone, given all of the statements made by

17   the petitioner under oath, and that one might reasonably

18   suspect the latest representation of the petitioner that

19   petitioner is Sudanese.

20        I'm concerned about the state of the evidence in

21   this case, whether any further proceedings of an evidentiary

22   nature should be undertaken, whether any further

23   investigation into petitioner's nationality should be

24   undertaken, and, if so, by whom.  Those are some of the

25   questions I have at this point.  So who would like to respond

33:21  1  at this time?  Mr. Bettwy?

2          MR. FIFE:  Well, your Honor, since I guess the

3  petitioner bears the burden in this case --

4          THE COURT:  Well, I think that -- I think Mr.

5  Bettwy stepped up before you did.

6          MR. FIFE:  Okay.

7          THE COURT:  But I think you're right, I think you

8  do have the burden here.  And as I say, based on the weight

9  of the evidence before me, it certainly could be reasonably

10  inferred that the later representation, the last

11  representation of Sudanese nationality, was one that was done

12  for ulterior purposes.  So why don't we start with that

13  assumption, although you may not agree with it, Mr. Fife, and

14  then perhaps you can address some of the concerns and

15  questions I have.

16          MR. FIFE:  Your Honor, I'd point out first, as I

17  indicated in the traverse, that the question of whether or

18  not Mr. Sesay is entitled to Zadvydas relief hinges on

19  whether or not his -- at this point his removal period has

20  been extended under 1231 (a)(1)(C).  As the case law I cited

21  indicates, that can only happen under two conditions:  One,

22  there has to be a notification of a failure to comply during

23  the 90-day removal period.  That didn't happen here.  Also

24  that can only happen -- the extension can only happen based

25  on acts which occurred during the removal period, which also

35:06  1   did not happen here.

2   The contention is that Mr. Sesay is from Sierra

3   Leone and not from Sudan because when he came to the United

4   States, his slave master presented a false Sierra Leone

5   passport.  That's now been confirmed by the Sierra Leone

6   embassy, who have agreed that there is something suspicious

7   about this passport; they do not accept it, they have no

8   record of it.  It's true that Mr. Sesay has -- insisting that

9   he is now -- that he is Sudanese, that that is the truth, and

10  he has maintained consistent nationalities, but as the case

11  law indicates --

12  THE COURT:  How do we know that's the truth, Mr.

13  Fife?  I mean what investigation has been undertaken?  What

14  evidence is there, what statements are there from family

15  members or others who would have some knowledge of his true

16  citizenship?

17  MR. FIFE:  Your Honor, I apologize.  I tried to --

18  I have -- I believe it will arrive today by overnight mail --

19  a declaration of Mr. Sesay's long-time girlfriend, who -- and

20  I have a copy of the declaration, but I haven't received it

21  back with her signature -- but her declaration, it states

22  that she met Mr. Sesay in 2000, seven years before his

23  removal, and that after some reluctance, because of his

24  feelings of shame about his past, he finally revealed to her

25  his true name and that he was from the Sudan and his history

36:27

1    as outlined in the declaration Mr. Sesay -- of Mr. Sesay that

2    I attached to the traverse and that subsequently he testified

3    about this to her church group, and this was in the year 2001

4    or 2002.

5            THE COURT:  So that's coming in; that evidence is

6    coming --

7            MR. FIFE:  Yes, your Honor.  It should be literally

8    in the mail at this point.

9            THE COURT:  What about evidence from the wife?

10            MR. FIFE:  I believe that's the girlfriend whose

11    declaration I just mentioned.

12            THE COURT:  Is that who you're speaking of, the --

13            MR. FIFE:  Yes, that's right, your Honor.  She's

14    known him since 2000 and known that he has told her this and

15    told this to her church group many years before the start of

16    the removal hearing.

17            THE COURT:  Are there any other relatives, any

18    other immediate family members, or any other associates of

19    the petitioner of long standing who could also submit

20    declarations, affidavits on this question?

21            MR. FIFE:  There is a letter that I have from one

22    of the members of his church group who was a witness to his

23    testifying to this to the group church and that she does know

24    him as Mikey Jabbar, and that she knows that he's from Sudan,

25    and that he was held in involuntary servitude.

37:30

1      THE COURT:  Well, I'm not talking about just a

2  member of the church who may have had heard his testimony;

3  I'm talking about other people who have known him over the

4  course of his life.  Are there such people?

5      MR. FIFE:  That's the point, your Honor, is if you

6  look back at Mr. Sesay's declaration about the history of his

7  sad life, he was taken -- his father was killed, his family

8  fled, his mother gave him to a businessman, and that's the

9  last that he's ever seen of any member of his family.  And

10  when he --

11      THE COURT:  Where did he get that information?

12      MR. FIFE:  The information is his own memory, your

13  Honor.  He was eight years old when he was given to Hassan

14  Dossa, the businessman in Chad, and he has lived --  he lived

15  for a year and a half in Chad in servitude there and then was

16  sold to a farmer in South Africa and was an involuntary

17  servant, a slave, for this -- for this South African for a

18  number of years until he escaped.

19      THE COURT:  So by the age of eight, he was out

20  of --

21      MR. FIFE:  Yes.  So this is, yes, based on his

22  memory.  He doesn't remember certain things of his youth like

23  he -- he doesn't remember his actual birthdate because he

24  wasn't born in a hospital, he was born in a small rural

25  village where there's no birth certificate or hospital

7

38:38   1   records, so -- he thinks he was born in 1971 or '72, or 1970,

2   somewhere in that time.

3         THE COURT:  What other evidence are you

4   contemplating that could be produced that would bear some

5   indicia of reliability on this question, Mr. Fife?

6         MR. FIFE:  Something I learned over the weekend,

7   your Honor -- and I'll endeavor to get a declaration from the

8   embassy official on this -- when Mr. Sesay had the telephone

9   interview with the consulate official of the Sudan in

10   February, the consulate official spoke to him in Dinka, which

11   is a language only spoken in Sudan and is unrelated to the

12   language spoken in Sierra Leone.  Mr. Sesay was not able to

13   respond in Dinka, but he was able to respond in English,

14   understanding the questions that the consulate official was

15   putting to him in Dinka.  I think that's pretty strong

16   evidence that Mr. Sesay is from Sudan because he understood a

17   language which is only spoken there, which he claims is part

18   of his -- that he's part of the Dinka tribe.  And I believe

19   that --

20         THE COURT:  This was a Sudanese official?

21         MR. FIFE:  Yes, it's an official of the Sudanese

22   embassy.  His letter is attached to the traverse.  And I

23   believe that we should be able to get declarations from ICE

24   officials because Mr. Sesay said this was, of course, as most

25   of these telephone conferences are done, on a speakerphone

7

10:00

1   with ICE officials present so that they know what kind of

2   exchange is going on between the officials and the deportee.

3           Now, I don't know what ICE officials were there;

4   perhaps Mr. Bettwy can facilitate who those were and obtain

5   the information, but my understanding is that there was a

6   conference, that there was an exchange in this language which

7   only someone from Sudan is likely to know.  And though Mr.

8   Sesay has not lived there since he was a small child and

9   can't actually respond in Dinka, he was able to understand

10  and answer the questions.

11          THE COURT:  All right.  Procedurally we have a

12  circumstance where the immigration judge issued an order for

13  the petitioner's removal and designated Sierra Leone as the

14  appropriate country of removal.  If there are further factual

15  determinations to be made here, what is the thinking of the

16  parties as to the proper forum for that?

17          MR. FIFE:  Your Honor, I think if there's any

18  intensive factual matters that has to be taken in a case like

19  this, if your Honor doesn't have the time for that, the

20  proper procedure would be to refer it to the assigned

21  magistrate -- that's why we have assigned magistrates on

22  these habeas cases -- and the magistrate can take any

23  evidence that's available and issue a report and

24  recommendation to this Court, the parties can raise

25  objections, and this Court will make a final determination.

11:32  1         THE COURT:  Was there an appeal from the order of

2  removal?

3         MR. FIFE:  No, your Honor, and that was on the

4  advice of counsel precisely because he believed -- because he

5  knew that there was no evidence he was from Sierra Leone, and

6  he thought of course --

7         THE COURT:  And how do you have that evidence?

8         MR. FIFE:  This is by speaking to Mr. Sesay's

9  appellate counsel -- immigration counsel.

10        THE COURT:  Shouldn't that matter go before the

11  immigration judge?  In other words, might not this Court

12  remand so that the immigration judge may reconsider the

13  findings with this new evidence that you have made reference

14  to?

15        MR. FIFE:  Perhaps, your Honor.  I think there's a

16  strange anomaly in the record, as pointed out in one of the

17  exhibits to the traverse.  The minute order that was entered

18  at the initial removal hearing specified Sierra Leone/Sudan

19  as the destination countries.  I don't know what the

20  explanation is, but for some reason, Sudan wasn't listed on

21  the final order in May.  But at the initial hearing, the

22  immigration judge identified Sudan as a alternate

23  destination, so for -- maybe for some clerical reason, that

24  doesn't show up in the final order.

25        THE COURT:  Well, okay.  But didn't the immigration

12:38    1    judge also determine that Mr. Sesay was a national of Sierra

2    Leone?

3              MR. FIFE:  I think -- as far as I understand, what

4    she did was she rejected his asylum claim; that I'm not sure

5    because I haven't seen any of the records that show the

6    specific findings about what his nationality was.  The final

7    order says Sierra Leone as the destination, but that's in

8    conflict with the initial minute order.  I know she rejected

9    his asylum claim to Sudan, and I'm not sure whether that's

10    based on -- specifically whether it's based on the fact that

11    he didn't show that he had a credible fear, that he was out

12    of time, or whether she just didn't believe he was from

13    Sudan.  I don't know what -- how that proceeded.

14              THE COURT:  Do you agree that it might be

15    appropriate to remand the matter so that further

16    consideration might be given to the new evidence in the case

17    and to allow the immigration judge to make any modifications

18    or corrections that might be appropriate?

19              MR. FIFE:  I think not, your Honor, because I would

20    point to the procedure that was used in one of the cases I

21    cited, Abdel-Muhti, where it was almost exactly parallel to

22    the situation here where in fact the deportee had made

23    several conflicting claims about his name and nationality and

24    birthdate prior to the removal period, but at the -- from the

25    very first beginning of the removal period, he maintained a

10

14:12    1    consistent argument, supported by declarations of people that

2    had known him -- he had lived in the United States for a good

3    40 years, 30 years at that time -- people that knew him,

4    explaining that he -- that they believed him, and they seemed

5    to have knowledge that his -- his maintaining that he was

6    Palestinian was not an obstruction; even though he had made

7    multiple claims of different nationalities prior to the

8    removal period, during the removal period he did everything

9    to cooperate with being removed to the country that he

10    claimed was his true nationality.

11        The other problem I think I see with referring this

12    back to the immigration judge is that there is some question

13    of whether the immigration judge has any jurisdiction after

14    this point under 1252 because a final order has been entered

15    on this.  There's been no motion to reopen, there's been no

16    motion for reconsideration.  I'm not sure on what basis the

17    immigration judge could now start taking new evidence on this

18    matter.  But the procedure in Abdel-Muhti was simply the

19    district court considered the evidence and made a

20    determination whether or not the deportee had made a good

21    faith argument that he was Palestinian, even though ICE

22    believed he was Honduran and was insisting that he was and

23    that he was being uncooperative for insisting that he was

24    Palestinian and not Honduran.  And the district court in

25    Abdel-Muhti said that doesn't matter, he's maintained a good

15:38   1   faith with some credible evidence backing that up and so he

2   is not being obstructionist and therefore 1231 (a) doesn't

3   apply and he was granted release.

4          THE COURT:  Okay.  Thank you, Mr. Fife.

5   Mr. Bettwy?

6          MR. BETTWY:  Thank you, your Honor.

7          THE COURT:  Does any of this change the position of

8   the government here, any of this that you've heard today,

9   including the reference to new evidence?

10         MR. BETTWY:  Well, not -- I think your Honor's

11   brought up a good point.  I mean if this is the -- if there

12   is new evidence, if there's any possibility of some injustice

13   being done here, what else can be done rather than have Mr.

14   Sesay sitting in detention or being a standoff between him

15   and the service?

16         Mr. Fife said jurisdiction -- the IJ has no

17   jurisdiction because there's been no motion to reopen.

18   Precisely.  There's been no motion to reopen.  That's one of

19   the administrative remedies that Mr. Sesay has.  He didn't

20   appeal, but he could have.  He could bring a motion to

21   reopen, and he hasn't done that.

22         Also he claims to be from the Sudan, and in 2000 of

23   course he applied for TPS, temporary protected status, from

24   Sierra Leone using this 1994 passport, which he still hasn't

25   explained how he got that.  He keeps talking about the 1986

17:08    1    passport and how that's phony but never has explained how he

2    got a 1994 renewed passport.  He's got a new declaration in

3    his -- with the traverse, and it says nothing about how he

4    got this new passport, which I think is very strong evidence

5    that he is from Sierra Leone.  He keeps talking about the

6    1986 passport and how that passport doesn't appear to be

7    correct and that the Sierra Leone government doesn't know

8    what, you know, where that passport came from, but he doesn't

9    address the 1994 passport.

10    Anyway, getting back to this TPS, temporary

11    protected status, in 19 -- in 2000 when he applied for TPS

12    from Sierra Leone, the Sudan was also a designated TPS

13    country, and he did not apply to that -- for TPS, temporary

14    protected status, from the Sudan.  He could still do that

15    today.  He could have done that when he was -- when he first

16    found himself in removal proceedings.  He could have applied

17    for TPS from the Sudan.  So there's another administrative

18    remedy that he has done nothing to pursue, and there would be

19    factual determinations made in that process as well.  So he

20    doesn't -- it's not as if this Court has to order anybody to

21    do anything; the petitioner has two things that he could have

22    been doing to --

23    THE COURT:  So in essence you're saying the keys

24    are in his pocket.

25    MR. BETTWY:  Absolutely.  I don't -- obviously this

48:27

1   Court isn't -- in habeas jurisdiction is not supposed to be a

2   fact-finding body; it doesn't review factual determinations.

3   In effect, petitioner is now asking this Court to review the

4   removal order, and that can't be done either; that's the --

5   the Ninth Circuit has absolute exclusive jurisdiction on

6   removing -- in reviewing a final removal order.

7           In effect now, there's -- it's being asked that

8   this Court challenge the IJ's determination that Mr. Sesay is

9   from Sierra Leone and only would designate Sierra Leone.  The

10  reason that the IJ didn't designate Sudan is because she

11  didn't believe he was from the Sudan.  And the IJ by

12  regulation can't just put down any country; it has to be a

13  country that reasonably is supported by some evidence.  So

14  that's why -- there's no evidence that it was some clerical

15  error.  Yes, initially there was an indication -- when Mr.

16  Sesay initially claimed to be from the Sudan, there was --

17  the Court did write that down as a preliminary --

18  preliminary -- I don't know -- recall it was exactly an

19  order, maybe it was -- but there was a preliminary

20  indication, but that was based on his claim that he was from

21  the Sudan, not by the IJ's determination that that was an

22  appropriate country.

23          So I don't know if your Honor wants me to address

24  any of these other factual points.  As I say, it's really not

25  yours to determine whether Mr. Sesay is really from the

( 50:04

1    Sudan.  I mean everything that we hear is based on what Mr.

2    Sesay told Mr. Fife, and we really can't believe anything Mr.

3    Sesay says.  I mean now he's a perjurer.  He just submitted

4    to this Court a -- finally under penalty of perjury a

5    statement that he is not a native and citizen of Sierra

6    Leone; in 2000 he submitted two documents under penalty of

7    perjury with the department, with DHS, saying that he was a

8    native and citizen of Sierra Leone, so now he's officially a

9    perjurer.  So we can't believe anything that he says.

10            THE COURT:  Mr. Fife is saying this Court has no

11    jurisdiction to remand the matter to the immigration judge

12    for further proceedings; do you agree with that?

13            MR. BETTWY:  I don't, your Honor.  This Court has

14    broad equitable powers in habeas jurisdiction.

15            THE COURT:  Okay.  All right.  Thank you,

16    Mr. Bettwy.

17            MR. BETTWY:  Thank you, your Honor.

18            THE COURT:  Anything further, Mr. Fife?

19            MR. FIFE:  Your Honor, I just wanted to clarify

20    that the issue here is not whether or not Mr. Sesay should be

21    removed to one country or another, but the simple Zadvydas

22    issue is that is there a significant likelihood of his

23    removal in the reasonably foreseeable future.  No.  There's

24    no question about that.  Two countries have specifically

25    denied that they will receive him back.  Has he been held in

( 51:28

1   prolonged detention?  Yes.  He's two-thirds beyond the

2   reasonable period which the Supreme Court said.  He is

3   entitled to Zadvydas relief.

4         The only question is has he -- has the removal

5   period been extended under 1231 (a)(1)(C).  And as I pointed

6   out, for two reasons that cannot be the case.  The government

7   has not complied with the regulations which would allow the

8   extension of the time, and two, it's pointing only to factors

9   which occurred before the removal period.  And I would point

10  the Court's attention again to the case I cited, Khan.  At

11  page 642 the district court said "acts occurring before the

12  removal period cannot be the basis of extending the removal

13  and denying release because those will never change," which

14  means that the deportee will forever be noncooperative and

15  that the Court -- the district court says is contrary to the

16  finding of the Supreme Court in Zadvydas.

17        Now, there is nothing -- the government can point

18  to the fact that he has committed some perjury, he has

19  criminal convictions; they can try to muddy him as much as

20  they want, but the only legal question here for this Court is

21  has the removal period been extended beyond the 90 days.  If

22  it has not, under Zadvydas Mr. Sesay must be released on

23  order of supervision.  If the period has been extended only

24  if the government has complied with the regulations, which

25  they have not, and only if they can point to evidence of

52:58  1  obstruction during the removal period, which they have not.

2         Comparing this case to Abdel-Muhti, exactly the

3  same situation, there is a conflict in the record of

4  different claims of nationality, but there is a consistent

5  claim during the removal period which is supported by some

6  evidence, and that means that Mr. Sesay has made a good faith

7  claim of his nationality and has cooperated on that basis.

8  In fact, he has volunteered to get travel documents from

9  Sudan.  At his insistence ICE conducted the telephone

10  interview with the embassy with Sudan, not because ICE at any

11  point agreed that they were going to try to give up their

12  futile effort to remove him to a country, which the Sierra

13  Leone embassy back in August said this document is false.

14  They have no proof, no proof, that Mr. Sesay is a citizen of

15  Sierra Leone, and that is all that's required for Mr. Sesay

16  to receive Zadvydas relief at this point.

17         THE COURT:  You wish to in any event make a further

18  submission to the Court with this evidence --

19         MR. FIFE:  Yes, your Honor.

20         THE COURT:  -- for whatever purpose it may have?

21         MR. FIFE:  Yes, your Honor.  I believe this

22  declaration is in the mail.  I should receive it today.  It

23  was -- we gave instructions to overnight it to try to get it

24  here.  I was more confident at the time when this was set at

25  two o'clock that I was going to be able to bring it in to the

( 54:17    1    Court.

2                    I would also try to get declarations either from

3    the ICE officials who listened in on the conversation with

4    the Sudanese embassy or contact Mr. Ujwok at the embassy of

5    Sudan to see if he will -- if he can attest to the fact that

6    he spoke to Mr. Sesay in Dinka and Mr. Sesay responded

7    appropriately.

8                    As it was pointed out in Mr. Sesay's declaration,

9    Mr. Ujwok did express a feeling that he had -- Mr. Sesay had

10    a familiarity with Sudan, which struck him as being credible

11    that he was Sudanese.  That's a similar kind of evidence

12    which in Abdel-Muhti the district court looked at and said

13    yeah, there was evidence that people --

14                    THE COURT:  Mr. Fife, let me stop you for just a

15    moment because I do think I understand your position, and I

16    need some clarification on a point here.  You indicate you're

17    more than willing to submit additional evidence, and what I

18    think I'd like to do so that I have everything before me is

19    to have you submit that evidence, obviously serving it upon

20    the government as well --

21                    MR. FIFE:  Yes.

22                    THE COURT:  -- with any further points and

23    authorities you'd like to cite or arguments to meet the

24    argument made by Mr. Bettwy that this Court has equitable

25    remedies available to it as a habeas court to remand the

55:42 1 matter for further factual determinations, notwithstanding

2 there was no appeal from the order of removal and

3 notwithstanding your argument, your legal argument.  Why

4 don't you address that.  If we can do it in an expeditious

5 fashion, I think that would certainly be indicated.

6 Mr. Bettwy, would you like to have a period of time to

7 respond to that, so we have one more round of briefs on a

8 telescoped schedule so that at least this Court knows what

9 it's dealing with?

10     MR. BETTWY:  Yes, please, your Honor, because there

11 are a lot of arguments being raised about extension of the

12 removal period and so on, and I have a response to that; I

13 can do that in a brief.

14     THE COURT:  Okay.  Mr. Fife, how much time would

15 you like, a week, two weeks?

16     MR. FIFE:  A week would be fine.  And, your Honor,

17 I just want to clarify that you want a response specifically

18 to equitable powers to remand to the immigration court in

19 particular?  Because we have no objection to this being

20 referred to a magistrate as in the normal course of a habeas.

21     THE COURT:  Well -- and I think your statement

22 about that is clear and on the record.  But you'd like to --

23 you're opposing any suggestion that the matter be remanded to

24 the IJ, so --

25     MR. FIFE:  Okay.

56:51    1              THE COURT:  -- would a week be sufficient for you?

2              MR. FIFE:  One week would be fine, your Honor.

3              THE COURT:  Okay.  And then we would be looking at

4     you to file and serve any further papers by the 4th of April.

5     And, Mr. Bettwy, would you like a week after that?

6              MR. BETTWY:  Thank you, your Honor.

7              THE COURT:  Okay.  Then you would have until

8     April 11.  And then we'll take the matter under submission at

9     that time; the matter will be taken under submission as of

10    the 11th of April, and a decision will be rendered shortly

11    thereafter.

12             MR. FIFE:  Thank you, your Honor.

13             THE COURT:  Okay.  Thank you very much for your

14    arguments.

15         (The proceedings were concluded.)

16

17

18

19

20

21

22

23

24

25

57:25

## Certificate of Reporter

I hereby certify that I am a duly appointed, qualified, and acting Official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the mentioned cause on the date or dates listed on the title page of the transcript; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.

Dated _____ at San Diego, California.


_____
Debra M. Henson
Official Court Reporter


For electronic filing purposes only:
//s//Debra M. Henson

# EXHIBIT B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE JEFFREY T. MILLER)**

| | |
|---|---|
| IDRISA SESAY,<br><br>          **Petitioner,**<br><br>      v.<br><br>MICHAEL CHERTOFF, et al.,<br><br>          **Respondents.** | Case No.  07CV2354-JM (LSP)<br><br>**DECLARATION IN SUPPORT OF<br>PETITIONER'S TRAVERSE** |

I, Teena Case, declare:

1.     I am a friend of the Petitioner in the above-captioned habeas corpus action.  If called to testify, I would be a competent witness to the facts attested to below in this Declaration.

2.     I have known Petitioner since 2000, when we met in Tennessee, where I currently live.  He and I have a boyfriend-girlfriend relationship.

3.     Although he seemed ashamed of his past at first, he eventually told me his true name was Mikey Jabbar and that he was born in the Sudan.  He told me he had been held in slavery in South Africa and was abused as a child by his master.  He told me this in 2000.

22

4.      After he opened up about his past, he testified about his life to my church group.  He told them his name was Mikey Jabbar, that he was from the Sudan, and that he had been held in slavery.  This was in 2001 or 2002.

I declare under penalty of perjury that the foregoing is true and correct, except for matters stated to be on information and belief, and as to those matters, I believe them to be true.

Executed this  27  day of March, 2008, at Eastridge, Tennessee.

_Teena Case_
TEENA CASE
Declarant

23

## CERTIFICATE OF SERVICE

Counsel for Defendant certifies that the foregoing is true and accurate to the best information and belief, and that a copy of the foregoing document has been caused to be delivered this day upon:

Courtesy Copy to Chambers

Copy to Samuel Bettwy, Assistant U.S. Attorney via ECF NEF

Copy to Mr. Idrisa Sesay


Dated: April 4, 2008                    /s/ JAMES FIFE
                                        Federal Defenders of San Diego, Inc.
                                        225 Broadway, Suite 900
                                        San Diego, CA  92101-5030
                                        (619) 234-8467  (tel)
                                        (619) 687-2666  (fax)
                                        James_Fife@fd.org (email)