KAREN P. HEWITT
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California State Bar No. 94918
United States Attorney's Office
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-7119
Facsimile:   (619) 557-5004

Attorneys for Respondents

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

IDRISA SESAY,                              )    Case No. 07cv2354 JM (LSP)
[A77 062 688]                              )
                                           )
                 Petitioner,               )
                                           )
        v.                                 )
                                           )
MICHAEL CHERTOFF, Secretary                )
of the Department of Homeland              )
Security, et al.,                          )
                                           )
                 Respondents.              )
_____    )

RESPONDENTS'

SUPPLEMENTAL

RETURN TO PETITION

FOR WRIT OF HABEAS CORPUS

1

**TABLE OF CONTENTS**

2

3   I      INTRODUCTION      1

4   II     SUPPLEMENTED STATEMENT OF FACTS      2

5   III    ARGUMENT      6

6          A.     THE SCOPE OF THE COURT'S HABEAS REVIEW
                 AND EQUITABLE POWERS      6
7

8          B.     THE *ZADVYDAS/PELICH* STANDARD OF REVIEW      8

9          C.     BECAUSE OF HIS UNCOOPERATIVENESS,
                 SESAY CANNOT MEET HIS BURDEN UNDER *ZADVYDAS*      9

10          D.     AUTHORITY OF DHS TO CONTINUE DETENTION
                 UNDER 8 U.S.C. § 1231(a)(6) AND *ZADVYDAS*      12
11

12          E.     UNCLEAN HANDS DOCTRINE      15

13   IV    CONCLUSION      16

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07cv2354-JM

1

## TABLE OF AUTHORITIES

2

Cases                                                                          Page

3

Ayigba v. Young,
    2007 WL 2736678 (W.D. La. Jul. 12, 2007)                                   7

4

Balogun v. I.N.S.,
    9 F.3d 347 (5th Cir. 1993)                                                 9, 13

5

Castillo-Gradis v. Turnage,
    752 F. Supp. 937 (S.D. Cal. 1990)                                             9

6

7

Lema v. I.N.S.,
    341 F.3d 853 (9th Cir. 2003)                                                8, 15

8

Mariscal-Sandoval v. Ashcroft,
    370 F.3d 851 (9th Cir. 2004)                                                 15

9

10

Mitchell v. Gonzales,
    2007 WL 121348 (N.D. Fla. Jan 12, 2007)                                       7

11

Ndenge v. Gonzales,
    2008 WL 682091 (D. Minn. Mar. 6, 2008)                                        9

12

13

Orantes-Hernandez v. Thornburgh,
    919 F.2d 549, 558 (9th Cir. 1990)                                             7

14

Parra v. Perryman,
    172 F.3d 954 (9th Cir. 1999)                                                  8

15

16

Pelich v. I.N.S.,
    329 F.3d 1057 (9th Cir. 2003)                                              1, 8

17

Powell v. Ashcroft,
    194 F. Supp. 2d 209 (E.D.N.Y. 2002)                                         7, 8

18

19

Riley v. Greene,
    149 F. Supp. 2d 1256 (D.Colo. 2001)                                           9

20

Sanders v. United States,
    373 U.S. 1 (1963)                                                             6

21

22

Sango-Dema v. District Director,
    122 F. Supp. 2d 213 (D. Mass.  2000)                                          8

23

Seretse-Khama v. Ashcroft,
    215 F. Supp. 2d 37 (D.D.C. 2002)                                            7, 8

24

25

Singh v. Gonzales,
    499 F.3d 969 (9th Cir. 2007)                                                6, 7

26

Singh v. Gonzales,
    448 F. Supp. 2d 1214 W.D. Wash. 2006)                                     14, 15

27

28

**TABLE OF AUTHORITIES (Cont'd)**

<u>Cases</u>                                                                      <u>Page</u>

<u>Swann-Charlotte v. Mecklenburg Board of Education</u>,
        402 U.S. 1 (1971)                                                          7

<u>Zadvydas v. Davis</u>,
        533 U.S. 678 (2001)                                          1, 7, 8, 9, 12, 13

        <u>Statutes</u>

8 U.S.C. § 1229a(c)(6)(B)                                                          5

8 U.S.C. § 1231(a)(6)                                               2, 12, 13, 14, 15

8 U.S.C. § 1324(a)                                                                 3

REAL ID Act, Pub. L. No. 109-13, § 106, 119 Stat. 231, 310-311 (2005)             6

        <u>Regulations</u>

8 C.F.R. § 241.14(g)(5)(iv)                                                   14, 15

        <u>Miscellaneous</u>

62 Fed. Reg. 59735-38 (Nov. 4, 1997)                                         4, 10

72 Fed. Reg. 10541 (Mar. 8, 2007)                                           4, 10

*Accused Accepts Passport Deal,* FOR DI PEOPLE, Freetown, 6 Aug 1998, p.1         10

CIA, The World Factbook: *Sierra Leone*, <u>available at</u>
        <https://www.cia.gov/library/publications/the-world-factbook/print/sl.html>
        (last visited April 10, 2008)                                            11

*Collaboration: Police, Sojas, RUF*, THE DEMOCRAT, Freetown, 9 April 1998, p. 1  10

Pham, J. Peter, *A Viable Model for International Criminal Justice:*
        *The Special Court for Sierra Leone*, 19 N.Y. INT'L L. REV. 37, 87 (2006)  11

Reno, William, *Clandestine economies, violence and states in Africa*,
        53 J. INT'L AFF. 433 (2000), <u>available at</u>
        <http://www.allbusiness.com/government/3493198-1.html>
        (last visited April 10, 2008)                                            10

Report of the International Commission of Inquiry on Darfur to the United Nations
        Secretary-General (Geneva Jan. 25, 2005) (pursuant to UNSC Res. 1564), <u>available at</u>
        <http://www.un.org/news/dh/sudan/com_inq_darfur.pdf>
        (last visited April 10, 2008)                                            11

I

<u>INTRODUCTION</u>

The Court has asked the parties to address the scope of its habeas jurisdiction and equitable powers in this case, and has given the Government an opportunity to address new arguments raised by Petitioner Sesay in his Traverse, at the March 28, 2008 hearing, and in his April 4, 2008 supplemental briefing.  In short, this is a case in which the Court's role is to determine whether, under <u>Zadvydas v. Davis</u>, 533 U.S. 678 (2001), Sesay has met his burden to show that his removal is not significantly likely in the reasonably foreseeable future.  He has not met the burden, because his lack of cooperation with the Department of Homeland Security ("DHS") is preventing his removal.  <u>See</u> <u>Pelich v. I.N.S.</u>, 329 F.3d 1057, 1060 (9th Cir. 2003) (an alien cannot meet the burden to show that his removal is not significantly likely in the reasonably foreseeable future if he is preventing his own removal).

Sesay's story of how he came to the United States from Sudan is directly contradicted by known facts, public information, and documents that Sesay himself filed with the Immigration and Naturalization Service ("INS") in 2000.  And, Sesay's claim that he is not from Sierra Leone is undermined by, among other things, his continuing failure to explain away the fact that he obtained a re-newed Sierra Leone passport in 1994 and that he applied for Temporary Protected Status ("TPS") from Sierra Leone instead of Sudan in 2000.  Sesay's attorney has submitted, in the supplemental briefing, an improbable suggestion that Sesay <u>could</u> have obtained the passport during the time that rebels were in control of the Sierra Leone government.  [Pet.'s Supp. at 14.]  The suggestion is improbable because rebels seized the capital in 1997, whereas Sesay's passport was, according to the photocopy, issued in 1994.

There is also no factual basis for Sesay's assertion, in his supplemental briefing, that Sierra Leone has refused to issue a travel document based upon a determination that the 1994 passport is not genuine.  The Sierra Leone consulate has never indicated any opinion to DHS about the authenticity of the 1994 Sierra Leone passport.  [Pitt Declaration, para. 4.]  Rather, the Sierra Leone consulate has been reluctant to issue a travel document given Sesay's insistence that he is Sudanese and not from Sierra Leone.  [Ex. 57.]

//

Apart from whether Sesay is from Sierra Leone or Sudan or some other country, the broader issue is his persistent untruthfulness, which is hampering the efforts of DHS to remove him from the United States. Therefore, even if it were ultimately determined that Sesay is not a citizen of Sierra Leone, it would only constitute yet another passage in Sesay's long history of deceit regarding his true identity and citizenship.

Sesay argues in the alternative that, whether or not he is cooperating, DHS lacked authority to detain him beyond the 90-day removal period because, he argues, it failed to properly invoke its authority to do so under 8 U.S.C. § 1231(a)(1)(C) (uncooperativeness). The question is moot because, at the end of the 90-day removal period, DHS invoked 8 U.S.C. § 1231(a)(6) (dangerousness/flight risk), not Section 1231(a)(1)(C), to detain Sesay beyond the 90-day removal period, and Sesay has not challenged such detention authority.

## II

## SUPPLEMENTED STATEMENT OF FACTS

This statement of facts has been substantially supplemented to address Sesay's new allegations and arguments.

On July 26, 1986, Sesay entered the United States as a visitor for pleasure, through New York City, by presenting a Sierra Leone passport and a B-2 nonimmigrant visa that had been issued by a U.S. consulate abroad, presumably in Freetown, Sierra Leone. [Exs. 7, 11, 29, 63.][1] Sesay alleges that his South African slave master, a Mr. Johannes Sepat, had provided him with a counterfeit Sierra Leone passport. [Ex. 87; Pet. at 2, 4.] In a sworn declaration dated March 27, 2007 (over the name "Mikey Jabbar"), Sesay claims that he was kept as a slave worker by Mr. Sepat in New York and then in Maryland until about 1989 when he managed to escape. [Exs. 87-88.] Sesay swears that, after that, he was homeless for six months and then taken in by a dying man named Mr. Robinson who taught him how to read and write. [Ex. 88.]

//

---

[1] "Ex." refers to exhibits (Exs. 1-62), which accompany the Government's Return and additional exhibits (Exs. 63-112) which accompany this supplemental return. The A-File has been reviewed by Sesay's attorney. Exs. 97-105 comprise printouts from DHS's "DACS" database relating to Sesay.

1    However, the documents in Sesay's A-File show that he was brought to the United States by
2    "an uncle"[2] and then lived with relatives in Takoma Park, Maryland.[3]  [Exs. 66-68, 89.][4]  That fall he
3    enrolled as a sophomore at High Point High School.  [Id.]  After only three years, he graduated.  After
4    graduation from high school in 1989, Sesay worked at the Trak Auto near his home.  [Ex. 69.][5]  At the
5    time, the employment sanctions law enacted in 1986, see 8 U.S.C. § 1324a (1986), was being vigorously
6    enforced nationwide, so it may be reasonably presumed that Sesay submitted false documents to verify
7    his employment authorization.  In the summer of 1989, Sesay was arrested on theft charges in
8    Hyattsville, Maryland.  [Exs. 4-5, 20.]

9    Then, in 1990, Sesay moved with his girlfriend Mariama Kamara to Hollywood, California, and
10   attended college from 1992 to 1996 at Los Angeles City College and California State University,
11   Los Angeles.  [Exs. 22, 71-74, 79.][6]  During that time, Ms. Kamara and Sesay had a child who is now
12   15 or 16 years old.  [IFP Motion, item no. 8; Ex. 22 (identified as "Sheck"), Ex. 75 (identified as
13   "Almanya Sesay").]  In the summer of 1992, Sesay was arrested on battery charges in Los Angeles.  [Ex.
14   4.]

15   On August 27, 1994, Sesay obtained a re-newed passport from the Government of Sierra Leone.
16   [Exs. 1-3, 12-14.]

17   //

18   
_____

19   [2]    On information and belief (ICE attorney worksheet which can be corroborated by a transcription
      of the recorded hearing), on February 7, 2007, either Sesay or his attorney told the Immigration Judge
20   ("IJ") that "an uncle" had brought him to the United States.

21   [3]    Public information indicates that Sesay has extensive family ties in the D.C. area.

22   [4]    Exs. 66-69 comprise documents that Sesay attached to his 2000 application for Temporary
      Protected Status ("TPS") from Sierra Leone.  Sesay's report cards are for grades 10 and 11 (academic
23   years 1986-87 and 1987-88).  The letter from the school district is addressed to Sesay's guardian "John
      Edwards" at 6735 New Hampshire Avenue.  In a worksheet that Sesay himself completed on July 30,
24   2007, he identifies "John K. Edwards" of Takoma Park, Maryland, as his cousin.  [Ex. 89.]  Public
      information shows that other relatives with the last name "Robinson" or "Robinson-Edwards" have lived
25   at the same address (not at a separate address where Sesay supposedly obtained refuge after escaping
      from a Mr. Sepat).

26   [5]    Public information shows the existence of a Trak Auto store at 6300 New Hampshire Avenue,
27   Takoma Park, MD, 20912, which is one mile south of the apartment where Sesay lived with his
      relatives.

28   [6]    Further research could reveal what citizenship Sesay claimed when he enrolled.

1    In the summer of 1998, Sesay was arrested in Los Angeles for spousal abuse (presumably against

2    Ms. Kamara, the mother of his child) [see Exs. 4, 75], and in 1999, he was arrested and convicted in

3    Los Angeles of falsely reporting a crime.  [Exs. 5, 20.]

4    On February 4, 2000, Sesay applied to INS for Temporary Protected Status ("TPS") from

5    Sierra Leone, claiming, under penalty of perjury to be a native and citizen of Sierra Leone.  [Exs. 7-11.]

6    INS approved the TPS application and the accompanying application for employment authorization.

7    [Exs. 7, 11.]  At the time, Sudan was also a TPS-designated country, see 62 Fed. Reg. 59735-38 (Nov.

8    4, 1997), and remains a TPS-designated country.  See 72 Fed. Reg. 10541 (Mar. 8, 2007).  Sesay has

9    never applied for TPS with respect to Sudan, and he has not explained why not.

10   From 2000 to 2001, Sesay worked as a counselor at a group home in Agoura Hills, California.

11   [Ex. 23.]  On November 4, 2001, police began an investigation into an accusation that Sesay had

12   repeatedly sexually molested a developmentally disabled adult female at the group home.  [Ex. 17.]

13   Pending the investigation, Sesay fled to Tennessee to avoid arrest.  [Exs. 24-25.]  On April 9, 2002, a

14   warrant was issued for his arrest [Ex. 17.]  In Tennessee, he worked as a diesel mechanic and met

15   Ms. Teena Case.  [Exs. 22-23, 28; 79.]  On April 11, 2003, Sesay was arrested and he reported to the

16   booking officer that he was a U.S. citizen.  [Ex. 16.]  Sesay also told the police that he had come to the

17   United States in 1986 from Sierra Leone.  [Ex. 22.]

18   On October 26, 2004, Sesay was convicted by a judge in Los Angeles of sexual battery by

19   restraint and sentenced to four years in prison.  [Ex. 15.]  On August 16, 2006, Sesay was interviewed

20   at the California State Prison at Soledad by a DHS officer to whom Sesay stated that he was a citizen

21   of the U.S. Virgin Islands (and that he had entered the United States at some time in 1982).  [Ex. 29.]

22   On October 2, 2006, DHS lodged a detainer with the warden of the prison where Sesay was serving his

23   sentence [Ex. 27], and on October 24, 2006, Sesay was transferred to the custody of DHS, which

24   commenced removal proceedings.  [Exs. 30-34.]

25   At hearings before the Immigration Judge ("IJ") on December 7, 2006, and January 3, 2007,

26   Sesay requested continuances to find an attorney.  At a hearing on February 7, 2007, represented by

27   counsel, he pleaded to the allegations and charges in the charging document ("Notice to Appear"),

28   denying for the first time that he is native and citizen of Sierra Leone and asserting that he is a native

1    and citizen of Sudan. [Ex. 32.]7/ On March 27, 2007, he filed an application for asylum in Immigration

2    Court, asserting, under penalty of perjury, that he is a native and citizen of Sudan. [Exs. 76-88.]

3    On May 10, 2007, the IJ ordered Sesay removed form the United States, designating only Sierra

4    Leone as the appropriate country of removal. [Ex. 32.] Sesay waived appeal from the IJ's decision, [id.],

5    and he did not bring a motion to re-open removal proceedings. See 8 U.S.C.A. § 1229a(c)(6)(B).

6    On May 11, 2007, DHS requested travel documents from the Sierra Leone consulate. [Ex. 36.]

7    On June 13, 2007, a consular officer of Sierra Leone interviewed Sesay who claimed to be a native of

8    Sudan. [Exs. 44, 97.]

9    On August 1, 2007, DHS notified Sesay that, on August 8, 2007, it would conduct a 90-day

10   custody review to determine whether he should be released from custody. [Ex. 38.] Sesay was notified

11   that he needed to demonstrate that he would not pose a flight risk or danger to the community. [Id.] The

12   custody review was conducted on August 12, 2007 by Deportation Officer John Thomas. [Ex. 41.]

13   On August 17, 2007, DHS notified Sesay that his detention would continue beyond the 90-day removal

14   period because DHS deemed him to be a danger to the community and a flight risk if released. [Ex. 38;

15   see Exs. 40-47.]

16   On November 20, 2007, Officer Thomas conducted another custody review and referred the case

17   to DHS headquarters for further review, noting that local DHS still had not received a response from the

18   Sierra Leone consulate. [Exs. 48, 106-12.]

19   On December 4, 2007, Officer Thomas began a six-month custody review. [Ex. 51.] During the

20   review, the Sierra Leone consulate notified DHS that a travel document would not be issued due to

21   Sesay's claim that he is Sudanese. As Officer Thomas noted in his report:

22       the Sierra Leone consulate notified ICE [Immigration and Customs Enforcement] that
         a travel document would not be issued due to him claiming to be a Sudanese citizen.

23       Since then, SESAY keeps providing ICE and the Sierra Leone Consulate with conflicting
         information regarding his true nationality. Although SESAY is considered a danger to

24       the community, he is further considered a Failure to Comply, due to deception
         surrounding his country of removal. Due to SESAY's lack of cooperation, ICE cannot

25       verify his true identity and nationality.

26   Ex. 57 (emphasis added).

27   _____

28       7/    Sesay also initially denied to the IJ that he had been convicted of sexual battery by restraint. [Ex.
         32.]

1    Accordingly, DHS determined that Sesay was "hampering removal and engaging in deceptive

2    behavior." [Id.]  On December 11, 2007, DHS issued and served a "Notice of Failure to Comply," citing

3    Sesay's failure to cooperate with efforts to obtain a travel document for his removal from the

4    United States.  [Exs. 49-57, 102.]  DHS has served Sesay with monthly Notices of Failure to Comply.

5    [Exs. 58-62.]

6    On December 17, 2007, Sesay commenced these habeas proceedings by filing a verified petition

7    in which he alleged that he is not a native and citizen of Sierra Leone [Pet. at 4:2-3], and he repeated the

8    allegations in a sworn statement which accompanies his Traverse.

9    On or about February 26, 2008, the Sudanese consulate determined that Sesay is not a Sudanese

10    citizen and denied DHS's request for a travel document.  [Ex. 104; Pitt Declaration, para. 5.]  The

11    Sierra Leone consulate has <u>not</u> formally denied DHS's request for a travel document.  [Pitt Declaration,

12    para. 3.]

13                                          III

14                                      ARGUMENT

15    A.    THE SCOPE OF THE COURT'S HABEAS REVIEW
             AND EQUITABLE POWERS

16

17    This Court has asked the parties whether it may "remand" the case to the IJ to reconsider, based

      upon hearing further evidence, whether Sierra Leone is an appropriate country of removal.  Although
18
      habeas proceedings are equitable in nature,[8] subject matter jurisdiction must lie.  According to the REAL
19
      ID Act,[9] this Court lacks subject matter jurisdiction to review the IJ's designation of Sierra Leone as the
20
      appropriate country of removal. <u>See Singh v. Gonzales</u>, 499 F.3d 969 (9th Cir. 2007) ("The Act provides
21
      that a petition for review in the court of appeals is 'the sole and exclusive means for judicial review of
22
      an order of removal'") (citing 8 U.S.C. § 1252(a)(5)).  Therefore, this Court may not review whether the
23
      IJ correctly designated Sierra Leone in her removal order, and it may not "remand" the case to the IJ,
24
      since this Court does not sit as a court of direct review of removal orders.
25

26    [8]    <u>See Sanders v. United States</u>, 373 U.S. 1, 17 (1963) ("habeas corpus has traditionally been
      regarded as governed by equitable principles") (quoting <u>Fay v. Noia</u>, 372 U.S. 391, 438 (1963), and
27    <u>United States ex rel. Smith v. Baldi</u>, 344 U.S. 561, 573 (1953) (dissenting opinion)).

28    [9]    Pub.L. No. 109-13, § 106, 119 Stat. 231, 310-311 (2005).

                                                6                           07cv2354-JM

1    However, the REAL ID Act does not preclude this Court from reviewing custody decisions and

2   ineffective-assistance-of-counsel challenges.  See Singh v. Gonzales, 499 F.3d at 979 (scope of habeas

3   review includes ineffective assistance of counsel claims despite REAL ID Act "notwithstanding his

4   ultimate goal or desire to overturn that final order of removal").  Sesay has not alleged ineffective

5   assistance of counsel in his removal proceedings, but he does contend that his removal is not

6   significantly likely in the reasonably foreseeable future.  Therefore, pursuant to Zadvydas, this Court has

7   habeas authority to examine such contention.

8    Given this Court's broad equitable powers in habeas proceedings,[10/] it could direct the IJ to

9   determine whether Sesay has been cooperating with DHS to effect his removal, but IJs have no expertise

10   in making such determinations.[11/]  A review of case law indicates that other district courts have taken

11   evidence to consider whether "the government has produced sufficient evidence to rebut the petitioner's

12   claim that there is no significant likelihood of removal in the reasonably foreseeable future."  Ayigba v.

13   Young, 2007 WL 2736678 at *6 (W.D. La. Jul. 12, 2007) ("the court finds that it is likely that petitioner

14   can and will be removed once he provides accurate and complete information to the INS");

15   Seretse-Khama v. Ashcroft, 215 F. Supp. 2d at 49 (D.D.C. 2002) (finding that the Government had not

16   rebutted the alien's showing with sufficient evidence); Powell v. Ashcroft, 194 F. Supp. 2d at 211

17   ("I find that Powell has acted to prevent his removal"); Mitchell v. Gonzales, 2007 WL 121348 at *7

18   (N.D. Fla. Jan 12, 2007) ("Respondents also have not demonstrated that Petitioner is hindering his

19   removal").

20    B.    THE *ZADVYDAS / PELICH* STANDARD OF REVIEW

21    In Zadvydas, the Supreme Court explained that, six months after a removal order becomes final,

22   a detained alien is eligible for conditional release upon demonstrating that there is "no significant

23   likelihood of removal in the reasonably foreseeable future."  Id. at 701.  However, this "does not mean

24

25   [10/]    See Swann-Charlotte v. Mecklenburg Board of Education, 402 U.S. 1 (1971); Orantes-Hernandez
26   v. Thornburgh, 919 F.2d 549, 558 (9th Cir. 1990).

27   [11/]   By contrast, in custody matters, IJs do have expertise in determining flight risk and
     dangerousness.  See Zadvydas, 533 U.S. at 699 ("Ordinary principles of judicial review in this area
28   recognize primary Executive Branch responsibility.  They counsel judges to give expert agencies
     decisionmaking leeway in matters that invoke their expertise").

1   that every alien not removed must be released after six months." Id.  Detention may continue "until it

2   has been determined that there is no significant likelihood of removal in the reasonably foreseeable

3   future." Id.  The alien has the burden of coming forward with "good reason to believe that there is no

4   significant likelihood of removal in the reasonably foreseeable future." Id.  If the alien satisfies that

5   burden, the Government must respond with "evidence sufficient to rebut that showing." Id.

6          As a matter of law in this Circuit, a detained alien cannot meet his burden as long as his acts of

7   non-cooperation are the reason that he cannot be removed. See Lema v. I.N.S., 341 F.3d 853, 856-57

8   (9th Cir. 2003) ("We hold today, consistent with *Zadvydas* and *Pelich*, that when an alien refuses to

9   cooperate fully and honestly with officials to secure travel documents from a foreign government, the

10  alien cannot meet his or her burden to show there is no significant likelihood of removal in the

11  reasonably foreseeable future"); Pelich v. I.N.S., 329 F.3d at 1060 ("the detainee cannot convincingly

12  argue that there is no significant likelihood of removal in the reasonably foreseeable future if the

13  detainee controls the clock") (citing Parra v. Perryman, 172 F.3d 954, 958 (9th Cir. 1999) ("A criminal

14  alien who insists on postponing the inevitable has no constitutional right to remain at large during the

15  ensuing delay, and the United States has a powerful interest in maintaining the detention in order to

16  ensure that removal actually occurs"); Powell v. Ashcroft, 194 F. Supp. 2d 209, 210-11 (E.D.N.Y. 2002)

17  (alien who claimed in four affidavits that he was from U.S. Virgin Islands, Jamaica, Trinidad, and

18  Canada, and provided false name and false date of entry, prevented his removal); and Sango-Dema v.

19  District Director, 122 F. Supp. 2d 213, 221 (D. Mass. 2000) (court upheld further detention of alien who

20  refused to provide passport and birth certificate, and refused to communicate with embassy officials or

21  complete application for documents)); Seretse-Khama v. Ashcroft, 215 F. Supp. 2d 37, 51 (D.D.C. 2002)

22  (an act of non-cooperation would include petitioner's denying his Liberian citizenship to the consulate

23  or giving false or misleading information that impeded the issuance of travel documents); Ndenge v.

24  Gonzales, 2008 WL 682091 at *2 (D. Minn. Mar. 6, 2008) ("where an alien will not cooperate with

25  efforts to procure travel documents to another country, the alien does not meet the burden of showing

26  no significant likelihood of removal. The reasoning is that, where the timing of removal is controlled

27  by an uncooperative alien rather than immigration officials, there is no meaningful way to ascertain the

28  likelihood of removal").

1      The same principle of law applied even before the <u>Zadvydas</u> decision was handed down.  <u>See</u>

2 <u>Balogun v. I.N.S.</u>, 9 F.3d 347, 350-51 (5th Cir. 1993) ("No court that has considered the issue has held

3 that the INS must release a deportable alien from detention if the alien engages in conduct which

4 prolongs his detention beyond the six-month period"); <u>Riley v. Greene</u>, 149 F. Supp. 2d 1256, 1263

5 (D.Colo. 2001) (Detention is justified due to Mr. Riley's refusal to assist in obtaining traveling

6 documents to effect departure and his attempt to renounce his citizenship in both Egypt and Lebanon);

7 <u>Castillo-Gradis v. Turnage</u>, 752 F. Supp. 937, 941 (S.D. Cal. 1990) (then effective statute mandated

8 release after six months "absent a showing of . . . delay caused by the alien's own actions") (citing <u>Dor v.</u>

9 <u>District Director</u>, 891 F.2d 997, 1003 (2d Cir. 1989) (refusing to order Dor released because he was

10 "largely responsible for the very delay of deportation of which he complain[ed]")).

11

12               C.     BECAUSE OF HIS UNCOOPERATIVENESS,
                    <u>SESAY CANNOT MEET HIS BURDEN UNDER *ZADVYDAS*</u>

13      Under <u>Zadvydas</u>, Sesay has the initial burden of coming forward with "good reason to believe

14 that there is no significant likelihood of removal in the reasonably foreseeable future." <u>Id.</u> at 702.

15 He contends in his supplemental briefing that Sierra Leone has denied DHS's travel document request

16 on the basis of its determination that the 1994 passport is not genuine [Pet. Supp. at 13:21-22], but there

17 is no factual basis for his contention.  The Sierra Leone consulate has not formally denied DHS's travel

18 request, and it has never expressed any opinion to DHS about the validity of Sesay's 1994 passport.

19 [Pitt Declaration, paras. 3-4.][12]  It has indicated only that it will not issue a travel document given

20 Sesay's insistence that he is from Sudan.  [Ex. 57.]

21      Regardless of whether the burden of proof has shifted to the Government, there is sufficient

22 evidence that Sesay has failed to cooperate with DHS to effect his removal, including his implausible

23 story of how he came to the United States from Sudan and his implausible claim that he is not from

24 Sierra Leone, especially given his failure to explain how and why he obtained the Sierra Leone passport

25 in 1994 and why he applied for TPS from Sierra Leone instead of Sudan in 2000.

26 //

27 _____

28 [12]  Sesay has not produced the original passport [Pitt Declaration, para. 4], so DHS is unable to conduct a forensic analysis of it.

            07cv2354-JM

1    Sesay insists that he is now being honest in his assertions that he is a native and citizen of Sudan

2    and not of Sierra Leone, yet for twenty years, from the time that he obtained a B-2 visa to come to this

3    country on a Sierra Leone passport in 1986, he consistently held himself out as a citizen of Sierra Leone

4    [Exs. 7-8, 11, 22] and even obtained a re-newed Sierra Leone passport in 1994.

5    In his supplemental briefing, Sesay still has made no effort to explain how and why he obtained

6    the re-newed Sierra Leone passport.  His attorney cites authority that non-citizens of Sierra Leone could

7    obtain Sierra Leone passports during the time that rebels had seized the capital and "used its sovereign

8    right to issue passports as a means to generate income from outsiders." See Reno, William, *Clandestine*

9    *economies, violence and states in Africa*, 53 J. INT'L AFF. 433 (2000), available at

10   <http://www.allbusiness.com/government/3493198-1.html> at *4 (last visited April 10, 2008).

11   However, according to the photocopy [Ex. 1], Sesay's passport was issued in 1994, whereas the rebels

12   did not seize the capital until three years later, in 1997.  See id. (citing *Accused Accepts Passport Deal,*

13   FOR DI PEOPLE, Freetown, 6 Aug 1998, p.1; *Collaboration: Police, Sojas, RUF*, THE DEMOCRAT,

14   Freetown, 9 April 1998, p. 1).

15   Furthermore, Sesay has not explained why, in 2000, he applied for TPS from Sierra Leone when

16   Sudan was also a TPS-designated country.  On November 4, 1997, the INS designated Burundi,

17   Sierra Leone, and Sudan as TPS countries.[13/] See 62 Fed. Reg. 59735-38 (Nov. 4, 1997).  Sudan remains

18   a TPS-designated country today, see 72 Fed. Reg. 10541 (Mar. 8, 2007), but Sesay has never applied for

19   TPS from Sudan.

20   Regarding Sesay's claim to Sudanese citizenship, the Sudanese consulate has determined that

21   Sesay is not a citizen of Sudan and has therefore formally refused to issue a travel document.  [Ex. 104;

22   Pitt Declaration, para. 5.]  Furthermore, Sesay's account of how he came to the United States from

23   Sudan is wholly inconsistent with many known facts.  Sesay claims that he was born in 1970 or 1971-72

24   [Pet. at 3:3; Ex. 86] and that he was eight years old (therefore it was between 1978 and 1980) when his

25   mother and siblings fled Sudan after his father was killed and their village church was burned by the

26   _____

27   [13/]    Sesay obtained his re-newed Sierra Leone passport three years earlier, in 1994, so the availability
     of TPS for Sierra Leone does not explain what prompted him, if anything, to obtain the re-newed
28   passport.

1  Janjaweed for religious reasons. [Exs. 80, 86.] His account does not jibe with the historical fact that

2  such ethnic violence by the Janjaweed against the Dinkas did not emerge until after the civil war in

3  Sudan began three years later, in 1983. See Report of the International Commission of Inquiry on Darfur

4  to the United Nations Secretary-General (Geneva Jan. 25, 2005) (pursuant to UNSC Res. 1564),

5  available at <http://www.un.org/news/dh/sudan/com_inq_darfur.pdf> (last visited April 10, 2008).

6      Sesay claims (through his attorney) that he has some familiarity with Sudan and can understand

7  Dinka and that this can be corroborated by a Sudanese consular officer who interviewed him. [Tr. 7:8-

8  10.] DHS has no record of such an interview, and the undersigned can find no local Deportation Officer

9  who has knowledge that such an interview took place. [see Exs. 103-04.] At any rate, if Sesay's

10  assertion is true, he could have studied about Sudan and learned some Dinka once he decided to claim

11  Sudanese citizenship instead of Sierra Leone citizenship. Or, perhaps he has a relative or relatives who

12  are from Sudan. A more weighty language consideration is Sesay's apparent proficiency in English.

13  Upon his arrival in the United States, he spoke English well enough to finish high school in three years

14  and then attend college, which is consistent with the fact that English is the official language of

15  Sierra Leone, spoken there exclusively by the educated elite. See Pham, J. Peter, *A Viable Model for*

16  *International Criminal Justice: The Special Court for Sierra Leone*, 19 N.Y. INT'L L. REV. 37, 87 (2006);

17  C I A ,   T h e   W o r l d   F a c t b o o k :   *S i e r r a   L e o n e*,   a v a i l a b l e   a t

18  <https://www.cia.gov/library/publications/the-world-factbook/print/sl.html> (last visited April 10,

19  2008).

20      As set forth in the facts above, Sesay's story of three years of enslavement by a Mr. Sepat in

21  New York and Maryland from 1986 to 1989, his escape, a six-month period of homelessness, and then

22  his rescue by a dying Mr. Robinson who took him in and taught him to read, is obviously false according

23  to documents Sesay himself submitted to INS in 2000. In reality, Sesay came to the United States with

24  a relative on a visitor's visa issued by a U.S. consulate, and during the three years that he was supposedly

25  enslaved by the fictional Mr. Sepat, he lived with relatives in the D.C. area and attended high school.

26  After those three years, when he supposedly escaped from Mr. Sepat and was homeless and illiterate,

27  he actually moved to Hollywood with his girlfriend to attend college.

28  //

1    Added to the obvious inconsistencies in Sesay's stories (and in his attorney's strained attempts

2    to corroborate them) is a long pattern of deceitfulness:  in 1989, he was arrested for theft; in 1999, he

3    was convicted of falsely reporting a crime; he has two social security numbers [Exs. 20, 28, 64-65]; he

4    has used multiple dates of birth [Ex. 20]; he fled to Tennessee when he was under investigation in

5    California; he claimed to be a U.S. citizen to police in 2003 [Ex. 16]; and he claimed to be a U.S. citizen

6    to DHS in 2006.  [Ex. 29.]  In addition, he is a perjurer, because he has submitted to this Court both a

7    verified petition and a sworn statement that he <u>is not</u> a native and citizen of Sierra Leone, and he

8    submitted sworn statements to INS (in 2000) that he <u>is</u> a native and citizen of Sierra Leone.

9    In sum, given Sesay's long history of untruthfulness and his failure to offer anything credible in

10    this case, an evidentiary hearing is not indicated.  The Court should deny the Petition, based upon a

11    finding that, because of his uncooperativeness, Sesay has failed to meet his burden to prove that his

12    removal is not significantly likely in the reasonably foreseeable future.

13

14    D.    AUTHORITY OF DHS TO CONTINUE DETENTION
          UNDER 8 U.S.C. § 1231(a)(6) AND *ZADVYDAS*

15    Sesay has also raised a new argument in his Traverse that DHS lacked authority, under 8 U.S.C.

16    § 1231(a)(1)(C) (uncooperativeness), to continue detention beyond the 90-day removal period (August

17    2007) because, he contends, his acts of non-cooperation did not occur during the 90-day removal period,

18    and because DHS did not issue and serve its Notice of Failure to Comply until December 2007, after the

19    90-day removal period had elapsed.  The argument is moot, because on August 17, 2007, DHS invoked

20    Section 1231(a)(6) (dangerousness/flight risk), not Section 1231(a)(1)(C), to detain Sesay beyond the

21    expiration of the 90-day removal period.  [Ex. 39.]

22    Sesay's acts of non-cooperation did begin during the 90-day removal period, in his June 2007

23    interviews with the Sierra Leone consulate [Ex. 97], but DHS did not learn, until December 2007, that

24    his statements during those interviews had hampered their efforts to obtain travel documents.  [Exs. 48,

25    57, 97, 100, 106-12.]    Therefore, in August 2007, DHS invoked Section 1231(a)(6)

26    (dangerousness/flight risk), not Section 1231(a)(1)(C) (uncooperativeness), to detain Sesay beyond the

27    90-day removal period.

28    //

12                                07cv2354-JM

1    Authority under Section 1231(a)(1)(C) is needed to detain an alien beyond the 90-day removal

2    period only when DHS lacks authority to extend detention under Section 1231(a)(6).  Therefore, when

3    DHS invoked authority to extend the 90-day removal period under 8 U.S.C. § 1231(a)(1)(C), on

4    December 7, 2007 [Ex. 49], it was a superfluous invocation, because on August 17, 2007, DHS had

5    already invoked Section 1231(a)(6) to continue detention beyond the 90-day removal period.  [Ex. 39.]

6    To the extent that Sesay would argue that the Government is required to invoke 8 U.S.C. §

7    1231(a)(1)(C) (within the 90-day removal period) to detain an alien for more than six months after the

8    final removal order on the basis of the alien's failure to cooperate (beyond the presumptively reasonable

9    period of detention under Zadvydas), there is no authority or logic to support the argument.  Indeed, the

10   argument would lead to the conclusion, *reductio ad absurdum*, that DHS must release dangerous/flight-

11   risk aliens who cooperate during the 90-day removal period, but who then purposefully prevent their

12   ultimate removal once the period has ended.  It is not uncommon for a dangerous/flight-risk alien, who

13   was cooperative throughout the 90-day removal period, to offer physical resistance or otherwise act

14   inappropriately during removal at the airport to cause the commercial carrier to decline transportation.

15   Furthermore, the argument is contrary to settled law.  See, e.g., Balogun v. I.N.S., 9 F.3d 347, 350-51

16   (5th Cir. 1993) ("No court that has considered the issue has held that the INS must release a deportable

17   alien from detention if the alien engages in conduct which prolongs his detention beyond the six-month

18   period"); see also decisions cited at pages 8-9 of this brief.

19   For the same reason that Section 1231(a)(1)(C) is a moot issue in this case, the decision cited by

20   Sesay, Singh v. Gonzales, 448 F. Supp. 2d 1214 (W.D. Wash. 2006), is distinguishable from this case.

21   In Singh, there is no indication that DHS invoked Section 1231(a)(6), as it did in the instant case, to

22   further detain Singh upon the expiration of the 90-day removal period.  Id at 1217.  Rather, in Singh,

23   DHS invoked only Section 1231(a)(1)(C).  Id.

24   //

25   //

26   //

27

28

13                                    07cv2354-JM

1    Furthermore, the <u>Singh</u> court incorrectly held that the regulations establish a strict deadline for

2    serving the notice of failure to comply, overlooking the fact that 8 C.F.R. § 241.14(g)(5)(iv)

3    contemplates invocation of Section 1231(a)(1)(C) after the 90-day removal period has ended:

4        The fact that the service does not provide a notice of failure to comply, within the 90-day
         removal period, to an alien who has failed to comply with the requirements of section
5        241(a)(1)(c) of the Act, shall not have the effect of excusing the alien's conduct.

6    <u>Id.</u> Indeed, the statute from which the regulation is derived clearly mandates DHS to extend detention

7    when the detainee has failed to comply and does not specify when the alien's actions or inactions must

8    occur:

9        (C) Suspension of Period
         The removal period <u>shall be extended</u> beyond a period of 90 days and the alien may
10       remain in detention during such extended period if the alien fails or refuses to make
         timely application in good faith for travel or other documents necessary to the alien's
11       departure or conspires or acts to prevent the alien's removal subject to an order of
         removal.

12

13   8 U.S.C. § 1231(a)(1)(C) (emphasis added). Again, it is not reasonable to conclude that Congress

14   intended the release of dangerous/flight-risk aliens who wait until the 91st day to begin their acts of non-

15   cooperation. Accordingly, the <u>Singh</u> decision is both distinguishable and fundamentally flawed.[14/]

16       In sum, on August 17, 2007, at the end of Sesay's 90-day removal period, DHS invoked its

17   authority under Section 1231(a)(6) to extend Sesay's detention due to his dangerousness as a sexual

18   predator and due to his flight risk, especially given his flight to Tennessee during the investigation of

19

20   [14/]  The <u>Singh</u> court also erred in its determination of when the removal period ended. In actuality,
     in <u>Singh</u>, DHS invoked Section 1231(a)(1)(C) only 19 days (not 17 months) after the removal period
21   ended. The <u>Singh</u> decision states that the 90-day removal period began on May 29, 2003, overlooking
     the fact that Singh had a stay of removal pending before the Ninth Circuit which began on August 2,
22   2004 [Ex. 93 (CR 46)], thereby delaying commencement of the removal period. <u>See</u> 8 U.S.C. §
     1231(a)(1)(B)(ii) ("The removal period begins on the latest of the following: . . . (ii) If the removal order
23   is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final
     order").
24       The Ninth Circuit did not deny Singh's petition for review until August 16, 2004 [Exs. 91-92,
     93 (CR 50)], and the mandate did not issue until October 4, 2004. [Ex. 93 (CR 58).] Therefore, the
25   operative 90-day removal period began on October 4, 2004, and did not end until 90 days later, on
     January 2, 2005. <u>See</u> <u>Mariscal-Sandoval v. Ashcroft</u>, 370 F.3d 851, 856 (9th Cir. 2004) (the stay is
     extinguished on the date the mandate issues).
26       Therefore, the <u>Singh</u> court incorrectly determined that the 90-day removal period ended on
     August 29, 2003. In reality, when DHS served the notice of failure to comply on Singh on January 21,
27   2005, only 19 days had passed since the end of the 90-day removal period, not 17 months. As explained
     above, under 8 C.F.R. § 241.14(g)(5)(iv), the 19-day delay would clearly not have prevented invocation
28   of Section 1231(a)(1)(C).

                                          14                                      07cv2354-JM

1    his sexual assault.  Although six months have now elapsed since Sesay's final order of removal, he

2    "cannot meet his . . . burden to show there is no significant likelihood of removal in the reasonably

3    foreseeable future," Lema v. I.N.S., 341 F.3d at 857, due to his acts of non-cooperation.

4         E.    UNCLEAN HANDS DOCTRINE

5         The Government continues to urge application of the unclean hands doctrine in this case.  Sesay

6    argues that there is no nexus between his perjury and the relief he seeks in this case.  Yet the two are

7    inextricably connected.  It is now inescapable that Sesay has perjured himself to the U.S. Government,

8    either to DHS in 2000 [Exs. 10, 11] or to this Court in the March 18, 2008 Declaration that accompanies

9    his Traverse [Exs. 86-88], on the very same issue and for the very same purpose, to prevent his removal

10   from the United States.  Sesay's misconduct presents a textbook case for application of the doctrine.

11   Accordingly, the Court should not afford Sesay any habeas relief.  As the Ninth Circuit stated in Lema,

12   "We also believe that removable aliens should not be rewarded with release into the United States for

13   their bad behavior in refusing to assist officials to effect their removal."  Id. at 857 n.7.

14                                    IV

15                               CONCLUSION

16        For the reasons set forth above, the Petition should be denied.

17        DATED:  April 11, 2008

18                                         Respectfully submitted,

19                                         KAREN P. HEWITT
                                           United States Attorney
20
                                           s/ *Samuel W. Bettwy*
21                                         _____
22                                         SAMUEL W. BETTWY
                                           Assistant U.S. Attorney
23                                         Email: samuel.bettwy@usdoj.gov

24                                         Attorneys for Respondents

25

26

27

28