KAREN P. HEWITT
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California State Bar No. 094918
CAROLINE CLARK
Assistant U.S. Attorney
California State Bar No. 220000
RAVEN M. NORRIS
Assistant U.S. Attorney
California State Bar No. 232868
U.S. Attorney's Office
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-7119 / 7491 / 7157
Facsimile:  (619) 557-5004

Attorneys for Respondents

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IDRISA SESAY, [A77 062 688]<br><br>Petitioner,<br><br>v.<br><br>MICHAEL CHERTOFF, Secretary of the Department of Homeland Security, et al.,<br><br>Respondents. | Case No. 07cv2354 JM (LSP)<br><br>TIME:  1:30pm<br>DATE:  September 19, 2008<br>CTRM:  16 |

MEMORANDUM OF POINTS AND AUTHORITIES

IN SUPPORT OF THE GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT

AND

RESPONSE IN OPPOSITION

TO PETITIONER'S MOTION FOR SUMMARY JUDGMENT

I

INTRODUCTION

The Petition should be denied because all available evidence indicates that Petitioner Sesay is not, as he now claims, from Sudan. Although all available evidence indicates that he is from Sierra Leone, and the Sierra Leone consulate is still in the process of deciding whether to issue a travel document, the fact remains that Sesay refuses to acknowledge his nationality, which has resulted in delays in obtaining a travel document for his repatriation. Because Sesay has refused to cooperate fully and honestly with the Department of Homeland Security ("DHS") to secure travel documents for his repatriation, "he cannot meet his or her burden to show there is no significant likelihood of removal in the reasonably foreseeable future." Lema v. I.N.S., 341 F.3d 853, 856-57 (9th Cir. 2003).

II

STATEMENT OF FACTS

According to Sesay, on July 26, 1986, he traveled from South Africa to the United States, accompanied by his South African slave master Mr. Sepat, seeking admission at the New York City port of entry as a visitor for pleasure, presenting a forged Sierra Leone passport that contained a forged B-2 nonimmigrant visa stamp. [Exs. 7, 11, 29, 87; Pet. at 2, 4.][1] Sesay claims that, during his first three years in the United States, Mr. Sepat kept him as a slave worker in New York and then in Maryland. [Exs. 87-88.] However, Sesay told the IJ that he was brought to the United States by "an uncle,"[2] and high school records show that, within a few months of his arrival in the United States, he attended high school in Takoma Park, Maryland, while living with his "guardian" [Exs. 66-67], Mr. Jonathan Edwards,

---

[1] It strains common sense that, presented with such a suspicious situation (traveling as a nonimmigrant visitor from South Africa with a Sierra Leone passport ), an immigration inspector would have granted Sesay admission. More likely, Sesay was accompanied by a Sierra Leone relative [see note 2 infra] and was admitted upon his presentation of a valid Sierra Leone passport and a nonimmigrant visa that had been issued by the U.S. consulate in Freetown, Sierra Leone.

[2] According to a privileged DHS attorney worksheet, which can be corroborated by a transcription of the recorded hearing, on February 7, 2007, either Sesay or his attorney told the Immigration Judge ("IJ") that "an uncle" had brought Sesay to the United States.

who is a native of Sierra Leone and whom Sesay has identified as his "cousin." [Exs. 66-68, 89.][3/] Then, in 1990, Sesay moved with his girlfriend Ms. Mariama Kamara, who is a native and citizen of Sierra Leone [Ex. 115], to Hollywood, California, and attended college from 1992 to 1996 at Los Angeles City College and California State University, Los Angeles. [Exs. 22, 71-74, 79, 117-20.]

On August 27, 1994, Sesay obtained a re-newed passport from the Government of Sierra Leone. [Exs. 1-3, 12-14.]

On February 4, 2000, Sesay applied to the Immigration and Naturalization Service ("INS") for Temporary Protected Status ("TPS") from Sierra Leone, claiming, under penalty of perjury to be a native and citizen of Sierra Leone. [Exs. 7-11.] INS approved the TPS application and the accompanying application for employment authorization. [Exs. 7, 11.] At the time, Sudan was also a TPS-designated country, see 62 Fed. Reg. 59735-38 (Nov. 4, 1997), and remains a TPS-designated country. See 72 Fed. Reg. 10541 (Mar. 8, 2007). Sesay has never applied for TPS with respect to Sudan.

From 2000 to 2001, Sesay worked as a counselor at a group home in Agoura Hills, California. [Ex. 23.] On November 4, 2001, police began an investigation into an accusation that Sesay had repeatedly sexually molested a developmentally disabled adult female at the group home. [Ex. 17.] Pending the investigation, Sesay fled to Tennessee to avoid arrest and began using the name "Mikey Jabbar." [Mar. 27, 2008 Declaration of Teena Case, para. 3 (Doc. No. 13); Exs. 24-25.] On April 9, 2002, a warrant was issued for his arrest [Ex. 17.] On April 11, 2003, Sesay was arrested and he reported to the booking officer that he was a U.S. citizen. [Ex. 16.] Sesay also told the police that he had come to the United States in 1986 from Sierra Leone (not from South Africa). [Ex. 22.]

///

---

[3/] Sesay has submitted a Declaration from Mr. Edwards who states that he has known Sesay "since the mid-1980s," which jibes with high school records for Sesay's 10th and 11th grades (1986-87 and 1987-88). [Exs. 66-67.] Edwards also states that he "know[s] him" (in the present tense) by the name of "Jabbar" and that "Idrisa Sesay" is a fake name, although the high school records list Edwards as the guardian of Sesay under the name "Idrissa Cisse." [Id.] Mr. Edwards states that Edwards first lived in the apartment below his with a man named Robinson. Public information (LEXIS) shows that persons by the name "Emily Robinson" (born circa 1940) and "Wilhemina Robinson-Edwards" (born circa 1899) have lived in the same apartment as Mr. Edwards'. Sesay never mentioned Mr. Edwards in his personal history, given under oath. [Exs. 88.]

On October 26, 2004, Sesay was convicted by a judge in Los Angeles of sexual battery by restraint and sentenced to four years in prison. [Ex. 15.] On August 16, 2006, Sesay was interviewed at the California State Prison at Soledad by a DHS officer to whom Sesay stated that he was a citizen of the U.S. Virgin Islands. [Ex. 29.] On October 2, 2006, DHS lodged a detainer with the warden of the prison where Sesay was serving his sentence [Ex. 27], and on October 24, 2006, Sesay was transferred to the custody of DHS, which commenced removal proceedings. [Exs. 30-34.]

At a hearing on February 7, 2007, represented by counsel, Sesay pleaded to the allegations and charges in the charging document ("Notice to Appear"), denying for the first time that he is native and citizen of Sierra Leone and asserting that he is a native and citizen of Sudan. [Ex. 32.] On March 27, 2007, he filed an application for asylum in Immigration Court, asserting, under penalty of perjury, that he is a native and citizen of Sudan. [Exs. 76-88.] On May 10, 2007, the IJ ordered Sesay removed form the United States, designating only Sierra Leone as the appropriate country of removal. [Ex. 32.] Sesay waived appeal from the IJ's decision. [Id.]

On May 11, 2007, DHS requested travel documents from the Sierra Leone consulate. [Ex. 36.] On June 13, 2007, a consular officer of Sierra Leone interviewed Sesay who claimed to be a native of Sudan. [Exs. 44, 97.]

On August 1, 2007, DHS notified Sesay that, on August 8, 2007, it would conduct a 90-day custody review to determine whether he should be released from custody. [Ex. 38.] Sesay was notified that he needed to demonstrate that he would not pose a flight risk or danger to the community. [Id.] The custody review was conducted on August 12, 2007 by Deportation Officer John Thomas. [Ex. 41.] On August 17, 2007, DHS notified Sesay that his detention would continue beyond the 90-day removal period because DHS deemed him to be a danger to the community and a flight risk if released. [Ex. 38; see Exs. 40-47.]

On November 20, 2007, Officer Thomas conducted another custody review and referred the case to DHS headquarters for further review, noting that local DHS still had not received a response from the Sierra Leone consulate. [Exs. 48, 106-12.]

///

On December 4, 2007, Officer Thomas began a six-month custody review. [Ex. 51.] During the review, the Sierra Leone consulate notified DHS that a travel document would not be issued due to Sesay's claim that he is Sudanese. [Ex. 57 ("the Sierra Leone consulate notified ICE [Immigration and Customs Enforcement] that a travel document would not be issued due to him claiming to be a Sudanese citizen").] Accordingly, DHS determined that Sesay was "hampering removal and engaging in deceptive behavior." [Id.] On December 11, 2007, DHS issued and served a "Notice of Failure to Comply," citing Sesay's failure to cooperate with efforts to obtain a travel document for his removal from the United States. [Exs. 49-57, 102.] DHS has served Sesay with monthly Notices of Failure to Comply. [Exs. 58-62.]

On December 17, 2007, Sesay commenced these habeas proceedings by filing a verified petition in which he alleged that he is not a native and citizen of Sierra Leone [Pet. at 4:2-3], and he repeated the allegations in a sworn statement which accompanies his Traverse.

On or about February 26, 2008, the Sudanese consulate determined that Sesay is not a Sudanese citizen and denied DHS's request for a travel document. [Exs. 104, 113; Pitt Declaration, para. 5.] The Sierra Leone consulate has not formally denied DHS's request for a travel document. [Pitt Declaration, para. 3.] The undersigned will keep Petitioner's attorney and the Court informed of updates from the Sierra Leone consulate regarding the issuance of a travel document. A request for an update was recently made by Sesay's current Deportation Officer, Officer Miguel Coronado.

III

ARGUMENT

A.  THE COURT SHOULD RULE FOR THE GOVERNMENT ON THE ISSUE OF WHETHER SESAY HAS FAILED TO MEET HIS BURDEN UNDER *ZADVYDAS*

The dispositive issue of this case is whether Sesay has met his burden of coming forward with "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." Zadvydas v. Davis, 533 U.S. 678, 701 (2001). If not, the Government is entitled to summary judgment pursuant to Fed. R. Civ. P. 56. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Sesay has not met his burden due to his overt acts of non-cooperation which are delaying the issuance of travel documents. See Lema v. I.N.S., 341 F.3d at 856-57 (9th Cir. 2003) ("We hold today, consistent with *Zadvydas* and *Pelich*, that when an alien refuses to cooperate fully and honestly with officials to secure travel documents from a foreign government, the alien cannot meet his or her burden to show there is no significant likelihood of removal in the reasonably foreseeable future"); Pelich v. I.N.S., 329 F.3d 1057, 1060 (9th Cir. 2003) ("the detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock").

Like the alien in Powell v. Ashcroft, 194 F. Supp. 2d 209 (E.D.N.Y. 2002), Sesay has given DHS conflicting versions of his national origin, having claimed that he is from Sierra Leone, the U.S. Virgin Islands, and Sudan. See id. at 210-11 (alien who claimed in four affidavits that he was from U.S. Virgin Islands, Jamaica, Trinidad, and Canada, and provided false name and false date of entry, prevented his removal). Like the alien in Sango-Dema v. District Director, 122 F. Supp. 2d 213 (D. Mass. 2000), Sesay has failed to provide the original of his passport, and although he has freely claimed, under oath, to be from Sierra Leone on previous occasions, he now refuses to acknowledge his Sierra Leone citizenship to the Sierra Leone consulate. See id. at 221 (court upheld further detention of alien who refused to provide passport and birth certificate, and refused to communicate with embassy officials or complete application for documents). See also Seretse-Khama v. Ashcroft, 215 F. Supp. 2d 37, 51 (D.D.C. 2002) (an act of non-cooperation would include petitioner's denying his Liberian citizenship to the consulate or giving false or misleading information that impeded the issuance of travel documents).

Sesay raises the factual defense[4] that he is telling the truth when he states that he is from Sudan. Yet, Sesay has not presented any evidence that raises a genuine issue of material fact. On the contrary, all evidence indicates that he is not from Sudan. The IJ was not convinced that Sesay was from Sudan [Ex. 35], and the Sudanese consulate has determined that Sesay is not a citizen of Sudan. [Exs. 104, 113, 122 (statement of Mr. Ujwok to court-appointed expert); Pitt Declaration, para. 5.]

---

[4] The Government's response to Sesay's legal argument is set forth in Part B. infra.

In addition, after a personal interview with Sesay, the court-appointed expert, Dr. Richard Lobban Jr., was unable to find any indication that Sesay is from Sudan. [Exs. 121-30 ("I am not convinced that he is Dinka, Darfuri, or Sudanese").] Sesay has been claiming (through his attorney) that he has some familiarity with Sudan and that he can understand Dinka [Tr. 7:8-10], but these claims were discounted by Dr. Lobban. Among the many indicators that Sesay is not from Sudan and is not a Dinka, he does not understand rudimentary Dinka words, he is "broadly not aware of . . . basic features of Dinka life," and he was "unable to offer any particular culturally-based knowledge." [Exs. 124-25.] As Dr. Lobban summarized, "it is virtually impossible that some one would be raised as a Dinka and not know about 'cattle culture,' age grades or basic Dinka words." [Ex. 125.] In addition, Sesay cannot locate his alleged tribal settlement of Toray [Exs. 80, 86] on a map, his supposed name "Mikey Jabbar" is not a Dinka name, his accounts do not jibe with known history, and he "does not have a Dinka appearance." [Exs. 122-23, 125, 127.] For example, Sesay is only five-foot, four, six or seven inches tall [Exs. 3, 4, 28], whereas Dinka tribal members are "instantly recognized by their very tall stature." [Ex. 125].

Sesay raises vague challenges to the court-appointed expert's methods [Pet. MSJ at 10], yet the expert considered every possible factor within the realm of his expertise, gave Sesay every benefit of the doubt, and consulted numerous outside sources to ensure accuracy. To defeat summary judgment, Sesay must present some evidence to support his claim that he is from Sudan, but he has presented no evidence apart from his own assertions. If a nonmoving party's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir.1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient").

Sesay's account of how he came to the United States from Sudan is improbable and is often inconsistent with known facts. As the court-appointed expert noted, the Janjaweed were not yet in existence when Sesay claims they attacked his settlement and killed his father [Exs. 80, 86, 127], and it is improbable that he was taken to South Africa and served as a slave there. [Exs. 122, 128.] Also, Sesay claims that he spent the first three years of his life in the United States as the slave of a Mr. Sepat. In reality, Sesay spent those years as a high school student while living with fellow countryman, Mr.

1  Jonathan Edwards of Takoma Park, Maryland. After those three years, he moved to Hollywood with
2  his girlfriend Mariama Kamara (also a Sierra Leone citizen) to attend college and start a family together.
3  [Exs. 22, 71-74, 79, 114-20.]

4  The only evidence that Sesay is from Sudan is Sesay's own assertions. Yet, Sesay has repeatedly
5  demonstrated that he cannot be believed. In 1989, he was arrested for theft; in 1999, he was convicted
6  of falsely reporting a crime; he has two social security numbers [Exs. 20, 28, 64-65]; he has used
7  multiple dates of birth [Ex. 20]; he fled to Tennessee when he was under investigation in California and
8  began using the name "Mikey Jabbar"; he claimed to be a U.S. citizen to police in 2003 [Ex. 16]; and
9  he claimed to be a U.S. citizen to DHS in 2006. [Ex. 29.] He is a perjurer, because he has submitted
10 to this Court both a verified petition and a sworn statement that he is not a native and citizen of Sierra
11 Leone, and he submitted sworn statements to INS (in 2000) that he is a native and citizen of Sierra
12 Leone.

13 Accordingly, the Court should find that Sesay has failed to prove that he is from Sudan. Indeed,
14 although it is not the Government's burden to prove a negative in this case, there is enough evidence to
15 prove that Sesay is not from Sudan.

16 Sesay illogically argues that, even if he is not from Sudan, the Government must prove that he
17 is from Sierra Leone in order to prove that he has impeded his repatriation. [Pet. MSJ at 11.] Apart
18 from the fact that it is Sesay who bears the burden of proof in these proceedings, Zadvydas at 701, if he
19 is not from Sudan, it necessarily follows that he is from another country which he refuses to
20 acknowledge or disclose.[5/] Whether he is a native of Sierra Leone or a third country, he has failed to
21 disclose his true citizenship and has therefore necessarily impeded the removal process.[6/]

---

[5/] The court-appointed expert noted that Sesay's "general appearance, physical stature, and language skills could be much more in keeping with a West African identity" and that, more specifically, he resembles persons from Sierra Leone. [Ex. 130.]

[6/] At the July 25, 2008 hearing, this Court raised concern over whether Sesay can be considered stateless. In general, a stateless person is a person who does not have a nationality under the law of any state, see Settlage, *No Place to Call Home Stateless Vietnamese Asylum-Seekers in Hong Kong*, 12 GEO. IMMIGR. L.J. 187, 189 (1988), but in 1949, the United Nations defined statelessness to include those who "no longer enjoy the protection and assistance of their national authorities, either because these
(continued...)

Sesay also contends that there remains a genuine issue of material fact on the issue of whether the cause of delay in the issuance of a travel document has been Sesay's insistence that he is from Sudan and not from Sierra Leone. Apart from the fact that Sesay bears the burden of proof, and he presents no evidence on this question,[7] DHS records clearly show that a Sierra Leone consular official informed DHS that Sesay's own actions had caused a delay in the issuance of a travel document, and Sesay has presented no evidence to the contrary. [Ex. 57.] The only better evidence would be testimony of a Sierra Leone consular official, but international law and foreign policy considerations restrict DHS from attempting to obtain such testimony. See Vienna Convention on Diplomatic Relations, *done* April 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95 (1961), *ratified*, 111 Cong. Rec. 23,773 (1965), *entered into force in the United States*, Dec. 13, 1972 (Article 31 of the Vienna Convention provides that "[a] diplomatic agent is not obliged to give evidence as a witness.")

Finally, the Government continues to urge application of the unclean hands doctrine in this case due to Sesay's commission of perjury in connection with his claim to, and then denial of, Sierra Leone citizenship. Sesay has perjured himself to the U.S. Government, either to DHS in 2000 [Exs. 10, 11] or to this Court in the March 18, 2008 Declaration that accompanies his Traverse. [Exs. 86-88.] Sesay's only responsive argument is that his perjury is unrelated to the relief he seeks in these proceedings. [Pet. MSJ at 5 n.2.] On the contrary, the perjury relates to the very pivotal issue of this case, namely whether

---

[6]/(...continued) authorities refuse to grant them assistance and protection, or because they themselves renounce the assistance and protection of the countries of which they are nationals." United Nations, *A Study of Statelessness*, U.N. Doc E/1112;E1112/Add.1 (1949). But see Riley v. Greene, 149 F. Supp. 2d 1256, 1263 (D.Colo. 2001) (Detention is justified due to Mr. Riley's refusal to assist in obtaining traveling documents to effect departure and his attempt to renounce his citizenship in both Egypt and Lebanon). Sesay does not claim to be stateless, but he might be considered stateless if he is, in reality, a citizen of Sierra Leone, and apart from his refusal to acknowledge his Sierra Leone citizenship, the country of Sierra Leone refuses to repatriate him. However, Sesay has not attempted to renounce his Sierra Leone citizenship, and Sierra Leone has not refused to repatriate Sesay. If Sesay is a citizen of some third country, then it is not known whether he is stateless until he reveals his true citizenship and DHS exhausts efforts to obtain travel documents from such third country.

[7]/ Sesay appears to have abandoned his contention that Sierra Leone has denied DHS's travel document request on the basis of its determination that the 1994 passport is not genuine. [Pet. Supp. at 13:21-22.] In fact, the Sierra Leone consulate has not formally denied DHS's travel request, and it has never expressed any opinion to DHS about the validity of Sesay's 1994 passport. [Pitt Declaration, paras. 3-4.]

1 he has lied about his citizenship to prevent his removal from the United States. As the Ninth Circuit
2 stated in Lema, "We also believe that removable aliens should not be rewarded with release into the
3 United States for their bad behavior in refusing to assist officials to effect their removal." Id. at 857 n.7.
4 Accordingly, the Court should not afford Sesay any habeas relief.

   B.  SESAY'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED

   Sesay continues to argue that, even if he has failed to cooperate and even if his failure to cooperate is the cause of delay in obtaining a travel document from the Sierra Leone consulate, DHS has not timely invoked authority, under 8 U.S.C. § 1231(a)(1)(C), to detain him beyond the ninety-day removal period. The Government has already addressed Sesay's argument in its Return, and Sesay has not addressed the Government's argument in his instant motion. To recapitulate, Sesay's argument is moot, because on August 17, 2007, DHS invoked Section 1231(a)(6) (dangerousness/flight risk), not Section 1231(a)(1)(C) (uncooperativeness), to detain Sesay beyond the expiration of the 90-day removal period. [Ex. 39.] DHS invoked Section 1231(a)(6) (dangerousness/flight risk), because it was not yet aware that Sesay's actions had or would cause a delay in the Sierra Leone consulate's issuance of a travel document.

   Even if DHS had not invoked authority under Section 1231(a)(6), the DHS's invocation of authority under Section 1231(a)(1)(C) is not subject to time restrictions. Further, a formal invocation is unnecessary in light of well-settled law. See, e.g., Balogun v. I.N.S., 9 F.3d 347, 350-51 (5th Cir. 1993) ("No court that has considered the issue has held that the INS must release a deportable alien from detention if the alien engages in conduct which prolongs his detention beyond the six-month period"); see also decisions cited at pages 8-9 of this brief.

   Sesay cites Singh v. Gonzales, 448 F. Supp. 2d 1214 (W.D. Wash. 2006) for support of his argument. However, in Singh, DHS invoked only Section 1231(a)(1)(C) and did not invoke Section 1231(a)(6). Id at 1217. Regardless, the Singh court incorrectly held that the regulations establish a strict deadline for serving the notice of failure to comply by overlooking the fact that 8 C.F.R. § 241.14(g)(5)(iv) contemplates invocation of Section 1231(a)(1)(C) after the 90-day removal period has ended. See also 8 U.S.C. § 1231(a)(1)(C) ("The removal period shall be extended beyond a period of

90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal") (emphasis added).[8]

In sum, Sesay's motion for summary judgment should be denied. On August 17, 2007, at the end of Sesay's 90-day removal period, DHS invoked its authority under Section 1231(a)(6) to extend Sesay's detention due to his dangerousness as a sexual predator and due to his flight risk, especially given his flight to Tennessee during the investigation of his sexual assault. Sesay's continued detention, more than six months after Sesay's removal order became final and executable, is authorized because, due to Sesay's acts of non-cooperation, he "cannot meet his . . . burden to show there is no significant likelihood of removal in the reasonably foreseeable future," Lema v. I.N.S., 341 F.3d at 857.

## IV

## CONCLUSION

For the reasons set forth above, the Petition should be denied.

DATED: August 29, 2008

Respectfully submitted,

KAREN P. HEWITT
United States Attorney

s/ *Samuel W. Bettwy*

SAMUEL W. BETTWY
Assistant U.S. Attorney

CAROLINE CLARK
Assistant U.S. Attorney

RAVEN M. NORRIS
Assistant U.S. Attorney

Attorneys for Respondents

---

[8] As explained in the Government's Return, the Singh court also incorrectly determined that the 90-day removal period ended on August 29, 2003. In reality, when DHS served the notice of failure to comply on Singh on January 21, 2005, only 19 days had passed since the end of the 90-day removal period, not 17 months. As explained above, under 8 C.F.R. § 241.14(g)(5)(iv), the 19-day delay would clearly not have prevented invocation of Section 1231(a)(1)(C).