KAREN P. HEWITT
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California State Bar No. 094918
CAROLINE CLARK
Assistant U.S. Attorney
California State Bar No. 220000
RAVEN M. NORRIS
Assistant U.S. Attorney
California State Bar No. 232868
U.S. Attorney's Office
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-7119 / 7491 / 7157
Facsimile: (619) 557-5004

Attorneys for Respondents

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IDRISA SESAY,<br><br>Petitioner,<br><br>v.<br><br>MICHAEL CHERTOFF, Secretary of Homeland Security et al.,<br><br>Respondents. | Case No. 07cv2354 JM (LSP)<br><br>**EXHIBITS (Exs. 113-31)** |

Letter dated February 26, 2008, from Sudan Embassy to DHS. . . . . . . . . . . . . . . . . . . . . . . . 113

Report of Investigation re Ms. Mariama Kamara. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114-16

Official Transcript, CSU, Los Angeles, re Idrisa Sesay.. . . . . . . . . . . . . . . . . . . . . . . . . . . 117-20

Report of Court-Appointed Expert, Dr. Richard A. Lobban Jr... . . . . . . . . . . . . . . . . . . . . 121-31

Embassy of The Republic of
the Sudan – Washington DC
2210 Massachusetts Ave.
Washington, DC, 20008

بسم الله الرحمن الرحيم



سفارة جمهورية السودان
واشنطون – دي سي
هاتف : 202-338-8565
فاكس : 202-667-2406

February 26, 2008

William Pitt
Department of Homeland Security
Bureau of Immigration and Customs Enforcement
880 Front Street, Suite 1234
San Diego, CA 92101-8834

REF: Sesay, Idrisa
A#77 062 688

Dear Sir,

Our records indicate that no proof of Sudan citizenship pertaining to Mr. Sesay Idrisa. Furthermore, Mr. Sesay possesses a passport from Sierra Leone. Mr. Sesay should furnish the Embassy of Sudan with the convincing Sudanese documents such as nationality certificate, birth certificate, national identity card or Sudan passport to prove his citizenship.

Sincerely Yours,

Paul A. Ujwok

Consular Section






113

REQUESTED BY: BULLARD, CASSANDRA

OFFICIAL USE ONLY

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>REPORT OF INVESTIGATION | TECS ACCESS CODE 3<br>PAGE 1<br>CASE NUMBER LA17GR08SD0005 |
|---|---|

TITLE: IDRISA SESAY

CASE STATUS: CLOSING RPT

| REPORT DATE | DATE ASSIGNED | PROGRAM CODE | REPORT NO. |
|---|---|---|---|
| 071108 | 060608 | YP0 | 001 |

RELATED CASE NUMBERS: SD17GR08SD005

COLLATERAL REQ:

TYPE OF REPORT:
INVESTIGATIVE FINDINGS

TOPIC: INVESTIGATIVE FINDINGS MARIAMA KAMARA

SYNOPSIS:

On May 9, 2008, ICE SAC/Los Angeles received a collateral request from SAC/San Diego to interview Mariama KAMARA for the purpose of verifying Idirisa SESAY's true citizenship. SESAY a Sierra Leone national, DOB: November 2, 1965, is detained under final order of removal to Sierra Leone, but now insists he is from Sudan. KAMARA, SESAY's former girlfriend is believed to be residing in Los Angeles, California. The United States Attorney's Office, Southern District of California is requesting an investigation to verify SESAY's true identity and nationality.

This investigative report will document the findings relating to Mariama KAMARA.

| DISTRIBUTION:<br>SACLA SACSD CAPA | SIGNATURE: ______<br>SALAZAR YOLANDA SENIOR SPEC AGENT<br>APPROVED: ______<br>MITCHELL GERTHIE OI GRP SUPERVISOR |
|---|---|
| | ORIGIN OFFICE: LA<br>LOS ANGELES, CA - SA<br>TELEPHONE: 032 168 4846<br>TYPIST: SALAZAR |

OFFICIAL USE ONLY

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T O F I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE 2<br>CASE NUMBER LA17GR08SD0005<br>REPORT NUMBER: 001 |
|---|---|

DETAILS OF INVESTIGATION:
On May 9, 2008, ICE SAC/Los Angeles received a collateral request from SAC/San Diego to interview Mariama KAMARA for the purpose of verifying Idirisa SESAY's true citizenship. SESAY a Sierra Leone national, DOB: November 2, 1965, is detained under final order of removal to Sierra Leone, but now insists he is from Sudan. KAMARA, SESAY's former girlfriend is believed to be residing in Los Angeles, California. The United States Attorney's Office, Southern District of California is requesting an investigation to verify SESAY's true identity and nationality.

July 7, 2008
ICE SAC/Los Angeles Special Agent (SA) Salazar conducted record indices relating to Mariama KAMARA. Record indices from various databases revealed the following information:

Mariama KAMARA, DPOB: 10/21/1965, Sierra Leone, entered the United States as a B2 visitor on or about 02/09/1991, through Cincinnati. October 19, 2004, KAMARA filed an application for Employment Authorization (EAD), A-file 72 322 009. On 02/21/2005, KAMARA was ordered removed to Sierra Leone by an immigration judge. On May 8, 2006, almost two years after her removal from the U.S. the EAD application filed October 19, 2004, was denied.

California Department of Motor Vehicle records revealed that a driver's license, number A9008030 was issued to Mariama Keimatta Kamara, DOB: 10/21/1965. Address: 4516 Coliseum Street, Apartment 8, Los Angeles, CA 90016.

California Law Enforcement Telecommunications System revealed that:

NAME: KAMARA, Mariama Feimatta
DPOB: 10/21/1965, Uganda
CII No.: A11418530
FBI No.: 886932CB0
Social Security No.: 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
KAMARA was convicted on 07/17/1996, in California Municipal Court for violations of California Penal Code 487(A) Grand Theft: Money/Labor/Property more than $400. She was sentenced to three (3) years probation, 73 days jail.

A request for employment information concerning KEMARA was made to the California Employment Development Department.

Copies of the warrant of deportation, order of removal, and the application for employment authorization were requested from KAMARA's A-file from


THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T O F I N V E S T I G A T I O N<br>C O N T I N U A T I O N | PAGE 3<br>CASE NUMBER LA17GR08SD0005<br>REPORT NUMBER: 001 |
|---|---|

Citizenship and Immigration Service, National Records Center (CIS/NRC).

Special Agents Salazar and Canterberry went to KAMARA's last known address at: 4516 Coliseum Street, Apt. 8, Los Angeles, California 90016. However, no person came to the door after several knocks. ICE agents approached two residents from the same apartment complex and presented a photograph of KAMARA. Neither resident recognized KAMARA's photograph and stated they had not seen her before. One resident mentioned that the people that lived in apartment 8 moved out about one week earlier.

July 8, 2008
Copies of the warrant of deportation, order of removal, and application for employment authorization were received from CIS/NRC.

A request for change address information was made to the U.S. Postal Inspectors Office concerning: 4516 Coliseum Street, apartment 8, Los Angeles, CA 90016.

SA Salazar conducted record indices in the California Department of Motor Vehicles database of KAMARA's son, Sheck Sesay, DPOB: 04/20/1980, United States. The record revealed that on June 22, 2004, Sheck Almammy Sesay was issued a California identification document, number [redacted], address: 4516 Coliseum Street, apartment 8, Los Angeles, CA 90016. The record revealed no violations.

July 9, 2008
The California Employment Development Department found no record of employment history for Mariama KAMARA.

The U.S. Postal Inspectors Office found no record of a change of address for: 4516 Coliseum Street, Apt. 8, Los Angeles, California 90016.

On July 10, 2008, SA Salazar obtained a certified copy of Sheck Almammy Sesay's birth certificate for the purpose of determining whether SESAY's place of birth was stated on his child's birth certificate. However, the birth certificate stated that KAMARA had failed to disclose the father's name. This concludes this investigation since all leads have been exhausted.

This case is closed.

O F F I C I A L U S E O N L Y
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

California State University, Los Angeles
5151 State University Drive, Los Angeles, California 90032-8534

**DECLARATION RE SUBPOENA DUCES TECUM**

**Case Name: Idrisa Sesay , Et. Al.,**
**Michael Chertoff , Inc., Et. Al.,**
**Case# 07cv2354-JM (LSP)**

**Name of Subpoenaed Business: California State University, Los Angeles**

The undersigned hereby declares:

1) I am duly authorized custodian of records of the above named business.

2) I have the authority to certify said records.

3) Check one of the following:

☐ The attached copies of records are true copies of all the original records described in the subpoena.

☐ No copies of records are submitted because the business has none of the records described in the subpoena.

☐ The attached copies of records are true copies of part of the original records described in the subpoena. The business does not have any other of the described records.

4) The accompanying records were prepared by the personnel of the above named business, in the ordinary course of business, at or near the time of the acts, conditions, or events recorded.

Executed on 6/25/08 at Los Angeles, California.

I declared under penalty of perjury that the foregoing is true and correct.

[signature]
Signature of Custodian of Records
Records Office

California State University, Los Angeles
5151 State University Drive,
Adm. Building, Room Number 606
Los Angeles, California 90032-8534

# CALIFORNIA STATE UNIVERSITY, LOS ANGELES

Official Transcript



118

Name : Idrissa Cisse
Student ID: 200196197

Birthdate : 1968-11-02

**Send To : Cisse,Idrissa Sesay**

Print Date : 2008-06-25

----- **Academic Program History** -----

Program : Health & Human Services
1993-01-04 : Active in Program

----- **Beginning of Undergraduate Record** ----

**Spring Quarter 1993**

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| EDCI | 93 | STUDY SKILLS:READING | | 0.00 | CR | |
| | Grading Basis: | Subcollegiate Credit/No Credit | | | | |
| HS | 150 | BASIC H+S STUDIES | 4.00 | 4.00 | C | 8.000 |
| MUS | 150 | MUSIC IN WORLD CULTURE | 4.00 | 4.00 | D | 4.000 |
| UNIV | 60 | STUDY GROUP | | 0.00 | CR | |
| | Grading Basis: | Subcollegiate Credit/No Credit | | | | |
| Higher Ed CUM GPA : | 1.500 | CUM TOTALS : | 8.00 | 8.00 | | 12.000 |

**Winter Quarter 1994**

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| EDCI | 93 | STUDY SKILLS:READING | | 0.00 | CR | |
| | Grading Basis: | Subcollegiate Credit/No Credit | | | | |
| HIST | 110C | WORLD CIVILIZATION III | 4.00 | 4.00 | C | 8.000 |
| SOC | 201 | PRINCIPLES OF SOCIOLOGY | 4.00 | 4.00 | D | 4.000 |
| Higher Ed CUM GPA : | 1.500 | CUM TOTALS : | 16.00 | 16.00 | | 24.000 |

*(Continued on the next page)*

Joan V. Woosley
University Registrar



000263744

This official transcript is printed on blue secured paper and does not require a raised seal. The word VOID will appear when photocopied. When photocopied, ALERT will appear in the registrar's signature area.

THIS DOCUMENT IS NOT OFFICIAL UNLESS YOU CAN VERIFY CAL STATE LA IN THE TAMPERSAFE® AREA

Patent #5,772,248 TamperSafe®

# CALIFORNIA STATE UNIVERSITY, LOS ANGELES

Official Transcript



Name : Idrissa Cisse
Student ID: 200196197

Birthdate : 1968-11-02

**Spring Quarter 1994**

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| CRIM | 235 | ELEMNTS OF INVEST | 4.00 | 4.00 | C | 8.000 |
| CRIM | 447 | DRUG CONTROL SYST | 4.00 | 4.00 | C | 8.000 |
| POLS | 150 | GOVT+AMER SOCIETY | 4.00 | 0.00 | F | |
| Grading Basis: Repeat Excluded | | | | | | |
| UNIV | 60 | STUDY GROUP | | 0.00 | CR | |
| Grading Basis: Subcollegiate Credit/No Credit | | | | | | |

Higher Ed CUM GPA : 1.667 CUM TOTALS : 28.00 24.00 40.000

**Fall Quarter 1994**

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| CRIM | 222 | PRIN+PROC JUS SYS | 4.00 | 4.00 | C | 8.000 |
| CRIM | 491 | CONTEMP STUDY CRIM JUST | 4.00 | 4.00 | C | 8.000 |
| HIST | 202A | U S CIVILIZATION | 4.00 | 4.00 | D | 4.000 |

Higher Ed CUM GPA : 1.667 CUM TOTALS : 40.00 36.00 60.000

**Winter Quarter 1995**

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| CHS | 111 | INTRO CHICANO STUDIES | 4.00 | 4.00 | C | 8.000 |
| CRIM | 301B | WRIT COMM CRIM JUST | 4.00 | 4.00 | CR | |
| CRIM | 365 | PERSONAL IDENTIF SYSTEM | 4.00 | 4.00 | D | 4.000 |

Higher Ed CUM GPA : 1.636 CUM TOTALS : 52.00 48.00 72.000

**Spring Quarter 1995**

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| CRIM | 301A | ADM CRIM JUST SYS | 4.00 | 4.00 | D | 4.000 |
| GEOG | 150 | HUMAN GEOGRAPHY | 4.00 | 4.00 | D | 4.000 |
| POLS | 150 | GOVT+AMER SOCIETY | 4.00 | 4.00 | C | 8.000 |

Higher Ed CUM GPA : 1.571 CUM TOTALS : 64.00 60.00 88.000

**Fall Quarter 1995**

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| CRIM | 221 | LEGAL ASPCTS EVID | 4.00 | 4.00 | B | 12.000 |
| CRIM | 410 | SEX CRIMES INVESTIGATION | 4.00 | 4.00 | C | 8.000 |
| PE | 150 | FITNES IN MOD SOC | 4.00 | 4.00 | C | 8.000 |

Higher Ed CUM GPA : 1.706 CUM TOTALS : 76.00 72.00 116.000

**Winter Quarter 1996**

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| ANTH | 260 | PHYSICAL ANTHRO | 4.00 | 4.00 | C | 8.000 |
| BIOL | 156 | NAT HIST PLANTS | 4.00 | 0.00 | F | |
| PHIL | 238 | COMPAR RELIGIONS | 4.00 | 4.00 | C | 8.000 |

Higher Ed CUM GPA : 1.650 CUM TOTALS : 88.00 80.00 132.000

*(Continued on the next page)*



Joan V. Woosley
University Registrar





000263743

This official transcript is printed on blue secured paper and does not require a raised seal. The word VOID will appear when photocopied. When photocopied, ALERT will appear in the registrar's signature area.

THIS DOCUMENT IS NOT OFFICIAL UNLESS YOU CAN VERIFY CAL STATE LA IN THE TAMPERSAFE® AREA

# CALIFORNIA STATE UNIVERSITY, LOS ANGELES

Official Transcript



Name : Idrissa Cisse
Student ID: 200196197

Birthdate : 1968-11-02

Spring Quarter 1996

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| BIOL | 156 | NAT HIST PLANTS | 4.00 | 0.00 | F | |
| CRIM | 223 | COMMUNITY RELATNS | 4.00 | 4.00 | B | 12.000 |
| GEOL | 155 | OCEANOGRAPHY | 3.00 | 3.00 | D | 3.000 |
| GEOL | 157 | OCEANOGRAPHY LAB | 1.00 | 1.00 | D | 1.000 |
| Higher Ed CUM GPA : | 1.609 | CUM TOTALS : | 100.00 | 88.00 | | 148.000 |
| | | Disqualification | | | | |

**Undergraduate Career Totals**

| | | | | | |
|---|---|---|---|---|---|
| Higher Ed CUM GPA : | 1.609 | CUM TOTALS : | 100.00 | 88.00 | 148.000 |

- - - - - *End of Transcript* - - - - -

Joan V. Woosley
University Registrar



000263742

This official transcript is printed on blue secured paper and does not require a raised seal. The word VOID will appear when photocopied. When photocopied, ALERT will appear in the registrar's signature area.

THIS DOCUMENT IS NOT OFFICIAL UNLESS YOU CAN VERIFY CAL STATE LA IN THE TAMPERSAFE® AREA

Patent #5,772,248
TamperSafe®

Report on Case 07CV2354-JM (LSP)

**Idrisa Sesay, petitioner**

Prepared by Dr. Richard A. Lobban, Jr.
Professor Emeritus of Anthropology,
Rhode Island College
Executive Director, Sudan Studies Association

Introduction

I first became aware of this case when contacted by the petitioner's Attorney Mr. James Fife (California State Bar N. 237620) Federal Defenders of San Diego and by attorneys Mr. Samuel Bettwy and Ms. Caroline Clark representing the Department of Justice. While I have had substantial experience with political asylum cases from Africa in general and with such cases from Sudan in particular I had no prior knowledge of the specific case of Mr. Sesay.

I raised the ethical concerns of representing, or communicating with, both sides in the case. After telephonic discussion with both sides, and with apparent sidebar discussions with the respective attorneys themselves, it was recommended and determined that I could be hired by both sides since I have no legal or personal interest in the case. If the cost of my consultation is carried by both, any financial interest (professional fees) is equally neutralized. By being employed by both sides, admittedly an unusual circumstance, I would continue to strive for neutrality as an expert witness and I would seek all relevant information irrespective of which side might find it of value in proceeding with their own interests and claims. With this unique relationship established I was directed to have any communication addressed to both sides and I was especially directed not to discuss this case further with either side until my report would be completed. Accordingly, when traveling to and from the San Diego Detention Center with Ms. Clark, we carefully avoided discussing the substance of the case and we had a lovely conversation about weather, sports and simple logistic practicalities. The joint discussion I did have was essentially to frame my investigation around the specific statements made in Mr. Sesay's (aka, Mikey Jabbar) affidavit of 3-27-2007. This affidavit is my basic reference point in:

1. the preparatory period prior to traveling to California;
2. the interview with Mr. Sesay during my visit to the Detention Center;
3. the interviews I had with content specialists as indicated below;
4. the subsequent post-interview research and writing

Further, on the subject of confidentiality, I have discussed the case with the Sudanese culture bearers, appropriate officials and Sudanist experts who were required for me to investigate the veracity of the affidavit. This was done in order to address and independently corroborate the areas within, or at the edges of my anthropological and Sudanist expertise to shed light, confirm or negate any of the circumstances recorded in the affidavit. With this said, relative to my further relevant consultation, neither side will be favored or undermined in this case. I will try to tell the truth as far as I can ascertain. Mostly importantly, with my advance preparation, I felt very focused to interview Ms. Sesay about key points. As a result of the interview I did some further research prior to writing this final report. As appendices I have attached various supporting documents as

well as list of my expenses. In short, I have struggled to be professional to seek and compile the best possible information, while being neutral and multilateral without favor or bias providing information equally to the court and attorneys to weigh as they wish.

AREAS OF INVESTIGATION:

His Nationality

As Mr. Sesay has confirmed in his affidavit and told me in person, he states that his name is truly Mikey Jabbar, and he is and was a [Nilotic] Dinka from Darfur, and that he is NOT, in fact, Idrisa Sesay, from Sierra Leone. His explanation for using this other identity and nationality is explained in the affidavit. I am aware that representatives of both nations, Sudan and Sierra Leone, have dismissed his claims, indeed, he has dismissed his own claim about Sierra Leonean nationality, so I have focused on his claim about being Sudanese. However this is described as the "Sesay case", it could be equally named as the "Jabbar case."

In his general defense I can confidently report that there is child and slave trafficking in this disturbed region of central and Sahelian Africa for many decades. It is possible that he was trafficked to such an extent and area that his clarity about origins could be much fogged. On the other hand, in my research and publications on modern African slavery, I have never heard of a single case of child trafficking as far as South Africa. Nor did I hear or know about slave masters (whom I have met personally in Kordofan, Sudan in 1971) paying for passports and airline tickets for slaves to travel to the United States. Most Sudanese slaves (and the numbers are not very great) are trafficked to northern Sudan, and a few to Libya and the Arabian Peninsula to work as domestic servants or in rural agriculture, or as forced concubines. As this is now more a legal question and a judgment about his personal veracity I will let the court make this determination but will comment a bit further down on the practice of slavery in the region.

His Name

Not needing to consider that the true name of Mr. Sesay is as recorded on this court case, I have focused on his name being "Mikey Jabbar." In my own familiarity with given Dinka names, this is certainly not a typical Dinka name. I did discuss this with Dr. 'Ali bin 'Ali Dinar of the African Studies Center, University of Pennsylvania. Dr. "Ali Dinar is, in fact the grand son of the last regnant Sultan of Darfur and he is a past President of the Sudan Studies Association and specialist on African folklore anthropology as well as being from Darfur. His view was that Mikey Jabbar was a possible name. Dr. Ali Dinar is a native Fur-speaker and he also speaks, Arabic and English, but I don't believe he speaks Dinka. A copy of his e-mail on this subject is attached

I spoke also with Mr. Paul A. Ujwok of the Sudanese Consular Office in Washington, DC about this specific topic, and he determined that Jabbar was not at all a Dinka name. Regarding this case, Mr. Ujwok spoke with Mr. Sesay by telephone and he said to me that Mr. Sesay was clearly neither Dinka nor Sudanese. He has made a similar written statement to the court on 26 February 2008. Mr. Ujwok is a southern Sudanese

Luo speaker and is very familiar with southern Sudanese languages. He guessed that Mr. Sesay might be a "Nubian" of the Kabera slum, or Ugandan or from Central African Republic (CAR). I asked Mr. Sesay about these possibilities but he insisted he was a Dinka from Darfur and explicitly denied these other possibilities.

Finally, I wrote to another friend and colleague Mr. Hoth Chan, an American-trained lawyer, now resident in Juba, Equatoria working on a project to transformed traditional customary law and SPLA military law into a modern codified structure. He is of Nuer origin and while not familiar with the towns of Toray and Hamada in Darfur he reacted that "Mikey Jabbar" is not at all a Dinka name. He also left Sudan under difficult circumstances but had very strong and clear memories of his young life as a Nuer. Nuer and Dinka pepole are very broadly similar and are neighbors in southern Sudan. He also said that any Dinka would know his section of the Dinka and would be familiar with cattle and their initiated age grade. Mr. Chan has a clear Nilotic accent, ethnic scarification and incisor evulsion. As we shall see below, Mr. Sesay was broadly not aware of these basic features of Dinka life.

Most Dinka are formally named long before the age of eight when he states that his impoverished and widowed mother gave him as a slave to Hassan Dossa by his mother. This was after the murder of his father by "the janjaweed clan". It is common to have no birth certificates issued in rural Sudan. It is also possible to give one's children as slaves/servants if it is no longer possible to care for them. I will return to these historical notes below.

Typically Dinka names are determined by "cattle names," traditional Dinka religion, folklore and genealogy. Little in the name Mikey Jabbar is consistent in this respect, and thus there is little possibility of external validation. If anything, the name Jabbar is more evocative of a Muslim identity and Mr. Sesay insists that he is a Christian and his family members are, as far as he knows, Sudanese Episcopalians. Being a Muslim Dinka is certainly and easily possible, but Mr. Sesay denied this, although he did have some familiarity with some Muslim religious principles. Below, I will return to this topic of religion.

His Ethnicity

A key and critical variable in anthropology is ethnicity (along with other learned social concepts such as "race" and language skills. Generally anthropologists prefer the term ethnicity to the term "tribe" which is applied in a very inconsistent manner in specific historical and political contexts. As such ethnicity is learned and is founded in key cultural markers and in linguistic categories and communication skills. To investigate this domain I kept in mind that Mr. Sesay left his cultural area at age 8 or 10, so I focused on basic cultural and linguistic concepts that would have been mastered by a Dinka boy of this age. I was especially informed by the works of Dr. Francis Deng, a native Dinka-speaker, trained anthropologist (PhD, Yale), lawyer, colleague, as well as one-time Sudanese Ambassador to the United States who I know personally and whose published works I have used I my anthropology classes for decades.

I also viewed the language and culture chart prepared by Catherine Miller in France, this chart (enclosed) notes that the percentage of southern Sudanese (including Dinka and other southerners) was a mere 1.96 percent in South Darfur. In other parts

(West and North) of Darfur it was even less. This tiny percentage means that some very few Dinka could be in south Darfur but they are very exceptional.

So, before meeting, Mr. Sesay, I collected a long list of words and concepts that would meet these age and cultural criteria. This list was derived, in part, from the extensive glossary (pps.183-188) in Dr. Deng's classic ethnography on the Dinka. I also did an extensive search of relevant Dinka concepts from the 195-page Dinka English dictionary compiled by Dr. Roger Blench (17 December 2005), itself complied from the equally classic Dinka-English dictionary by the British colonial official Nebel. My final, selective Dinka word list included was of about 60 words representing colors, Dinka greeting, numbers, household concepts, basic values, animal names, rural agricultural terms, and basic family kin terms to represent Dinka language skills for a young boy and to pick up concept leads embedded in his affidavit. As an anthropologist I was thinking to create a list of more than 100 terms to indulge myself with this ethnographic opportunity to learn still more about Dinka language and culture. Had I done so, it would have been unproductive I am sure, since my list of highly selective, and tailored made words for this age group, Mr. Sesay was unable to offer any particular culturally-based knowledge. I first asked him to unilaterally offer *any* Dinka words, but this was essentially unproductive. Then I offered him Dinka words from my list and he also could not respond in a substantive or convincing way. In particular, given key events in his life, I asked Mr. Sesay about the words 'laang' (slave, servant) and 'abar' (orphan). He was not aware of these words. He did seem to have some idea of the word 'wa' (father) and 'weng' (cattle), but these were offered in a very hesitating manner. When I confronted Mr. Sesay with my view of his extremely limited Dinka language skills, he was dismissive and offered only the explanation that he was too young, and too long gone to recall. Frankly, this was not convincing to me from a linguistic point of view. Perhaps an explanation of PTSD would work here, but this is not in my competency.

Since I am conversant in Sudanese colloquial Arabic, I then switched to this language, which was very widely spoken in Darfur, if even as a second language. He had a bit of knowledge of Arabic but even counting in Arabic, a basic skill, he did poorly, inaccurately, and was strongly accented, perhaps in a tonal language that he first learned. Dinka language has sound patterns and accents with which I am familiar and Mr. Sesay did not manifest such patterns. In fact, this all added to my growing supposition that he is neither Dinka, nor Darfuri but might have an origin in such places as Eastern Congo, southern Sudanese borderlands, or CAR. Probing this further he insisted that he was a Dinka from Darfur. Since this entire region has been long destabilized and not under effective government control I also speculated to myself that he might have been victimized or a participant in some other regional conflict like Chadian rebellions, the LRA, or part of the movements in eastern Congo. I asked him if he could name other peoples of southern Sudan; this had no result. I asked him in a more focused way if he knew of Azande, Bari, Kakwa, and Kuku. He roughly nodded but then said nothing of substance about them and even said he had never been to southern Sudan Kenya or Uganda. He did say that he speaks some *Lingala* (of DRCongo), but I did not quiz him in this language that I was not prepared for, nor do I know. This elusive pursuit of his substantial personal knowledge became rather frustrating and added to my impression that he just did not truly have this knowledge or alternatively, because of youth and

possible PTSD he could not recall. My professionally impression was the former, but my professional competence could not confirm the later. I also speak French (spoken in Chad and DRC) so I investigated his skills with that language and I would estimate that it was even less than Arabic.

Beyond language in the strict sense, there are core cultural concepts that any Dinka should know as a rural, young boy. These relate especially to the important "cattle culture complex" from which values, names, wealth, wives, history and identity are all derived. I showed a picture of known and named variant color patterns of Dinka (Nuer) cattle to Mr. Sesay and his response ranged from non interest to no linguistic competency in this respect, to some derision about people who are too interested in cows. These are very un-Dinka attitudes. Furthermore, Dinka are typically introduced and initiated in "age grades" that bond young, fellow Dinka together for life. This is primary in the Dinka value system, but Mr. Sesay did not respond in a convincing or knowledgeable manner to this field of inquiry. The only explanation that I could think of that might account for this was again PTSD, since it is virtually impossible that some one would be raised as a Dinka and not know about "cattle culture," age grades or basic Dinka words. Initially accepting his claim to Dinka origins I was confident that I could easily and quickly verify this if he provided solid responses about these usual cultural domains. I recalled another judicial case of a Dinka charged with murder in an American court, his lawyer found him unresponsive until we suggested using simple Dinka greeting "chibok." Immediately this Dinka became responsive. I tried this with Mr. Sesay with no success.

Dinka people are relatively isolated and homogenous, not to the point of any exclusive genetic markers, but as a strong rule, Dinka can often be instantly recognized by their very tall stature, typical Nilotic physiognomy and postures, evulsion (removal) of incisor teeth, and ethnic scarification (cicatrice, shiloukh). Before meeting Mr. Sesay I assumed that at least several of these physical features would be present. In fact none of these physical characteristics were to be found in this case.

Finally, most Sudanese not only know their own ethnicity and kin relations, but they typically known the ethnicities of their neighbors, especially if a neighbor is responsible for the murder of your father. Widespread (Baggara) Arabs group in Darfur include the Mahaliya, and Tai'isha (especially), as well as Missiriya, Humr, and Rizegat in Kordofan province. Of these Arab groups Mr. Sesay recognized none.

Dinka Territorial Domain

Ethnographic Maps were used to determine if the two towns of Hamada and Toray were Dinka towns. Generally, Dinka territory lies to the south and east of southern Darfur. Territory between the (Ngok) Dinka and Missiriya Arabs has become much contested, especially around the town of Abyei in the last few years. Another case was in the massacre of and estimated 1,000 Dinka people along the railway at ad-Da'ien from 28-29 March 1987. This was confirmed by the human rights activists Ushari Mahmoud and by Suleiman Baldo who now lives in New York. This event certainly underscores the tension and violence between Dinka and Arabs in southernmost Darfur, but again, this was well after Mr. Sesay had departed, and importantly, he does not have a Dinka appearance.

His Historical context

Based on the statement that Mr. Sesay was born in 1971-1972. He was given as a slave when he was about 8 years old, or in 1979 to 1980. At both of these periods I was living and working in Sudan. For most of 1971 I was employed as a journalist in the Ministry of Southern Affairs, my Minister Syd. Joseph Garang was a Dinka and I traveled with him and President Nimieri to Wau in Bahr al Ghazal. Admittedly, Mr. Sesay's departure from Sudan at a young age could easily explain that he had no awareness of such contemporary historical figures or events.

My life and travels in Sudan, especially my visit to the south in 1971 brought me into contact with Dinka (and "Jur" areas) in the southern Sudan. I also traveled throughout most of Kordofan including the far south where I visited non-Dinka areas of Baggara and Nuba Mountain people. There, the Dinka population is very small and as one ventures further north the Dinka people become very much less common. My personal knowledge, in private conversations and lectures, of the negotiators for the Abyei Boundary Commission (ABC) as well as the Abyei conflict in 2007 and 2008 made it clear that the region is contested. However, it is the approximate and seasonal borders between major concentration of Ngok Dinka to the south and Missiriya Arabs to the north. In the early 1980's there were tensions at Abeyi but it was managed through traditional conflict resolution.

Conferring with the oversize ethnographic map [back pocket] map in G.P. Murdock (1959) or with Deng (1984) one can see that the territorial domain of the Dinka just barely elides into the southeastern most parts of Darfur. The conflict in southern Sudan restarted in 1983. This distributed southern Sudanese (including Dinka) all over Sudan and neighboring nations as refugees ("Lost Boys"), but since Mr. Sesay left Sudan in 1980, it is not reasonable to have him and his family in areas in Darfur where Dinka would not be traditionally or as refugees at this time.

The cases of the villages Toray and Hamada

In even more specific terms, Mr. Sesay specifically cited the settlements of Hamada and Toray in his personal biography. In 2005, both settlements were in the print media. There is a town in Darfur near Nyala called Hamada. Actually I understand the word to be of Arabic origin, but it has a general geological reference to mean barren desert broken up by hard rock outcroppings. It is believed by some in Darfur that some of these rocks are worm smooth by human porters and slaves marching from south to the north.

In any case, there are journalistic accounts summarized by Eric Reeves that indicate an Arab attack on Hamada on 14 (or 16) January 2005 in which 100 (or 69) were reportedly killed. The report noted that Hamada was a Birgid "tribal village" (Birgid [Birkid] are a Nubian [non-Nilotic] population of Darfur). With differing casualty figures, this attack was also noted by Amnesty International (27 January 2005); by the New York Times (24 January 2005); by Reuters (26 January 2005); by the Associated Press (28 January 2005) and by the Sudanese Organization Against Torture (SOAT), 19 January 2005. By 26 January 2005, that attack on Hamada was also confirmed by the United Nations in which 105 civilians were killed, mostly women and children. Hamada is located 50 km northeast of Nyala, very far from Dinka land and it is noted as place of

occupation of the Birgid people. Moreover, this event took place twenty-five years after Mr. Sesay's departure, which was a much more peaceful time.

Regarding Toray, in Kass Province, south of Jebal Marra in south Darfur, one can confirm (Reeves, 11 March 2005) that it was also attacked on the morning of 29 February 2005 by 500 militiamen. At Toray, 17 civilians were reportedly killed, 3 women were raped, and 11 people were wounded (SOAT, 7 March 2005). In the SOAT account the names of 16 killed and 11 wounded were provided. The majority of the victims were farmers and all had typically Muslim names, none had names that were traditionally Dinka. This would make Mr. Sesay's statement very unusual indeed to have Christian Dinka people in Toray. Indeed, Mr. Sesay said that Toray "was close to Egypt"; this is very far from the case since it is in southern Darfur.

Mr. Sesay's statement also referred to the murder of his father by "members of the Janjaweed clan". Overlooking the fact that the Janjaweed are not a clan but an informal proxy militia of Khartoum, the more important points are that the Janjaweed were not first recognized until 1988 (Wikipedia, 5/4/2007). This is at least eight years after Mr. Sesay left the area and they were not very active until after February 2003 when the fighting in Darfur escalated substantially with the SLA/JEM joint attack on Sudan Armed Forces in the capitol of Darfur at al-Fasher. So, precisely who may have killed Mr. Sesay's father I can not say, but a force termed 'janjaweed clan' should be ruled out since they were not active or existing in the time or place. So again the chronology and nomenclature are not consistent with the statement. And one defense is again, sloppy historical recollection because of a young age. These days the janjaweed are very active as are Arab militias ('murahileen') in southern Kordofan, but for the dates indicated by Mr. Sesay this was not the case at the time of his enslavement.

Political Maps

During my visit to the Detention Center I brought a detailed (scale 1:2,700,000) Map of Sudan (International Travel Maps, Vancouver, Canada). A copy of this section is attached. Although Toray and Hamada were not indicated it provided abundant detail about main and secondary roads, wells, political boundaries, *wadis* (valleys), railway, mountains, elevations and with scores of villages noted for south Darfur. However, Mr. Sesay could not get oriented, nor could he indicate any features and he could not show the general area where Tory and Hamada are, in fact, situated. Since he was also taken to neighboring Chad, I asked about that, but there was nothing he could identify on the map or recall in a precise way. Again, with two decades passing and being there as a child, he explained that he could not remember.

Mr. Sesay's Family and his own Religion

It is unusual to find Christians in Darfur, but the definitely do exist and they would be more common among Nilotics than any of the other diverse peoples in Darfur. The statement that he has lost all contact with his family makes it extremely hard to corroborate. However a long standing friend and neighbor of mine in Bridgewater, New Hampshire is Rev. Frank Griswold, who recently retired as the Bishop for the entire Episcopal Church in the United Sates. Since Mr. Sesay stated that his sibs and mother were Episcopalians, I asked Rev. Griswold to inquire through his church channels in

Sudan about any of these individual registration or whereabouts. To date no evidence or information has been forthcoming from this approach. Naturally negative evidence proves nothing, but it probably raises more questions than it answers.

South African and American addresses for Mr. Sesay

As with other information in Mr. Sesay's statement, this is hard to confirm or even pursue, but I should think that American investigative authorities could work on the American side of his claims. I should think that our Embassy in South Africa might probe the South African link to Mr. Sesay. I did ask if he knew any Afrikaans words from South Africa and he could provide none. I did think it odd that a slave from Sudan would have been shipped so very far as South Africa. I asked if there was any record or other memory of this experience. He said "no" because he was concealed in compartments or under belongings as he passed many borders from DRC to South Africa. I thought that this is a very long journey in such a condition. I did not venture further than this into these domains of his biography.

The Case of Sudanese Slavery

The last area that I will consider from the point of my expertise is in the topic of slavery in Sudan. My publications and publications from others are attached for a more in depth account of contemporary slavery in Sudan and in the Arab world. Since these articles and statements about slavery were written prior to any knowledge of the case, they stand as an independent reference point on the specifics of Mr. Sesay. Essentially this is the one area which his statement could be most strongly reconciled in general terms. The practice of slavery is built upon de-racination and alienation and usually transportation to faraway places to assist the master in creating a docile and frightened slave. I have no independent way to confirm that this is what actually happened to Mr. Sesay, but the post-traumatic shock disorder, helplessness, futility of resistance, confusion and repression about details is certainly a common circumstance in the slave business. Moreover Southern Sudan and south Darfur (especially *Hofrat an-Nahas* [copper mines] and *Dar Fertit*) have been areas from which Arabs have acquired slaves since time immemorial. The process of slaving and the existence of slaves in Sudan can not really be questioned. It has been confirmed, observed and studied very considerably. Naturally having this slave system in the Sudan only justifies the contextual portion of Mr. Sesay's statement that he was a victim of the system. He did show me some faint marks on his forearm that he indicated were the result from being bound. His personal veracity in the important claim of slavery in his biography is a separate issue that I can not resolve.

Alternative Approaches:

**Linguistics**

Since there are notable gaps in his knowledge and memory for reasons of his youth and the conditions he faced, I felt much frustrated in finding satisfactory ways to resolve the issues of his veracity and even his identity as a Darfurian Dinka. Perhaps someone highly and specifically trained in African phonology and linguistics could make further progress since he speaks English with a notable African accent. In other political

asylum cases I have had usually a simple word list (e.g. Mahas Nubian, of Darfurian Zaghawa) has been sufficient to confirm the ethnic identity of individuals. My knowledge of spoken Sudanese colloquial Arabic and French is certainly adequate to converse with anyone from Chad or Darfur, but this was not possible in this case. Below I have guessed at another strategy to see if Mr. Sesay might speak Sierra Leonean Creole.

**Biology and Genetics**

With a degree in biology (BS, Bucknell, 1966) and degrees in anthropology (MA, Temple, 1968; PhD, Northwestern, 1973) I believed it would not be a fruitful way to confirm the identity of Mr. Sesay. I also have a chapter in the book by Dr. Carolyn Fluehr-Lobban, (my wife and colleague), entitled Race and Identity in the Nile Valley. The 14 chapters in this book might be consulted however on other related matters, especially including the role of slavery and how it has confused identities in Sudan. Essentially the issue of cultural identity can not be confirmed by genetics in general. Yes, parentage can be confirmed, and DNA in a crime scene can confirm that it matches (or does not match) with a specific individual. But that gene flow in the Nile Valley is so extensive for such a long time that unless one is discussing a specific DNA matched sample, this is not productive in this present case. The issues of phenotypic appearance learned cultural and language and genotypic (genomic) realities do not necessarily converge. Nonetheless I spoke with Dr. Shomarka Keita, [Senior Research Associate, National Genome Center and Research Associate, Department of Anthropology, Smithsonian Institution] who is a highly regarded, and extensively published specialist on this topic. He confirmed my view and said that genetic material can confirm origins in very broad regions of Africa, but even here the best that can be ascertain is within a sweeping probabilistic model, and certainly not affiliation with a specific language or culture. He added that the Dinka, however homogenous they may been they are not isolated enough to have a unique pattern of mitochondrial (PN2, M2 and M35) DNA. Even among primordial Nilo-Saharan people there was also genetic variability. Thus, there could be average profiles and some congruence, but it could not be confirmatory. He added that gene pools overlap and will not be exclusive among most African populations. For the Dinka, long raided and slaved upon, you could find northern Sudanese with "Dinka genes" and southern Sudanese with "Arab genes".

**Psychology**

While this is certainly beyond my competence, it did occur to me that someone trained in PTSD analysis and treatment might be called into this case to venture his or her views.

On Balance:

Few, if any concrete cultural specifics were forthcoming or presented to confirm the Sudanese identity of Mr. Sesay. On the basis of the above points, I am not convinced that he is Dinka, Darfuri, or Sudanese. Too many substantive details are missing, or incomplete, or inconsistent. His young age at the time of his departure could account for this to some extend, but geography and history also do not intersect in a supportive way. However, if his case of early childhood trafficking is correct this "amnesia" could be explained by such factors as Post Traumatic Stress Disorder (PTSD) of a child who

wished to forget such circumstances or was so traumatized by them that he simply could not recall the specifics with any precision. Note that some written slave narratives in the Atlantic slave trade did recall specifics of place of birth and natal language. Perhaps there is something else that we should know about Mr. Sesay but I was not able to determine what that might be. Since he denied the legitimacy of his Sierra Leone passport, I did not investigate this possibility, but it did get me reflecting that this might in fact, have more truth to it. This is a nation of English speaking Africans who are exposed to Islam. This is also a nation that was traumatized by an especially brutal civil war with heavy use of child soldiers. Being led away for Sierra Leone by his denial of the valid passport, but then not being convinced of his Sudanese or Dinka identity, I began to think that his general appearance, physical stature, and language skills would be much more in keeping with a West African identity. Along this line, I looked at book on the war in Sierra Leone, by Teun Voeten (How De Body) that was richly supplied with photographs, that look way more similar to Mr. Sesay than he looks like any Dinka. I would recommend comparing Mr. Sesay's image with those depicted in the book. Were further investigation about this question to take place, I suggest getting a native Sierra Leonean to provide a word list of Sierra Leonean Creole or Mande words. Then without telling Mr. Sesay the origin of these words, but suggesting that they might be Sudanese words, check his comprehension or reaction. Naturally I am only guessing about this, but it would be easy to come up with a scenario that Mr. Sesay was somehow involved in the conflict there. He could easily acquire an illegal passport (printed by various rebel groups), and now he can't go back, or does not want to go back for fear of something.

Since I was not specifically asked to determine precisely what his ethnicity was, but to seek to confirm the internal specifics of the affidavit, I will only offer some alternatives about his identity. I can suggest that a route of psychological investigation about PTSD or a still closer linguistic study of central African phonology might be helpful to sort this out. My expertise lies in African culture and history and does not extensively venture into psychology (having only generally familiarity with this in some political asylum cases), or linguistic phonology (but did have graduate level training in anthropological linguistics). Hopes to solve this issue by genetic investigation are not considered useful at this individual personal or cultural level.

At the conclusion of my forensic interview I informed Mr. Sesay that he had not convinced me with verifiable proof he was of Dinka origins. Yes, there were possibilities, but not a strong likelihood after I pursued a variety of evocative approaches. Too much was wrong and too little was recalled about too many variables. I expressed sympathy for his indeterminate plight in the detention center. I suggested to Mr. Sesay, that the full and complete truth was the very best route for him to follow. Even if he were not Dinka, telling his story accurately and in an independently confirmed manner, could help him, at least, get out of detention, but it would not likely spare him from deportation. Moisture in his eyes suggested he was listening closely but he stuck with his story as presented in his original statement. Perhaps, I guessed that detention was not at all pleasant but maybe deportation to an African nation was viewed, perhaps as still worse. I gave him my name and phone number if he would like to contact me with any further information of reflections.

Bibliography:

Anon. "Janjaweed." *Wikipedia* website, downloaded 5/4/2007.

Deng, Francis Mading, 1984, The Dinka of the Sudan, Holt, Rinehart, Winston. Prospect Heights: Illinois.

Fluehr-Lobban, Carolyn, 2004, Race and Identity in the Nile Valley: Ancient and Modern Perspectives. Red Sea Press: Trenton: NJ

Lobban, Jr. Richard A.; Robert Kramer; Carolyn Fluehr-Lobban, 2002, Historical Dictionary of the Sudan, 2002, Scarecrow Press: Lanham, Maryland.

Murdock, George Peter, 1959, Africa: its Peoples and their Culture History. McGraw Hill: New York.

Reeves, Eric, "Khartoum Continues Genocidal Assaults on Darfur Civilians." Sudan Tribune, 30 January 2005 (published 2 February 2005).

Reeves, Eric, "Darfur Mortality Update," 11 March 2005.

Voeten, Teun, 2000, How De Body? St. Martin's Press: New York.