# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IDRISA SESAY<br><br>                          Petitioner,<br><br>  vs.<br><br>MICHAEL CHERTOFF, et al.<br><br>                          Respondents. | CASE NO. 07cv2354 JM(LSP)<br><br>ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT; DENYING PETITIONER'S MOTION FOR SUMMARY JUDGMENT; DENYING PETITION FOR WRIT OF HABEAS CORPUS |

On December 17, 2007 Petitioner Idrisa Sesay filed the instant petition for writ of habeas corpus ("Petition") pursuant to 28 U.S.C. §2241 alleging that his detention exceeds the presumptively reasonable 180 day period of detention announced in Zadvydas v. Davis, 533 U.S. 678, 690 (2001). Respondents oppose the Petition. Having carefully considered the record, pertinent authorities, and for the reasons set forth below, the court grants Respondents' motion for summary judgment, denies Petitioner's motion for summary judgment, and denies the Petition. The Clerk of Court is instructed to close the file.

**BACKGROUND**

Petitioner has claimed to be either a citizen and national of Sierra Leone, Sudan, or the U.S. Virgin Islands. In 1986 Petitioner entered the United States as a temporary visitor, presented a passport from Sierra Leone, and claimed to be a citizen of Sierra Leone. (Gov't. Exhs. 7, 11, 29). Petitioner renewed his passport from the Government of Sierra Leone in 1984 and subsequently

claimed immigration benefits from the Department of Homeland Security ("DHS") in 2000 based upon his asserted Sierra Leonese citizenship. (Exh. 1-3). On February 4, 2000 Petitioner applied to the Immigration and Naturalization Service ("INS") for Temporary Protected Status ("TPS") claiming, under penalty of perjury, to be a native and citizen of Sierra Leone. (Exhs. 10, 12). The INS approved both applications. (Exhs. 7, 11).

Petitioner's criminal history includes a 1989 arrest for theft, a 1992 arrest for battery, a 1998 arrest for spousal abuse, and a 1999 conviction of falsely reporting a crime. (Exhs. 4, 5, 20). The conviction that rendered Petitioner removable occurred on October 26, 2004 when he was convicted of sexual battery by restraint and sentenced to four years in prison. ( Exhs. 15). In conjunction with those proceedings, Petitioner continued to claim he was a citizen of Sierra Leone. (Exh. 22).

Shortly before Petitioner's release from state prison on the sexual battery conviction, Petitioner was interviewed by a DHS officer to whom he stated that he was a citizen of the U.S. Virgin Islands. (Exh. 29). On October 2, 2006, DHS lodged a detainer against Petitioner and he was transferred to DHS custody on October 24, 2006 pending the conclusion of removal proceedings. (Exhs. 27, 30-34).

Following two hearings during which Petitioner requested continuances to obtain counsel, on February 7, 2007 Petitioner pleaded to the allegations in the Notice to Appear. (Exh. 32). He also claimed for the first time that he is a native and citizen of Sudan. Id. On March 27, 2007 Petitioner filed an application for asylum in Immigration Court wherein he declared under penalty of perjury that he is a native and citizen of Sudan.

On May 10, 2007 the Immigration Judge ordered Petitioner removed from the United States, designating Sierra Leone as the appropriate country of removal. (Exh. 32). Petitioner did not appeal the Order of Removal. In order to achieve Petitioner's

removal, on May 11, 2007 DHS requested travel documents from the Consulate of Sierra Leone. (Exh. 36). In June 2007, a consular officer of Sierra Leone interviewed Petitioner. During the interview Petitioner claimed to be a native of Sudan. As a result of Petitioner's claim to Sudanese citizenship, the Consulate of Sierra Leone has been unwilling to issue travel documents to Petitioner. (Exhs. 44, 47, 48, 57).

On August 17, 2007 DHS conducted a custody review and concluded that Petitioner should

1  not be released from custody because he poses a high flight risk and danger to the community. (Gov't
2  Exh. 39-47). On December 7, 2007 Petitioner was issued and served a "Notice of Failure to Comply,"
3  citing Petitioner's failure to cooperate with efforts to obtain a travel document for his removal from
4  the Untied States. The "Notice of Failure to Comply" also informed Petitioner of his lack of
5  cooperation, noting that after his interview with the Sierra Leone Consular Official in June 2007,
6  Petitioner continued to provide "conflicting information regarding his true nationality." (Gov't Exh.
7  57).
8  On June 17, 2008 the court granted the parties' joint motion for appointment of Richard
9  Lobban, Ph.D. as an expert witness. (Docket No. 24). Dr. Lobban is the Chair and Professor of
10 Anthropology at Rhode Island College, Executive Director of the Sudan Studies Association, and
11 Adjunct Professor of African Studies at the Naval War College. He was retained to assist the court
12 and parties to determine whether Petitioner is from Sudan or Sierra Leone. (Gov't Exh. 121-131).
13 The parties have completed significant discovery and now both parties move for summary judgment.
14
15                                    **DISCUSSION**
16 **Legal Standards**
17       A motion for summary judgment shall be granted where "there is no genuine issue as to any
18 material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P.
19 56(c); Prison Legal News v. Lehman, 397 F.3d 692, 698 (9th Cir. 2005). The moving party bears the
20 initial burden of informing the court of the basis for its motion and identifying those portions of the
21 file which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v.
22 Catrett, 477 U.S. 317, 323 (1986). There is "no express or implied requirement in Rule 56 that the
23 moving party support its motion with affidavits or other similar materials <u>negating</u> the opponent's
24 claim." Id. (emphasis in original). The opposing party cannot rest on the mere allegations or denials
25 of a pleading, but must "go beyond the pleadings and by [the party's] own affidavits, or by the
26 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that
27 there is a genuine issue for trial.'" Id. at 324, 106 S. Ct. At 2553 (citation omitted). Neither may the
28 opposing party rely solely on conclusory allegations unsupported by factual data. Taylor v. List, 880

F.2d 1040, 1045 (9th Cir. 1989).

The court must examine the evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Any doubt as to the existence of any issue of material fact requires denial of the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). On a motion for summary judgment, when "'the moving party bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial.'" Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992) (emphasis in original) (quoting International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991), cert. denied, 502 U.S. 1059 (1992)).

While the parties argue that the present issues may be resolved on summary judgment, the court notes that in reviewing claims on habeas the court "does not have to rigidly apply rules which would be inconsistent or inequitable in the overall framework of habeas corpus." United States v. Frady, 456 U.S. 152, 166 n.15 (1982).

**The Petition for Writ of Habeas Corpus**

In the ordinary course, an alien subject to removal must be removed within 90 days after the order of removal becomes final. 8 U.S.C. §§1231(a)(1), 1231(a)(3). However, two statutory provisions permit the continued detention of individuals subject to a final order of removal: 8 U.S.C. §1231(a)(1)(C) and 8 U.S.C. §1231(a)(6). Petitioner contends that neither statutory provision applies and, even if applicable, the Attorney General's authority to detain him is limited by the judicial doctrine established in Zadvydas v. Davis, 533 U.S. 678, 689 (2001). Each argument is discussed in turn.

Detention Under 8 U.S.C. §1231(a)(1)(C)

The Government represents that Petitioner is properly detained pursuant to 8 U.S.C. §1231(a)(1)(C) which provides:

> The removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal.

This provision evidences Congress' intent to permit the continued detention of aliens when an alien refuses to cooperate with the DHS to secure the alien's ultimate removal from the country. Pelich v. Immigration and Naturalization Service, 329 F.3d 1057, 1060 (9th Cir. 2003); Lema v. I.N.S., 341 F.3d 853, 857 (9th Cir. 2003) (§1231(a)(1)(C) authorizes the "continued detention of a removable alien so long as the alien fails to cooperate fully and honestly with officials to obtain travel documents). In Pelich, the petitioner was subject to a final order of removal. When Pelich initially entered the United States in 1982, Pelich claimed that he was born in Poland and identified himself as a Polish national. In a subsequent application for lawful permanent resident status completed in 1983, Pelich stated that he was a German national, that his father was born in Germany, and that he did not know his mothers place of birth. In 1998 Pelich pleaded guilty to embezzlement, served a five year custodial sentence, and subsequently placed in removal proceedings. On October 27, 2000 Pelich was interviewed by an INS deportation officer and Pelich represented that his father was from Israel and his mother from Monaco. He also gave different names for his parents than those provided on his permanent resident application. On January 3, 2001 the Immigration Judge ordered Pelich removed to Poland or Germany.

The INS initiated efforts to obtain travel documents for Pelich but Pelich refused to fill out the Polish travel documents application, claiming that he was a citizen of Germany. The Ninth Circuit noted that there existed significant evidence in the record to support the finding hat Pelich himself was largely responsible for his continued detention. Pelich refused to complete the required travel documents and the Polish consulate explicitly reserved its determination of Pelich's citizenship status pending review of the travel documents. The Ninth Circuit then noted:

> Since Pelich falls within the category of non-cooperative detainee, he cannot legitimately object to his continued detention when that very detention is caused by his own conduct. Pelich could likely effectuate his own removal (and free himself from detention) by providing the Polish government with the requested information. It naturally follows that his detention is not destined to be indefinite. To the contrary, Pelich's behavior places him within that class of aliens properly detained pursuant to 8 U.S.C. § 1231(a)(1)(C).

Id. at 1060.

More closely on point is Lema v. I.N.S.. There, an Ethiopian national subject to a final order of removal, applied to the Ethiopian Embassy for travel documents and listed his nationality as

1  Eritrean/Ethiopian. When he spoke with Ethiopian officials he informed them that he is Eritrean, not
2  Ethiopian. "Because Lema said he was Eritrean, Ethiopian officials decided not to grant him travel
3  documents." 341 F.3d at 853. Thereafter Lema did not reapply for travel documents nor did he
4  provide "evidence corroborative of his Ethiopian nationality to Ethiopia despite a request by the INS
5  that he do so." Id.

> In the two years since Lema first applied for travel documents, Lema has not furnished the Ethiopian government or the INS with any new evidence (such as affidavits from family members) to support his claim of Ethiopian nationality. Lema has not filed a new request for travel documents. Lema has not attempted to contact the Ethiopian consulate. Lema has refused to comply with an INS request, made in April 2002, that he provide the INS with certain documents. If Lema were to cooperate with the INS to dispel the Ethiopian government's confusion over his nationality, the Ethiopian government might issue travel documents in the reasonably foreseeable future.
>
> We conclude that the record contains substantial evidence that Ethiopia's reluctance to issue Lema travel documents is caused by Lema's continuing failure to cooperate with the Untied States and Ethiopian officials to secure travel documents from Ethiopia.

13  Id. at 857.

14  Here, there is overwhelming evidence in the record that Petitioner has failed to fully cooperate
15  with the DHS and the Sierra Leonese Consulate to secure travel documents. Petitioner entered the
16  United States on July 26, 1986 on a passport issued by the government of Sierra Leone. (Exh. 7, 11,
17  29). The Petition alleges that he was actually brought to this country by his South Africa slave master,
18  Mr. Sepat. Subsequently, Petitioner or his counsel represented that he was brought to this country by
19  his uncle. Within a few months of his arrival he attended high school in Maryland while living with
20  his guardian, Mr. Jonathan Edwards, who is a native of Sierra Leone and whom Petitioner has
21  identified as his cousin. (Gov't Exhs. 66-68, 89). A few years later in 1990 Petitioner moved to the
22  Los Angeles with his girlfriend, Ms. Mariama Kamara, who is a native and citizen of Sierra Leone.
23  (Gov't Exh. 115).

24  When Petitioner's Sierra Leonese passport expired, on August 27, 1994 he obtained a renewed
25  passport from the Government of Sierra Leone. (Gov't Exh. 1-3, 12-14). On February 27, 1994
26  Petitioner applied to the INS for Temporary Protected Status ("TPS") claiming, under penalty of
27  perjury, to be a native and citizen of Sierra Leone. (Gov't Exhs. 7-11). The INS approved the TPS
28  application and accompanying application for employment authorization. Id. At the same time, the

court notes that Sudan was also a TPS designated country, see 62 Fed.Reg. 59735-38 (Nov. 4, 1997), and Petitioner did not claim Sudanese nationality.

On November 4, 2001 the police began an investigation into an accusation that Petitioner, while employed as a counselor at a group home in Agoura Hills, California, had repeatedly sexually molested a developmentally disabled adult female at the group home. Upon learning of the investigation, Petitioner fled to Tennessee to avoid arrest and began living under the name "Mikey Jabbar." (Exhs. 24-25). On April 11, 2002 Petitioner was arrested and claimed to be a United States citizen. He also told the police that he was from Sierra Leone. (Gov't Exh. 22).

After completion of his custodial sentence for sexual battery, Petitioner was transferred to DHS custody. During a represented hearing on February 7, 2007 Petitioner claimed for the first time that he is a native and citizen of Sudan. (Gov't Exh. 32). On March 27, 2007 Petitioner filed an application for asylum in Immigration Court claiming, under penalty of perjury, that he is a native and citizen of Sudan. (Gov't Exh. 76-88).

On July 17, 2008 the court granted the parties' joint motion to appoint expert witness Richard Lobban, Ph.D. to assist the court in determining whether Petitioner is from Sudan or Sierra Leone. Dr. Lobban concluded that he was unable to confirm Petitioner's claim to Sudanese nationality. Petitioner was unaware of basic features of Dinka life and did not understand rudimentary Dinka words nor could he identify any culturally-based knowledge. Dr. Lobban concluded that "it is virtually impossible that some one would be raised as a Dinka and not know about 'cattle culture,' age grades or basic Dinka words." (Gov't Exh. 125).

The only evidence submitted by Petitioner consists of his self-serving statement and verification that he is from Sudan. (Petition at p. 2). This bare assertion to Sudanese nationality, in light of the overwhelming evidence submitted by the Government, fails to create a genuine issue of material fact. In both civil and criminal cases, courts have refused to accept subsequent sworn statements that contradict earlier sworn statements. See Benavidez v. San Jose Police Dept., 71 CalAp.4th 853, 860 (1999) (court may give great weight to prior admissions made in depositions and disregard subsequent contradictory and self-serving declarations); United States v. Laano, 153 F.Supp.2d 205, 208 (E.D.N.Y. 2001) (court rejects subsequent claims of innocence where defendant

1  provided prior written and oral statements under oath that were treated as truthful and conclusive
2  statements at the time they were made).  Moreover, Petitioner fails to submit any other evidence even
3  remotely suggesting he is a national from any other country but Sierra Leone.

4  In light of the one-sided nature of the evidence, the court concludes that Petitioner has refused
5  to fully and honestly cooperate with government officials to secure the travel documents necessary
6  for his repatriation to Sierra Leone.  Consequently, Petitioner's continued detention is authorized by
7  8 U.S.C. §1231(a)(1)(C).

8  Petitioner contends that Respondent should be precluded from relying upon his non-
9  cooperation because Respondent failed to timely provide the "Notice of Failure To Comply Pursuant
10 to 8 C.F.R. 241.4(g) ("Notice")."  Petitioner represents that the 90-day removal period commenced
11 on May 10, 2007 and that he was not provided with the required Notice until December 11, 2007, four
12 months after the 90 removal period and one month after the presumptively reasonable period for
13 removal identified in Zadvydas, 533 U.S. 678.  Petitioner contends that the remedy for Respondent's
14 late filing of the Notice is to preclude Respondent from asserting his non-cooperating as a defense.
15 Petitioner relies on Singh v. Gonzales, 448 F.Supp.2d 1214 (W.D. Wash. 2006) as authority.  In Singh,
16 petitioner was not provided with the required Notice until 17 months after the 90 day removal period
17 had expired.  Id. at 1219.  The Magistrate then concluded, consistent with 8 C.F.R. §241.4(g)
18 (providing that filing the Notice shall extend the removal period "if the removal period has not yet
19 expired"), that the Government could not rely upon 8 U.S.C. §1231(a)(C) as a basis to continue to
20 detain the alien.

21 Here, the court concludes that the late filing of the Notice did not automatically extend the
22 detention period. The regulations provide that the mere filing of the Notice is sufficient to extend the
23 detention period.  8 C.F.R. §241.4(g).  That said, however, there is nothing in the regulations to
24 suggest that Respondents cannot continue to detain an alien based upon an evidentiary showing that
25 the alien is uncooperative.  8 C.F.R. §241.4(g)(5)(iv) specifically provides that an alien's failure to
26 cooperate shall not be excused by the fact that DHS served the Notice after the 90 day removal

27
28

period.[1] Moreover, Congress clearly anticipated and authorized the continued detention of uncooperative aliens. 8 U.S.C. §1231(a)(1)(C). Where, like here, the Government comes forward with overwhelming evidence to demonstrate that an alien subject to a final order of removal has not fully and honestly cooperated to effectuate his removal, Petitioner's continued detention is authorized by 8 U.S.C. §1231(a)(1)(C).

Finally, Petitioner contends that his continued indefinite detention violates the Supreme Court's reasoning in Zadvydas. That argument is addressed below.

### Detention Under 8 U.S.C. §1231(a)(6)

There is no dispute that Petitioner's October 26, 2004 conviction and four year term of incarceration for sexual battery by restraint constitutes a removable offense that subjects him to continued detention. See 8 U.S.C. §1227(a)(2). Pursuant to 8 U.S.C. §1231(a)(6) the Attorney General is authorized to detain individuals who have been determined "to be a risk to the community or unlikely to comply with the order of removal." Here, Petitioner does not directly challenge Respondents' August 17, 2007 determination that Petitioner, in light of his criminal history, prior fugitive status, and perjured statements, is both a flight risk and danger to the community. Rather, he contends that his continued detention is indefinite within the meaning of Zadvydas. That argument is addressed in the following section.

### Detention Under Zadvydas

In order to provide a limit on the length of detention beyond the 90-day removal period, the Supreme Court held that constitutional concerns limit "an alien's post-removal period [of] detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention." Zadvydas, 533 U.S. at 689. The Supreme Court held that a six month post-removal period of detention is a "presumptively reasonable period of detention." Id. 699.

---

[1] 8 C.F.R. §241.4(g)(5)(iv) provides:

The fact that the Service does not provide a Notice of Failure to Comply, within the 90-day removal period, to an alien who has failed to comply with the requirements of section 241(a)(1)(C) of the Act, shall not have the effect of excusing the alien's conduct.

After the six-month presumptively reasonable period of time has expired, Respondents may continue to detain an alien unless the "alien provides good reason to conclude there is no significant likelihood of removal in the reasonably foreseeable future." Id. at 701;

> [O]nce the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. And for detention to remain reasonable, as the period of prior post-removal confinement grows, what counts as the "reasonably foreseeable future" conversely would have to shrink.

Id..

The above procedures apply when an "indefinite detainee" cooperates with the DHS to effectuate removal and "who, through no fault of their own, could not be removed from the United States." Pelich, 329 F.3d at 1059. Here, however, Petitioner's continued detention, for the above stated reasons, is attributable to his own failure to fully and honestly cooperate with government officials to effectuate his removal. Consequently, Petitioner fails to demonstrate that there is no significant likelihood of his removal in the reasonably foreseeable future.

Notwithstanding, Petitioner contends that he has "consistently asserted since February 2007 that he is Sudanese." (Traverse at p.4:22). In his declaration Petitioner declares that he was born in Sudan and does not have a birth certificate because he was born at home. (Sesay Decl. ¶2). Petitioner further declares that he was brought to the United States by a family that obtained a Sierra Leone passport for him. Petitioner also declares that he has completed every form requested by DHS. (Sesay Decl. ¶13). In further support of his claim to Sudanese citizenship, Petitioner completed an asylum application in March 2007 claiming Sudanese nationality. Finally, to take Petitioner outside the scope of Pelich, he argues that Petitioner's acts of non-cooperation occurred prior to the commencement of the removal period and therefore such conduct should not be considered by the court. Besides the self-serving declaration, Petitioner does not present any evidence to support his claim of Sudanese citizenship.

Here, Petitioner simply fails to provide good reason to believe that he will not be removed in the reasonably foreseeable future. Moreover, even if he were to provide such reason, the Government has demonstrated by overwhelming evidence that Petitioner has failed to fully and honestly cooperate

to effectuate his removal. In this sense, Petitioner appears to hold the keys to liberty in his pocket. The record indicates that Sierra Leone has denied the request for travel documents solely because Petitioner claims to be a national of Sudan. (Exh. 57). The court rejects Petitioner's argument that his most recent claims to Sudanese nationality must be accepted as true. In light of Petitioner's prior sworn statements that he is Sierra Leonese and the other evidence submitted by Respondents, including the expert report of Dr. Lobban, this argument has little evidentiary value.[2]

Here, the Government has come forward with sufficient evidence to establish that Petitioner has failed to cooperate to effectuate his timely removal from the country. If Petitioner were to cooperate with DHS and the Consulate of Sierra Leone to dispel the confusion regarding Petitioner's nationality, the government of Sierra Leone may issue travel documents in the reasonably foreseeable future.

In sum, the court grants Respondents' motion for summary judgment, denies Petitioner's motion for summary judgment, and denies the Petition. The Clerk of Court is instructed to close the file.

**IT IS SO ORDERED.**

DATED: October 30, 2008

_____
Hon. Jeffrey T. Miller
United States District Judge

cc:     All parties

---

[2] The court addresses Petitioner's evidentiary objections. First, Petitioner objects to a Report of Investigation ("ROI") dated July 11, 2009. Petitioner argues that the ROI is not authenticated and not relevant. The Government responds that the ROI is relevant because it demonstrates that the mother of Sesay's child is from Sierra Leone, and shows that his primary acquaintances during at least the first ten years in the United States were from Sierra Leone and not Sudan. The Government correctly represents that the ROI is admissible as a business record under FRE 803(6), 901(b)(1), and 902(11). As Petitioner does not separately challenge the authenticity or admissibility of statements contained in the ROI, the court does not reach those issues. Second, Petitioner objects to the submission of his UCLA college transcripts from the period of 1993 - 1996. Among other things, the custodian of records did not check the box on the form indicating that the attached records are true copies. The custodian's failure to indicate that the copies are accurate copies constitutes a failure to authenticate the documents. This document was not considered by the court.